# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

**UNITED STATES OF AMERICA**     *

**v.**                                    *        **Criminal No. RDB-10-0532**

**ULYSSES S. CURRIE, et al.**          *

*       *       *       *       *       *       *       *       *       *       *       *       *

## DEFENDANTS' PRETRIAL MOTIONS

## TABLE OF CONTENTS

Page

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.    Government's Allegations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.    The Government's Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  COUNTS NINE THROUGH SIXTEEN MUST BE DISMISSED BECAUSE
      THEY ARE UNCONSTITUTIONALLY VAGUE, INCLUDE CORE ALLEGATIONS
      THAT ARE NOT UNLAWFUL, AND ARE AN
      UNLAWFUL FEDERALIZATION OF STATE CONDUCT.. . . . . . . . . . . . . . . . . . . . . . . 7

      A.    Criminal Prosecutions Based on Undisclosed Conflicts of Interest Are
            Unconstitutional.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            1.    *Skilling v. United States.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

            2.    *Counts Nine Through Sixteen Include the Improper Skilling
                  Theory of Conflict of Interest as an Honest Services Fraud.* . . . . . . . . . . . 9

IV.   COUNTS ONE THROUGH SIXTEEN AND THE FORFEITURE
      ALLEGATION SHOULD BE DISMISSED BECAUSE "OFFICIAL
      DUTIES," AS APPLIED IN THIS CASE, IS UNCONSTITUTIONALLY
      VAGUE, UNDEFINED, AND FAILS TO PROVIDE THE DEFENDANTS
      WITH PROPER NOTICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      A.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      B.    Proof of a Violation of the Maryland Bribery Statute Is Required In Order
            to Prove the Federal Offenses at Issue in This Matter. . . . . . . . . . . . . . . . . . . . . 14

      C.    There Is No Established Definition of "Official Duties" As It Relates to
            Maryland's Part-Time Citizen Legislators. . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

            1.    *There Is No Express Definition of "Official Duties."* . . . . . . . . . . . . . . . . 17

            2.    *Because Maryland Legislators Are Expected And Permitted to Have
                  Other Employment That Involves Interaction With State and Local*

*Government, There Is No Well Delineated Common Understanding
Or Practice That Further Defines "Official Duties."* . . . . . . . . . . . . . . . 18

    D.    With One Exception, the Actions Alleged in the Indictment Are Not
Legislative And Could Have Been Undertaken By Any Consultant. . . . . . . . . . 20

    E.    The Legal Standard For Vagueness. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

    F.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IV.    MOTION FOR SEVERANCE OF DEFENDANTS AND/OR SEVERANCE OF
COUNTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    A.    Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    B.    The Statements. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    C.    Severance of Defendants. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    D.    Severance of Counts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    E.    Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

V.    COUNT EIGHT, ALLEGING A VIOLATION OF THE HOBBS ACT, AND
PARAGRAPH 7(b), ALLEGING THAT AN OBJECT OF THE CONSPIRACY
WAS TO VIOLATE THE HOBBS ACT, MUST BE DISMISSED BECAUSE THE
FUNDS ALLEGEDLY EXTORTED WERE ONLY PAID BY ONE CONSPIRATOR
TO ANOTHER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

VI.    THE ALLEGATION THAT SENATOR CURRIE VOTED ON A LEGISLATIVE
BILL SHOULD BE STRICKEN BASED ON MARYLAND'S CONSTITUTIONAL
LEGISLATIVE IMMUNITY PROVISIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA          *

v.                                *          Criminal No. RDB-10-0532

ULYSSES S. CURRIE, et al.          *

*     *     *     *     *     *     *     *     *     *     *     *     *

**<u>DEFENDANTS' PRETRIAL MOTIONS</u>**

The Defendants, Ulysses S. Currie, William J. White, and R. Kevin Small, by their undersigned counsel, hereby submit the following pretrial motions in this matter.  It is intended that each issue raised below is to be applicable to each defendant unless otherwise noted.  As explained herein, this motion requests: (1) dismissal of Counts Nine through Sixteen of the Indictment, or in the alternative, striking significant portions of those counts (*see* Section II); (2) dismissal of all the entire Indictment for failure to provide adequate notice of the official duties alleged to have been the subject of bribery (*see* Section III); (3) severance of the false statement counts of the Indictment (Counts Seventeen and Eighteen) (Section IV), and/or, severance of the defendants; dismissal of the extortion count and striking of the extortion allegation as an object of the conspiracy; (Section V); and, (4) dismissal of any and all portions of the Indictment that conflict with the legislative immunity provisions of Maryland law (Section VI).

**I.      INTRODUCTION**

This Motion and Memorandum seek a variety of types of relief.  It begins with the background of the investigation and Indictment and then moves into the substantive requests for relief.  A variety of different forms of relief are requested to address each concern.

II.    **FACTUAL BACKGROUND**

A.    <u>**Government's Allegations**</u>

This matter involves three defendants: State Senator Ulysses S. Currie, William J. White, former president of the Maryland division of Shoppers Food Warehouse and Pharmacy ("Shoppers"), a division of SuperValu, located in Eden Prairie, Minnesota, and R. Kevin Small, formerly a property manager for the Maryland Shoppers division. *See* Indictment (Dkt. No. 1) at ¶¶ 3 - 5. The allegations, reduced to their most basic, are that Mr. White, unbeknownst to any other Shoppers or SuperValu officials, even those who had direct involvement with the matter, brokered a secret deal to bribe Senator Currie to engage in corrupt activities in the course of his official senatorial duties for the benefit of Shoppers, Mr. White and Mr. Small. *Id.* at ¶¶ 60-61. It is alleged that the bribery relationship was concealed within a consulting arrangement between Senator Currie and Shoppers by which Senator Currie was to receive, initially, a $3,000 monthly payment to assist Shoppers with community relations activities. *Id.* At some point thereafter, Mr. Small became involved, and it is alleged that he became Shoppers' primary contact with Senator Currie for implementing the scheme.

It is alleged that the scheme extended for approximately five and one half years. *Id.* at ¶ 7. Senator Currie and Mr. White had allegedly began talking about a consulting arrangement in late 2002. *Id.* at ¶ 67(a). According to the discovery materials, Senator Currie submitted a letter proposal to Mr. White drafted by an attorney. Mr. White passed that letter up through the corporate and legal chain within Shoppers and SuperValu. A final letter agreement was reached

in January, 2003.[1]  Over the five and one half year relationship, it is alleged that Senator Currie, in the course of his official duties as a Senator, specifically and corruptly engaged in nine acts as a *quid pro quo* for his monthly consulting payments.  *Id.* at ¶¶ 13, 15-59.  It is not clear from the Indictment whether the government views those acts as the entire field of so-called corrupt acts, or whether those are simply the ones identified in the Indictment.

Mr. White retired from Shoppers in the spring of 2006, and was replaced by Richard Bergman.  The Indictment alleges that the bribery scheme continued for the next two years either with or without Mr. Bergman's knowledge.  *Id.* at 7.[2]  By June 2007,  Mr. Small had also left Shoppers, thereby ending his relationship with Senator Currie.  *Id.* at ¶ 4.   The logical conclusion, therefore, is that in the Government's mind, the bribery conspiracy as they have alleged it, continued for another 18 to 24 months without the participation of Mr. White or Mr. Small.[3]

---

[1]      A number of Shoppers/SuperValu employees had significant involvement in negotiating the agreement and in implementing it over the five and one half year relationship, including Mr. White's and Mr. Small's successors.  None of those individuals have been indicted.

[2]      As reflected in the discovery materials, after replacing Mr. White, Mr. Bergman was so pleased with Senator Currie's actions in resolving a Minority Business Enterprise controversy that threatened the opening of a new Shoppers facility at Mondawmin Mall in Baltimore City, that he caused Senator Currie's monthly fee to be raised to $7,800.  *See* Indictment, ¶¶ 64, 65.

[3]      The defendants have submitted a Request for a Bill of Particulars which the government has opposed.  That Request seeks the identities of those individuals whom the government and grand jury deemed to be known but unindicted co-conspirators.  Given that the conspiracy is alleged to have existed for two years after Mr. White and Mr. Small left Shoppers, and given that the so-called corrupt activities continued after their departure, and given that their successors were responsible for those activities on the Shoppers side, including increasing Senator Currie's compensation, and given that the Indictment expressly alleges, and the grand jury therefore found, that there are other "known" conspirators, it seems hardly controversial for

During the alleged five and one half year conspiracy, Shoppers paid slightly over $245,000 to Senator Currie. *Id.* at ¶ 9. The government alleges that entire sum was a bribe. Of central importance to the government is that Senator Currie, from 2004 through 2008, failed to disclose his employment with Shoppers on a required annual ethics disclosure form for state legislators. *Id.* at ¶ 66.

**B.     The Government's Investigation**

The history of the government's investigation is of direct relevance to these motions. It appears that the federal authorities began looking into the relationship between Senator Currie and Shoppers at some point in 2007. The reason for that interest has not been disclosed. In any case, the investigation remained secret until May, 2008 when law enforcement agents panned out over central Maryland and other areas with search warrants, grand jury subpoenas, and prepared interview outlines. On May 29, 2008, Senator Currie was interviewed in his home at 7:30 a.m. by FBI and IRS agents while additional agents searched his home and removed computers, bank records, and other personal papers. That same day, Mr. White was also confronted in a surprise visit by FBI agents at his home and was questioned about events dating back six years, with which he had had no involvement for well over two years. Mr. Small was confronted at his home the night before. All of these interviews occurred without counsel.[4]

these defendants to inquire into the identities of these other known conspirators.

[4]     The interviews of Senator Currie, Mr. White, and Mr. Small are known as "ambush" interviews: that is, law enforcement agents show up unannounced at each of their respective homes and attempt to interview the individuals for as long as possible. These interviews typically occur early in the morning or after business hours in the evening, making it more cumbersome for a person to contact an attorney. The agents arrived at Senator Currie's home at approximately 7:30 a.m. While he was being questioned, agents were also searching the entire house, seizing documents, financial records, and computers. While the interviews require

For the next two and one half years the matter was investigated in large part on the theory of prosecution that Senator Currie failed to disclose a conflict of interest and therefore defrauded the citizens of Maryland out of his honest and faithful services which, at the time, was perceived to be a violation under 18 U.S.C. § 1346.  The government employed this theory to obtain search warrants for Shoppers sites and Senator Currie's home, and for other pre-Indictment matters.  It is counsel's understanding that at some point in late 2009 or early 2010, the Department of Justice issued a directive indicating that no indictments based on so-called "honest services" fraud under Section 1346 could be brought until the question of the constitutionality of that provision  – then being litigated in the Supreme Court in the *United States v. Skilling* matter – was resolved.

In July 2010, the Supreme Court issued its opinion in *Skilling v. United States*, 130 S. Ct. 2896 (2010).  This landmark decision is discussed more fully below, but, fundamentally, *Skilling* explicitly prohibits federal "honest services" theft prosecutions grounded in allegations of undisclosed conflicts of interest, leaving only bribery or kickback schemes as the permissible basis of such prosecutions.

The *Skilling* holding struck at the very core of this investigation, compelling the

---

intense preparation on the part of the agents, often times in direct and lengthy preparation sessions with the overseeing federal prosecutors, the standard investigative purpose is to catch the interviewee with no time to reflect on the events at issue  – some as many as five years old – or review documents in advance.  The law enforcement justification for attempting to obtain information from a suspect in the "ambush" context is that the individual, theoretically, has no time to prepare a false story.  While this concept may have some validity in the investigation of a discrete event, say, a bank robbery, it is an exceedingly dangerous investigative technique, susceptible of generating significant misinformation, when trying to inquire into detailed financial transactions dating back over half a decade. The opportunity for mistake, confusion, and mis-recollection is obvious.

government to radically change its theory and investigative approach.  Upon the issuance of

*Skilling*, the prosecutors here had only two choices: (1) recognize that the Supreme Court had

eviscerated its investigation; or (2) attempt to recast its conflict-of-interest theory as a bribery

scheme, the only genre of honest services theft prosecution that survived *Skilling*.  To salvage

years of work, the prosecutors chose the latter option and presented the grand jury a theory of

prosecution laden with conflicts of interest allegations, but shoehorned into charges of "bribery"

and "extortion."[5]

The awkward fit between the charged offenses and the content of the allegations betray

the serious substantive defects inherent in this prosecution.  For example, in order to sustain a

conviction under any of the charged statutes – the Travel Act, Extortion Under Color of Official

Right, and Wire/Mail Fraud – the government must establish that Senator Currie accepted

payments to influence the performance of his "official duties" as a Maryland legislator.  But, in a

"citizen legislature" such as Maryland's, the position of a legislator is a part-time post.  Notably,

all of the government's allegations, save one, pertain to lawful ***non***-legislative activities

---

[5]     One of the more dismaying aspects of this last minute change is an unholy deferred prosecution agreement with Shoppers.  Shoppers is a multi-billion dollar publicly traded corporation which found itself quite unexpectedly threatened with a bribery indictment following *Skilling*.  In order to avoid having to make public disclosures in government filings regarding a pending indictment, the corporation agreed to pay $1,000,000 dollars as an administrative penalty and accept a deferred prosecution.  For Shoppers, the fine is paltry when compared to the overwhelming costs in money, time, stock value, and public image of defending against the allegations, even if the corporation were ultimately acquitted.  As to the deferred prosecution, Senator Currie's counsel was told over two years ago in no uncertain terms that it was the absolute policy of this United States Attorney's Office that no deferred prosecutions were to be approved for any reason no matter how compelling the circumstances, and it was fruitless, if not ridiculous, to even raise the possibility.  Apparently, that "absolute policy" only applies to the indigent, and not to a billion dollar corporation that needs to be neutralized so that it will not pay for counsel for its former employees or bring its own significant resources to bear to defend against this Indictment.

6

performed by Senator Currie for a non-constituent corporation relating to matters outside his senatorial district, and in the course of his non-legislative employment as a consultant.[6]  Without definition, the concept of "official duties" is simply too vague, uncertain, and amorphous to provide proper notice to these defendants as to the nature of the allegations against them so as to permit them to defend against the allegations.

III.  **COUNTS NINE THROUGH SIXTEEN MUST BE DISMISSED BECAUSE THEY ARE UNCONSTITUTIONALLY VAGUE, INCLUDE CORE ALLEGATIONS THAT ARE NOT UNLAWFUL, AND ARE AN UNLAWFUL FEDERALIZATION OF STATE CONDUCT.**

A.  **Criminal Prosecutions Based on Undisclosed Conflicts of Interest Are Unconstitutional.**

1.  ***Skilling v. United States***

In *Skilling v. United States*, 130 S. Ct. 2896 (2010), the Supreme Court clarified the reach of federal "honest and faithful services" prosecutions in the wake of the judicial uncertainty generated by and following *McNally v. United States*, 483 U.S. 350 (1987).  And in so doing, the Court caused a sea change in federal criminal jurisprudence on a par with *Booker*, *Gall*, and *Kimbrough*.  The core *Skilling* holding explicitly prohibits "honest services" theft prosecutions grounded in allegations of undisclosed conflicts of interest.  *Skilling*, 130 S. Ct. at 2931.  This holding marked a radical departure from the then-typical federal prosecutorial practices which enabled – though not without considerable controversy – federal authorities to impose their view of acceptable conduct on state officials through federal criminal prosecutions.

In *Skilling*,  Jeffrey Skilling, the notorious Enron executive, was charged with, among

---

[6]  Indeed, only one allegation—that Mr. Currie voted on legislation transferring a beer and wine license from one Shoppers store to another Shoppers store — can be said to pertain to his "official duties" as a state senator.  *See* Sections III & VI herein.

other offenses, conspiracy to commit honest-services wire fraud. *Id.* at 2925. "[I]n particular, [the indictment] alleged that Skilling had sought to 'depriv[e] Enron and its shareholders of the intangible right of [his] honest services.'" *Id.* at 2908 (internal citations omitted). Skilling argued that Section 1346 was either unconstitutionally vague or did not encompass his conduct. *Id.* at 2925-26. The essence of his position was that the phrase "honest and faithful services" did not provide adequate notice as to what conduct was criminal.

The government pursued a theory premised on Skilling's failure to disclose a conflict of interest that was created by his misrepresenting Enron's fiscal health to artificially inflate the company's stock price (which benefitted Skilling through bonuses and salary). *Id.* at 2932. In this regard, the government claimed that in addition to prosecutions based on bribery and kickback schemes, Section 1346 permitted honest services prosecutions premised on:

> undisclosed self-dealing by a public official or private employee -- i.e., the taking of official action by the employee that furthers his own undisclosed financial interests while purporting to act in the interests of those to whom he owes a fiduciary duty. *Id.* at 2932 (internal citations omitted).

Skilling's substantive position, accepted by the Court, was that Section 1346 was void-for-vagueness, violating his right to due process:

> "To satisfy due process, 'a penal statute [must] define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement.'" *Id.* at 2927-28

(quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). Skilling argued that Section 1346 satisfied neither of these due process requirements. *Id.* at 2928, because the phrase "the intangible right of honest services" did not "adequately define what behavior it bars." *Id.* As a result, the statute's "'standardless sweep allows policemen, prosecutors, and juries to pursue their

personal predilections,' thereby 'facilitat[ing] opportunistic and arbitrary prosecutions.'"  *Id.* (quoting *Kolender*, 461 U.S. at 358).  In other words, the concept of "honest services," as interpreted by the government, allowed the federal authorities to construct **criminal** prosecutions founded on what essentially offended their personal concepts of "good government" or "ethical business practices".

The Court agreed.  It differed only in determining the remedy for that constitutional vagueness defect.  Skilling sought to have Section 1346 simply declared unconstitutional.  The Court declined to invalidate the statute *in toto*, opting instead to follow the practice of salvaging the constitutionality of the provision by "consider[ing] whether the prescription is amenable to a limiting construction."  *See id.* at 2929.  In this regard, it re-construed Section 1346, holding that the provision was valid so long as it  **"criminalizes only the bribe-and-kickback" schemes.**  *Id.* at 2931 (emphasis added).  According to the Court, "**. . . no other misconduct falls within § 1346's province**."  *Id.* (emphasis added).  It completely rejected the government's position that Section 1346 could embrace undisclosed financial interests amounting to a conflict of interest, stating instead that  "a reasonable limiting construction of § 1346 must exclude this amorphous category of [conflict of interest] cases."  *Id.*  Thus, under *Skilling*, there can be no federal prosecution for the failure to disclose a conflict of interest.

> **2.**     ***Counts Nine Through Sixteen Include the Improper Skilling Theory of Conflict of Interest as an Honest Services Fraud.***

Counts Nine through Sixteen of the Indictment are based upon theories of prosecution rejected by the Supreme Court in *Skilling*.  The government's investigation was over three years old at the time of the *Skilling* decision, and the Indictment reflects the government's stubborn

refusal to accept the groundbreaking legal shift that *Skilling* represents.  Counts Nine through Sixteen,[7] which address the mail and wire fraud honest services theft allegations, claim that Senator Currie, along with his co-defendants:

> . . . devised and intended to devise a scheme and artifice to defraud and to deprive citizens of Maryland and the State of Maryland of the right to the honest and faithful services of Senator Currie through **bribery** and the **concealment of material information**, and **to obtain money and property by means of materially false and fraudulent pretenses, representations, promises and material omissions**.

Ind't pp. 37, 39 (emphasis supplied).

The language of these counts is ambiguous, but what it seems to embrace are three distinct bases upon which the defendants are alleged to have deprived the citizens of Maryland of Senator Currie's honest and faithful services.  First, it alleges bribery, a clearly permitted allegation under *Skilling*.  Secondly, it appears to allege that the fraud also occurred by the concealment of material information.  This allegation is aggravated by the incorporation of the innumerable references in Count One to Senator Currie's failure to disclose the relationship with Shoppers.  *See, e.g.,* Ind't ¶ 14(a)-(c).  The third allegation is that the defendants obtained money and property through the scheme to defraud.  This apparently refers to Senator Currie's state salary and benefits in that the "victim" of that conduct is alleged to be the citizens of Maryland.  Put simply, of the three theories of prosecution alleged, two are *Skilling*-barred.

The "concealment of material information" phrase is nothing more than the failure to

---

[7] Counts Nine and Ten allege mail fraud while Counts Eleven through Sixteen allege wire fraud.  All of those counts, however, are honest and faithful services allegations expressly incorporating 18 U.S.C. § 1346.  The only difference between these groups of counts is the tool of the alleged criminal acts: the use of the mails versus the use of interstate wire communications.

disclose a conflict of interest, and thus, on its face, runs afoul of *Skilling*.  Secondly, to allege that Senator Currie's receipt of his public salary was fraudulent is little more than a back door allegation that the citizens of Maryland were deprived of "good government" by Senator Currie's receipt of that salary.  Not only is this allegation an attempt to bypass *Skilling*, it is a theory that was rejected in pre-*Skilling* cases.  *See, e.g., United States v. Ratcliff*, 488 F.3d 639, 643-49 (5th Cir. 2007) (salary of elected official who obtained position through violation of state ethics and disclosure laws could not, as a matter of law, be prosecuted under a mail fraud theory/honest services theory as an unlawful receipt of a public salary); *United States v. Turner*, 465 F.3d 667, 666-83 (6th Cir. 2006) (same).  Those cases properly note that there has always been controversy over whether a public official can be guilty of "stealing" his salary by not honestly carrying out his duties, at least where it is not alleged that the elected official sought the position specifically to misappropriate the salary.  After *Skilling*, however, any such dispute is over: to suggest that a public official "stole" his salary by not carrying out his duties "honestly" is a concept that no longer has validity, because the Supreme Court stated that the **only** permissible theory under Section 1346 is bribery.

Counts Nine through Sixteen should be dismissed.  The language and substance of these counts is so muddled and ambiguous – combining one legally acceptable theory with two legally unacceptable theories – that they generate substantial confusion as to what is precisely being charged.  Such confusion violates the Defendants' Fifth Amendment right to face trial **only** for what the grand jury found, and violates the principles of due notice and vagueness discussed in

depth in *Skilling*.[8]  As such,  Counts Nine through Sixteen must be dismissed as violative of the

defendants' Fifth and Sixth Amendment rights.[9]

## IV.    COUNTS ONE THROUGH SIXTEEN AND THE FORFEITURE ALLEGATION SHOULD BE DISMISSED BECAUSE "OFFICIAL DUTIES," AS APPLIED IN THIS CASE, IS UNCONSTITUTIONALLY VAGUE, UNDEFINED, AND FAILS TO PROVIDE THE DEFENDANTS WITH PROPER NOTICE.

### A.    Introduction

The term "official duties" in Maryland's bribery statute is unconstitutionally vague as

applied to the defendants in this case.  This position is analogous to and reminiscent of the

Court's holding in *Skilling* regarding the fatal vagueness of Section 1346.  The central question

is: does the bribery statute's requirement of an attempt to influence a public employee in the

performance of his "official duties," as applied in this particular case, provide adequate notice of

what is unlawful?  The answer is "no", and for that reason Counts One through Sixteen should be

---

[8]         Of course, neither the Court nor defense counsel has access to the legal instructions given to the grand jury, so no one can tell at this stage what the grand jury was told it needed to find in order to return the Indictment. Further, it is impossible to tell whether the grand jury's vote represented a majority on the theory of bribery, a majority on the theory of material concealment, a majority on the receipt of salary, and/or a majority on some blended combination of all three.  As such, without examining the actual testimony, or even more, without examining the government's legal instructions to the indicting grand jury, it is impossible to know under what theory the grand jury approved these counts. It would provide great clarity and further the Court's and counsels' understanding of what is meant in the honest services counts for the Court to require the government to disclose, *in camera*, its legal instructions to the grand jury.

[9]         As an alternative to outright dismissal, the Court could order that all of the language offending *Skilling* be stricken from the counts. This would include all of the language following the word "bribery" in Counts Nine through Sixteen.  This remedy makes the charge more pristine, but unfortunately, it does not answer the question as to what exactly the grand jury meant when it issued this Indictment. The issue, however, reduces to the indisputable point that conflict of interest language and concepts so infuse those counts (and the entire Indictment) that any effort to surgically excise the infected portions is, at best, a daunting task.

dismissed.

In outline form, the argument is as follows:

1. In order for any of the defendants to be found guilty of any of the charges, it is necessary for the government to prove a violation of Maryland's bribery statute.

2. An element of Maryland bribery requires that the public employee be influenced in the performance of his official "duties".

3. The term "official duties" is not statutorily defined, nor is there any well delineated understanding of that term by practice or custom under Maryland law.

4. Maryland's legislators are part-time, and it is recognized and expected that they will have outside employment that interfaces with local and state government.

5. A Maryland legislator can lawfully undertake almost any activity that a private party could undertake, and the legislator's interaction with state and local government can be the same as that which any private party would undertake if employed for the same purpose.

6. Because a legislator is expected to have outside employment, because of the overlap of permitted activities between what a legislator can do as a legislator and as a private party, because there is no definition of the term "official duties" in the Maryland bribery statute, and because the *mens rea* requirement for Maryland bribery includes the knowledge on the part of the conspirators that the payments are to influence the public employee's "official duties," the term is unconstitutionally vague as applied in this case because it does not provide adequate notice to the defendants as to the very essence of the allegations against them.

In short, the tension between the existence of a part-time legislature and the absence of a well-delineated definition of "official duties," has resulted in a prosecution that rests on an unconstitutionally vague use of that phrase that provides no notice to the Defendants of the allegations against them.

13

**B.      Proof of a Violation of the Maryland Bribery Statute Is Required In Order to Prove the Federal Offenses at Issue in This Matter.**

The Ann. Code of Md., Cr. L. Art. § 9-201(c), states, in part, that "[a] public employee may not demand or receive a bribe, fee, reward, or testimonial to: (1) influence the performance of **official duties** of the public employee; or (2) neglect or fail to perform the **official duties** of the public employee." (emphasis supplied).[10]

Other than the false statement charges in Counts Seventeen and Eighteen, there are three federal offenses alleged: the Travel Act, Hobbs Act extortion, and honest services fraud.[11]  A close examination reveals that each of these offenses hinges on the government proving a violation of Maryland's bribery statute.

First, 18 U.S.C. § 1952, commonly known as "the Travel Act",  provides that

 "[w]hoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce, with intent to--(1) distribute the proceeds of any unlawful activity; or * * * (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity, and thereafter performs or attempts to perform" the unlawful activity, is guilty . . .

The term "unlawful activity" is then defined to include "extortion, bribery, or arson **in violation of the laws of the State in which committed** . . ."  18 U.S.C. § 1952(b) (emphasis supplied). According to the Indictment, the "unlawful activity" upon which the Travel Act allegations are based is a violation of Maryland's bribery statute.

_____

[10]       Section 9-201(b) utilizes the same language but makes unlawful the paying of a bribe, as opposed to the receipt of a bribe.

[11]       Technically, Count One charges a fourth offense – conspiracy in violation of 18 U.S.C. § 371. The alleged objectives of that conspiracy, however, are simply to violate §§ 1952 and 1951.  Ind. at ¶ 7.  Accordingly, the analysis for those provisions applies to conspiracy as well.

Secondly, 18 U.S.C. § 1951, the federal extortion statute charged in Count Eight, provides that:

> "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section" is guilty under the statute.

For the purposes of the statute, the term "extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right."  18 U.S.C. § 1951(b)(2).  "[E]xtortion under color of official right" tracks hand-in-hand with Maryland bribery statute as it occurs "only if 'the payments are made in return for an explicit promise or undertaking by the official to perform or not to perform an official act' where 'the official asserts that his official conduct will be controlled by the terms of the promise or undertaking.'"  *United States v. Hedgepeth*, 418 F.3d 411, 421 (4th Cir. 2005) (quoting *McCormick v. United States*, 500 U.S. 257, 272-73 (1991)). So, once again, the government's case is tethered to Maryland's bribery statute.

The mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343 respectively, prohibit the use of the mails or wires in furtherance of "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises."  18 U.S.C. § 1346, in turn, defines "the terms 'scheme or artifice to defraud'" to include "a scheme or artifice to deprive another of the intangible right of honest services."  As discussed above, as a result of *United States v. Skilling*, 130 S. Ct. 2896, 2932-35 (2010), these charges also require a finding of Maryland bribery.

Accordingly, to sufficiently allege or prove a violation of any of the above-cited statutes,

15

the government must demonstrate a violation of Maryland's bribery statute which, in turn, requires proof that Senator Currie corruptly accepted payments to influence the performance of his "official duties" as a *quid pro quo*.

### C.     There Is No Established Definition of "Official Duties" As It Relates to Maryland's Part-Time Citizen Legislators.

This prosecution is premised on conduct that is not explicitly legislative in nature, and thereby raises legitimate constitutional questions about whether these defendants had notice of the criminal implications of Senator Currie's extra-legislative conduct.[12]  For example:

- What exactly are the "official duties" of a part-time citizen legislator?

- Did Senator Currie actually know that he was engaging in "official duties"?

- Did the indicted Shoppers employees – Mr. White and Mr. Small – know that Senator Currie, **objectively**, was operating within the ambit of his "official duties"?

- Did the indicted Shoppers employees – Mr. White and Mr. Small – believe **subjectively** that Senator Currie was operating within the ambit of his "official duties"?

- What evidence was presented to the indicting grand jury as to the meaning of "official duties"?

- Does the indictment actually spell out activities which, objectively, are within Senator Currie's "official duties"?

- Given the absence of an operative definition of "official duties," what legal instructions did the government attorneys provide to the indicting grand jury on this issue?

---

[12]     Similarly, by relying on the broadest possibly construction of a part-time legislator's official duties, this prosecution also clearly runs afoul of the rule of lenity, which "instruct[s] that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor'" of the criminal defendant.  *United States v. Nelson*, 484 F.3d 257, 267 (4th Cir. 2007) (quoting *Cleveland v. United States*, 531 U.S. 12, 25 (2000)).

16

These are not idle musings of pedantic lawyers; rather, these are issues that lie at the very heart of this matter.  It is supremely unfair for these defendants, or any defendants anywhere, to be subjected to what some federal attorneys may "feel" is improper behavior.  The problem of the over-federalization of state authority and the imposition of what is commonly referred to as "federal morality" have been well-documented in so-called corruption cases across the country during the past several decades.  This issue is made far more acute because Maryland legislators not only are part-time, but their so-called "outside" employment is actually their primary employment and major source of income.  Indeed, the problem in this case is probably best demonstrated by trying to engage in the thought experiment of crafting an accurate jury instruction that distinguishes for a lay jury actions taken as a legislator and actions taken as a non-legislator.  It is a daunting task.

### 1.    There Is No Express Definition of "Official Duties."

There are **no** statutes which define or outline the official duties of members of the General Assembly.[13]  Indeed, the Indictment in this case itself highlights this very issue by failing to recite amongst all its various allegations what exactly Senator Currie's official duties entailed. The closest it comes is in Paragraph Six.  Paragraph 6(a) is nothing more than a recitation that Senator Currie owes a duty of hones and faithful services, which, under *Skilling*, means that he cannot accept a bribe.  Paragraph 6(b) also indicates that Senator Currie cannot accept a bribe under state law, making it nothing more than a tautologic restatement of ¶ 6(a).  Paragraph 6(c)

---

[13]    The absence of a statutory definition stands in stark contrast to the federal bribery statute which does contain such a definition.  *See* 18 U.S.C. § 201(a)(3) defining the analogous term, "official act."  As discussed below, even that expressly defined term is subject to debate about its meaning and reach.  *See infra* at pp. 25-26.

indicates that a legislator cannot use the prestige of his office in inappropriate ways, but it does not contribute any substantive meaning to the definition of "official duties." And Paragraphs 6(d) and (e) simply recite that a legislator is required to fill out conflict of interest disclosure statements. But nowhere does this lengthy speaking indictment even attempt to define "official duties." With all of the time and attention that the federal authorities have given to this matter over the past three years, that absence is telling.

> **2.      Because Maryland Legislators Are Expected And Permitted to Have Other Employment That Involves Interaction With State and Local Government, There Is No Well Delineated Common Understanding Or Practice That Further Defines "Official Duties."**

In the absence of an express definition of "official duties," it is permissible to define it by well understood practice and usage. *See United States v. Birdsall*, 233 U.S. 223, 231 (1914); *Thomas v. State*, 413 Md. 247, 259 (Md. 2010); *Richardson v. State*, 63 Md. App. 324, 330 (Md. Ct. Spec. App. 1985). Any implicit definition, however, would only satisfy due process if focused on actions that could **only** be performed by state legislators, and not, as discussed below, if grounded in actions permitted by both public and private actors. However, the Indictment does not allege any Maryland practice and usage to help define what an "official duty" means in the Indictment. Thus, the defendants are left to guess what "duties" are illegal and which are permitted. It is not for this Memorandum to establish what would be an accepted "official duty." That is for the Indictment to allege, or at the very least, for the government to clarify in their response to the Bill of Particulars. They have chosen to do neither, and thus the Indictment is unconstitutionally vague.

The vagueness is of particular concern where, as here in Maryland, members of the

General Assembly are part-time legislators who are expected to seek outside employment.  For

example, 79% of Maryland legislators earn outside income.  Report of the General Assembly

Compensation Committee (Exh. 4), published January 2010.[14]  And, while the majority describe

themselves as lawyers or businesspeople, at least six describe themselves as "consultants,"

including Senator Currie.  *Id.*  Working with government agencies is permitted by members of

the General Assembly.  The Ethics Guide states that in Maryland, legislators are given "rather

broad authority for legislators to interact with governmental entities in the normal course of their

employment."  Ethics Guide, Joint Committee on Legislative Ethics, Department of Legislative

Services (Annapolis, MD), published 2008, p. 48.[15]  Legislators are also expressly permitted to

assist or represent their private employers "in matters involving the legislator's regular business,

employment, or profession, in which contact with a governmental unit: (1) is an incidental part of

the business, employment, or profession; (2) is made in the manner that is customary for persons

in that business, employment, or profession; and (3) is not for contingent compensation."  Ann.

Code of Md., State Government Art. § 15-504(b)(2)(ii), *see e.g.*, Md Public Ethics Law S 15-

504(b).[16]

---

[14]     The Report is available online at
http://mlis.state.md.us/Other/GeneralAssemblyCompensationCommission/2010Report.pdf.

[15]     The Ethics Guide is available online at
http://mlis.state.md.us/2008rs/misc/Ethics_Guide_2008.pdf.

[16]     The Maryland ethics laws, regulations, and procedures clearly recognize and
address the friction between a legislator's legislative and extra-legislative employment may arise.
Indeed, the Ethics Guide issued by the Joint Committee on Legislative Ethics explicitly provides:

"As members of a citizen legislature, senators and delegates engage in a wide
variety of business and employment activities in their private lives. In view of the
significant role that governments play in the State's economy, **it is inevitable that**

19

Because the common practice for part-time Maryland legislators often involves interaction with other government entities and officials means that a prosecution based almost entirely on non-legislative acts fails to provide adequate notice to these defendants as to what the law forbids.

**D.     With One Exception, the Actions Alleged in the Indictment Are Not Legislative And Could Have Been Undertaken By Any Consultant.**

Paragraphs Sixteen through Fifty-Nine of the Indictment recite alleged "actions taken by Currie" that, if proven, could, in the government's view, support a conviction for the federal offenses charged.  To adequately assert a violation of the Maryland bribery statute, however the **actions** must have been taken within the ambit of his "**official duties**."[17]   However, the alleged "actions taken by Currie" are **non**-legislative activities performed by Senator Currie for a non-constituent corporation. All of them could have been done by any private consultant, with the exception of actually voting on a bill.[18]

the business activities of some legislators or their employers will involve transactions with governmental units at the State or local level." ETHICS GUIDE, p. 47, (emphasis supplied).

[17]     It cannot be emphasized enough that the standard is the nature of the "official duty" and not "official action".

[18]     Indeed, only one allegation—that Mr. Currie conspired to introduce legislation transferring a liquor license from one store to another—can be said to pertain to his "official duties" as a state senator. While such an activity, if true, is clearly within a senator's official duties, the defendants vehemently deny that the alleged activity was the result of a bribe.  It cannot go without mention that the vote in which Senator Currie participated was 47 to 0, and Senator Currie was not precluded from participating in that vote so long as he filed a one page form indicating that he could participate in that vote notwithstanding a relationship with Shoppers.

First, it is alleged that Senator Currie arranged several meetings with the Secretary of the Maryland Department of Transportation ("MDOT"), Mr. White and Mr. Small, and others to discuss the relocation of a Motor Vehicle Administration ("MVA") building on the property of Mondawmin Mall, an urban shopping mall located in **Baltimore City**.  Id. at ¶¶ 15-16, 20.  At that time, Shoppers was negotiating with the owner of the Mall to bring a supermarket to the newly-renovated site.  To accommodate the developer's plans, the MVA would have to move to a new and more modern facility on the property.  *Id.* at ¶ 16.  Senator Currie also met with the Secretary of the Department of Business and Economic Development to urge him to provide an additional $2 million in public funds for the project.  *Id.* at ¶ 20.  Of course, what is not included is that the Mall redevelopment was a major undertaking that was moving forward on a number of fronts far removed from the interests of Shoppers.  Indeed, the major new tenant was a Target Store which was adamantly in favor of a relocated MVA.  In all, the project was intended to re-vitalize the mall, and it served the interests of the city of Baltimore and most importantly, the residents in the Mondawmin area, who lived in what is commonly called a "food desert."[19] Senator Currie's communications with state employees were no different than if he had been a non-legislative consultant, and hence cannot by its very terms be an "official duty."

Second, it is alleged that at Mr. Small's behest, Senator Currie contacted the Maryland Energy Administration and requested that the agency delay the implementation of the Maryland Energy Efficiency Standards Act (hereinafter "EESA") which imposed new standards for

---

[19]     This term refers to an area, typically populated by minority and low income individuals, who have no local access to large scale grocery outlets.  Those individuals are forced to purchase higher cost but lower quality food items at corner stores, convenience stores, and high priced local markets.

commercial air conditioning and refrigeration units.  *Id.* at ¶¶ 36-37.  Again, this action involved little more than forwarding a packet of information to the Energy Department about the need for **all** grocery outlets in the state to retrofit their refrigerators and freezers to meet the requirements of the new energy legislation, which, incidentally, Senator Currie not only had voted for, but also had voted to override the gubernatorial veto.  Again, Senator Currie did nothing more than any other consultant could have done, and thus his actions cannot be an "official duty."

Third, it is alleged that Senator Currie contacted officials at the Maryland-National Capital Park and Planning Commission ("M-NCPPC") and other local government entities to assist in a transaction which would permit the landlord for Shoppers' Chillum supermarket to acquire an adjacent piece of property then-owned by the Washington Metropolitan Area Transit Authority ("WMATA") without entering into a competitive public bidding process.  *Id.* at ¶¶ 38-42.  Again, this was not in Senator Currie's legislative district.  Even more, the discovery materials clearly demonstrate that the impetus for the sale to the shopping center landlord was from M-NCPCC itself, and **not** from Senator Currie.  Further, it was a proposed transaction which would generate a price for the seller established by an appraisal procured by the **seller** itself.  It would have enabled Prince George's County to obtain athletic fields and trails paid for by Shoppers on a theretofore undeveloped parcel at a huge cost-savings to the taxpayers.  Again, there was nothing legislative about Senator Currie's actions.

Fourth, it is alleged that Senator Currie hosted in his Senate office in Annapolis in 2006 with the Deputy Chief of Staff for the Governor of Maryland, an official from the State Highway Authority ("SHA"), where the developers of a new, private commercial development, the Richie Station Marketplace, requested that the state budget include $3 million for certain road

22

improvements at the nearby Richie-Marlboro interchange.  *Id.* at ¶ 47.  At the time, Shoppers was considering placing one of its supermarkets in the development, but the SHA and MDOT wanted the developer to pay for necessary road improvements nearby, costs which would be passed on to tenants by way of higher rent payments.  *Id.*  The government further alleges that Senator Currie also met with several Secretaries of MDOT in his Senate office to request that he consider awarding certain grants to the developers of the Richie Station Marketplace to pay for the necessary road improvements.  *Id.* at ¶¶ 49-50.  Again, this development, which was not in Senator Currie's district, was **never** approved by the State of Maryland, and all that Senator Currie did, as with the other transactions, was to enable the Shoppers representatives to make their position known to the state agencies that were responsible for the possible development.  Such actions are not "official duties."

Fifth, the Indictment states that Senator Currie contacted the Administrator of the SHA regarding a request by Shoppers to install a traffic signal at the entrance to a shopping center on Route 140 in Baltimore County.  *Id.* at ¶¶ 52-53.  Again, this was an area outside of his legislative district, which had no conceivable legislative impact, and represents actions that were within those of any private consultant.

Sixth, it is alleged that Senator Currie, Mr. Small, an unidentified state senator, the Administrator of the SHA, and others met at the proposed site of the renovated Shoppers supermarket on Route 198 to discuss Shoppers's request to install a traffic signal there.  *Id.* at ¶¶ 56-57.  Senator Currie also contacted the SHA Administrator several times thereafter to inquire as to the status of Shoppers' request.  *Id.* at ¶ 58.  This transaction, again occurring outside of Senator Currie's district,  is no different in analysis than that regarding the Route 140 traffic

23

light.

The seventh and final alleged wrongdoing relates to the transfer of a liquor license for beer and wine from one Shoppers store in Takoma Park to another Shoppers store in College Park.  Senator Currie, along with Mr. Small and Shoppers' counsel, met with the Chairperson of the Liquor Board to discuss the means by which Shoppers could transfer the liquor license issued for its Tacoma Park store to its College Park store.  This, of course, is non-legislative.  It is alleged that Senator Currie prompted another state senator to introduce a floor amendment for necessary state legislation to permit that license transfer.  And, it is alleged that Senator Currie also ultimately voted in favor of the bill.  The defendants readily acknowledge that his vote on that bill (though not necessarily activity associated with the introduction of the bill) falls under the ambit of an official duty for Senator Currie because it is an action that can only be taken by a legislator (though whether his actions were the result of a bribe is quite another matter).  Of all the actions implicitly claimed to be part of his "official duties," only that single vote on one bill in 2005, two years after the conspiracy allegedly began, can qualify.  And simply because one action out of a buffet of allegations may be said to fit within the ambit of "official duties," does not save the Indictment from the vagueness challenge.

Put simply, except for actually casting his vote on the beer and wine license, these allegations do not describe the performance of Senator Currie's "official duties" as a part-time state senator, but instead are coexistent with that which a part-time legislator can perform for a private employer under Maryland law.  Even if one or more of these alleged instances violates Maryland's ethics law, they are not the basis for a federal prosecution for bribery, which is what the Indictment alleges.

### E.        The Legal Standard For Vagueness

Due process requires that "a penal statute define [a] criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and (2) in a manner that does not encourage arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  To be valid, "an indictment must contain the elements of the offense charged" and "fairly  inform a defendant of the charge."  *United States v. Kingrea*, 573 F.3d 186, 191 (4th Cir. 2009).  The requirement that all elements of the offense be present in the indictment is rooted in the Fifth Amendment, *United States v. Hooker*, 841 F.2d 1225, 1230 (4th Cir. 1988), which provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury. . . ." U.S. CONST. AMEND. V.  The notice requirement is derived from the Sixth Amendment's requirement that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation."  U.S. CONST. AMEND. VI, *Hooker*, 841 F.2d at 1230.

Under Maryland law, "it is essential for a conviction of bribery that the briber must make an attempt to influence the bribee in the performance of his 'official,' 'public' or 'legal' duty." *Richardson*, 63 Md. App. at 328.  Indeed, to be convicted for bribery under Section 9-201, the government has the heavy burden of establishing that his alleged conduct fell within his duties as a "public" employee, *i.e.* a legislator, rather than as "private" consultant.

Even though this case hinges on a state law interpretation of the phrase "official duties," certain federal cases discussing 18 U.S.C. §§ 20(b) and 21(c), the federal bribery and gratuity statutes, which criminalize the unlawful receipt of compensation by a federal official for an "official act," are informative.  In that context, the term "official act" is specifically defined in

25

Section 201(a)(3).  The teaching of *Birdsall* and *United States v. Sun-Diamond Growers*, 526

U.S. 398 (1999)*,* however, can usefully be reduced to the following principle: not every act an

individual takes when wearing his "official" hat is, in fact, an official act within the ambit of

Section 201, and where there is no clearly defined or understood definition of what constitutes an

official act, there can be no criminal prosecution.  As the *Sun-Diamond* Court stated:

> [T]he numerous . . .regulations and statutes littering this field[]
> demonstrate that this is an area where precisely targeted prohibitions are
> commonplace, and where more general prohibitions have been qualified
> by numerous exceptions. Given that reality, a statute in this field that can
> linguistically be interpreted to be either a meat axe or a scalpel should
> reasonably be taken to be the latter.

*Id.* at 412.

The problem of what constitutes an "official act" under Section 201 was also specifically

addressed by the D.C. Circuit in *Valdes v. United States*, 475 F.3d 1319 (D.C. Cir. 2007).  Valdes

was a District of Columbia police detective accused of receiving payments in exchange for using

official police databases to run vehicle information, license plate numbers, and warrant status

reports for private parties.  Upon his conviction for accepting illegal gratuities, the Court was

required to determine whether that conduct was covered by Section 201(a)(3)'s expansive

definition of "official act".[20]  In brief, the Court held that Valdes' actions in utilizing the police

databases for private gain did not constitute an official act, even under the very liberal federal

statutory definition.  In so holding, the Court clearly and explicitly outlined the problems linked

---

[20]     Section 201(a)(3) defines "official act" as ". . .any decision, or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."  As indicated above, Maryland has no statutory definition of the term "official duty" in Section 902(a).

to an over broad interpretation, offering the highly trenchant comment directly applicable to this very case: "More importantly, our [the Court's] job is not to provide juries with a broad menu of opportunities to punish an '*evil act.*'" *Id.* at 1328 (emphasis supplied).  What is required instead is a rigorous and highly disciplined application of important legal principles.

### F.   Conclusion

Here, the Indictment does not define "official duties."  The requirement of proving that Senator Currie and the others compromised his "official duties" is an essential element in Counts One through Sixteen.  As applied to this prosecution, the phrase "official duties" is unconstitutionally vague because (1) the bounds of a state legislator's "official duties" are not clearly delineated by statute or otherwise; (2) the defendants did not have notice that his extra-legislative actions were illegal; (3) Maryland ethics laws make clear that a legislator's conduct, like that of Senator Currie's in this case, is legal when a legislator takes the administrative step of filing certain paperwork; and (4) the vast majority of his alleged criminal conduct could have been performed by any private consultant.

The government's theory of prosecution for bribery is grounded in an unconstitutionally vague interpretation of the phrase "official duties."  Though the term itself, as applied to a broad swath of public employees, seems to defy precise definition, it can be far better understood with a typical full-time state employee or official.  In such a situation, there are job descriptions and well-settled guidelines.  And, in those situations, an additional employment relationship is typically some type of "moonlighting" position that is clearly secondary to the primary employment.  The situation with Maryland legislators, however, is just the opposite: there is no codified list of duties, the position is part-time, the expectation and understanding is that the

27

legislator's other employment is primary, there is frank official recognition that the other employment may well result in interaction between the legislator and state and local government agencies, and that contact is permitted and lawful so long as what the legislator is doing could have been done by someone in the private sector retained to engage in the same acts.  What constitutes Senator Currie's official duties in this matter – where he is involved in a wide-range of non-legislative activities – simply cannot be defined with a shoulder shrug reminiscent of Justice Potter Stewart's famous "I know it when I see it" definition of pornography.  *See Jacobellis v. Ohio*, 378 U.S. 184 (1964) (Stewart, J. Concurring).

For these reasons Counts One through Sixteen should be dismissed.

## IV.    MOTION FOR SEVERANCE OF DEFENDANTS AND/OR SEVERANCE OF COUNTS.

### A.    Introduction

This request for a severance is submitted pursuant to Rules 8 and 14 of the Federal Rules of Criminal Procedure, as well as the Fifth and Sixth Amendments to the United States Constitution. The severance request is based on the fact of post-conspiracy statements to law enforcement from all three defendants.  If the government intends to use any of the statements of any given defendant in its case-in-chief, the other defendants are entitled to a severance under *Bruton v. United States*, 391 U.S. 123 (1968).

In addition,  it is requested that the Court order a severance of Counts Seventeen and Eighteen of the Indictment in which Mr. White and Senator Currie are each charged, respectively, with making false statements to law enforcement in violation of 18 U.S.C. § 1001. The bases for these two counts are the allegedly false post-conspiracy interviews of Mr White

(White statement) and Senator Currie (Currie statement).  In order to prove the alleged falsities, it will be necessary for the government to introduce the substance of those interviews, which, again, violates *Bruton.*

### B.    The Statements

As indicated above, all three defendants were initially interviewed by law enforcement agents in early May, 2008.  Each of the statements involve, implicate, and are irretrievably intertwined with the substantive allegations against all three defendants in the substantive counts. In addition, Mr. Small and his counsel met with the prosecutors and agents on six other occasions (collectively, "the Small statements").[21]  Those serial statements from Mr. Small also are irretrievably intertwined with the substantive counts against Mr. White and Senator Currie.[22]

### C.    Severance of Defendants

The government has not indicated to defense counsel what its intentions are regarding the introduction of the various statements, but the introduction of any of the White, Currie, or Small statements in a joint trial violates *Bruton*.

It is a fundamental proposition that where a defendant provides a post-offense statement that implicates a second defendant, a severance is required if the government intends to introduce

---

[21]     Correctly or not, Mr. Small and his counsel were under the impression that Mr. Small was not a target of the investigation.  As a result, Mr. Small's counsel did not solicit or receive the limited immunity that typically controls such interviews.

[22]     The FBI memoranda of the three initial interviews are being supplied to the Court separately along with a motion to seal those documents, thus permitting the Court to see for itself how enmeshed these statements are with the substantive offenses and how each defendant is intertwined with the others in those statements.  Such an *in camera* review is expressly contemplated by Rule 14(b) of the Federal Rules of Criminal Procedure.  Unless the Court or government counsel believe it to be necessary, there is no need to burden the Court with sealed copies of all of the successive Small interview memoranda.

that statement in its case-in-chief.  *Id*.  The fundamental vice arises from the fact that the

defendant cannot cross-examine the codefendant who is also the declarant in the context of the

out-of-court statement. The inability to cross-examine the declarant/codefendant violates the

confrontation clause of the Sixth Amendment.  Moreover, the problem is not cured by a limiting

instruction. *Bruton* at 137.  While certain limited redaction can, at times, save the admissibility of

the out-of-court statement, *see Richardson v. Marsh*, 481 U.S. 200 (1987),  even redaction is not

proper so long as it is apparent **from the statement itself** that it refers to the other defendant.

*Gray v. Maryland*, 523 U.S. 185 (1998).  There is no conceivable way that the Currie statement

could be redacted so as to fairly avoid substantive reference to Mr. White and Mr. Small; the

same is true of the White statement's inherent references to Senator Currie and Mr. Small's

statements as to Mr. White and Senator Currie.  The statements themselves entangle the other

defendants, and there is no redaction that could ever alleviate the problem.   Accordingly, if the

government intends to offer any of them at trial, then the other defendants are each entitled to a

severance.

###### D.        Severance of Counts

As indicated above, Mr. White and Senator Currie are each charged with having given

false information to law enforcement in their respective interviews.  In order to attempt to prove

that Mr. White is guilty of that count, the government must, of necessity, introduce the substance

of the White statement as a first step.  The same is true with regard to the false statement count

against Senator Currie and the Currie statement.   The statement has to be introduced before a

trier of fact can assess whether it is false. Yet, as to the White statement, it is equally obvious that

Senator Currie and Mr. Small are prejudiced by the inability to cross-examine Mr. White if the

30

White statement is introduced.  And Mr. Small and Mr. White are similarly prejudiced if the Currie statement is introduced. In other words, the government cannot prove the false statement count against Mr. White without his statement, yet the introduction of that statement violates the *Bruton* rights of Senator Currie and Mr. Small.  And similarly, the government cannot prove the false statement allegation against Senator Currie without the Currie statement, yet the introduction of that statement violates the *Bruton* rights of Mr. White and Mr. Small.

In a joint trial, the introduction of the White statement and/or the Currie statement – necessary in any effort to prove the false statement counts – violates *Bruton.*  The issue evaporates if the false statement counts are severed. On the other hand, if each defendant were severed from the others – leading to three separate trials – the problem would also be resolved and the false statement counts would then be triable.   In any event, the confrontation clause problem in this instance is obvious and acute, and if the government indicates that it will **not** use the White or Currie statements in its case-in-chief, there is no alternative but to sever Counts Seventeen and Eighteen.

### E.    Conclusion

If the government intends to use the statements, severance of the defendants is required. If the government does not intend to use the statements, severance of the false statement counts is still required.  In either scenario, the government must make an election and there must be a severance.

31

**V.     COUNT EIGHT, ALLEGING A VIOLATION OF THE HOBBS ACT, AND
PARAGRAPH 7(b), ALLEGING THAT AN OBJECT OF THE CONSPIRACY
WAS TO VIOLATE THE HOBBS ACT, MUST BE DISMISSED BECAUSE THE
FUNDS ALLEGEDLY EXTORTED WERE ONLY PAID BY ONE
CONSPIRATOR TO ANOTHER.**

The Hobbs Act criminalizes interference with interstate commerce by extortion (along

with conspiracies to do so), 18 U.S.C. § 1951(a).  It defines extortion as "the obtaining of

property from another, **with his consent**...under color of official right."  *Id.* at §1951(b)(2).

(emphasis supplied).   The plain meaning of the statute, therefore, requires that to conspire to

extort funds under color of official right, the conspirators must agree to obtain money from at

least one other individual or entity that is **not** a co-conspirator.  *United States v. Brock*, 501 F.3d

762 (6th Cir 2007).[23]

In *Brock*, the two defendants were owners of a bail bond company who bribed a court

clerk to prevent the collection of bonds when their criminal-defendant clients absconded.   This

conduct was characterized as a conspiracy between the defendants and the clerk to "extort money

in violation of the Hobbs Act." *Id*. at 766.  In vacating their convictions, the Court ruled:

> [t]o be covered by the statute, the alleged conspirators ... must have formed an
> agreement to obtain "property from another," which is to say, formed an
> agreement to obtain property from someone outside the conspiracy. Yet that did
> not happen. These three people did not agree, and could not have agreed, to obtain
> property from "another" when no other person was involved-when the property,
> so far as the record shows, went from one coconspirator (one of the Brocks) to
> another [the court clerk]. We see no reason to ignore the "property from another"
> requirement and ample reason to give it content....
>
> In addition to requiring the conspirators to agree to obtain property from another,

---

[23]     The Fourth Circuit has not squarely considered this issue, and there is no
controlling Fourth Circuit opinion addressing *Brock*.  However, this precise issue is currently
pending in the Fourth Circuit in a case from the Western District of North Carolina, *United
States v. Medford*, No. 08-5030.  Medford's brief has been filed. *See* 2010 WL 4738730.  The
government's brief is pending.

the statute requires the conspirators to obtain that property with the other's consent. How do (or why would) people conspire to obtain their own consent?

*Id.* at 767.

Here, the Indictment alleges that the three named defendants together with Shoppers conspired to extort "money and other property from SFW with its consent." Ind. at ¶ 7. As in *Brock*, the property that was allegedly extorted came from one alleged conspirator (Shoppers) to another alleged conspirator, Senator Currie. As a result, there simply is no allegation that the alleged conspiracy obtained "property from another." Accordingly, the portion of the Indictment alleging a conspiracy to violate the Hobbs Act in ¶ 7(b) should be dismissed. For the same reasons, Count Eight of the Indictment, which charges only Senator Currie with the substantive Hobbs Act violation, should also be dismissed.[24]

## VI.   THE ALLEGATION THAT SENATOR CURRIE VOTED ON A LEGISLATIVE BILL SHOULD BE STRICKEN BASED ON MARYLAND'S CONSTITUTIONAL LEGISLATIVE IMMUNITY PROVISIONS.

As discussed above, all of the federal charges asserted against Senator Currie rely on proof that Senator Currie violated state law, in particular the state prohibition against the bribery of public officials. Under state law, however, it is clear that members of the General Assembly

---

[24]   Though not actually charged in Count Eight, Mr. White and Mr. Small are alleged to have aided and abetted Senator Currie in the extortion of funds from Shoppers. This is exceedingly confusing and misleading language, and even if Count Eight is not dismissed, this language should be stricken. In *United States v. Spitler*, 800 F.2d 1267 (4th Cir. 1986), the Fourth Circuit, concluded that a "victim" of extortion could not be prosecuted as an aider and abettor under the statute. In so doing, the Court rejected the notion that a corporate officer of the company that made the payments to the public official could not be considered a "victim" simply because the funds came from the company and not himself. While acknowledging that there were instances where the corporate officer could possibly be an aider and abettor, those circumstances do not apply here, particularly where Mr. White and Mr. Small left Shoppers well before the alleged extortion ended. Even more significantly, the victim corporation in *Spitler* was **not** a co-conspirator. *See United States v. Brock*, *supra*., 501 F.3d at 769.

may only be **prosecuted** for bribery so long as prosecutors do not "imping[e] on the legislative privilege by introducing evidence of legislative acts." *State v. Holton*, 193 Md. App. 322, 337 (Md. Ct. Spec. App. 2010) (quoting *Blondes v. State*, 16 Md. App. 165, 183 (Md. 1972)).

The Maryland Constitution and the Maryland Declaration of Rights afford state senators and delegates broad legislative immunity.  Specifically, Section 18 of Article 3 of the Maryland Constitution provides that "[n]o Senator or Delegate shall be liable in any civil action, **or criminal prosecution**, whatever, for words spoken in debate."  Equally, Article 10 of the Maryland Declaration of Rights provides"[t]hat freedom of speech and debate, or proceedings in the Legislature, ought not to be impeached in **any** Court of Judicature."

Counsel recognizes that in *United States v. Gillock*, 445 U.S. 360 (1980), the Court held as a matter of **evidence**, a state legislative immunity privilege did not translate into an evidentiary privilege in a federal prosecution.  The important distinction here, however, is that proof of the federal charges in this matter requires proof of the substantive offense of Maryland bribery, and that offense, *i.e.*, Maryland bribery, cannot be **prosecuted** in state court.  Because it cannot be prosecuted in state court, the government, in this case, cannot prove a violation of state law, the necessary predicate for all of the federal charges.  In short, legislative immunity is a substantive defense to state law bribery, not a mere evidentiary privilege.

Since a state prosecution predicated on legislative activities would be barred by the Maryland speech and debate clauses, and all of the federal charges asserted are predicated on an underlying violation of state law, the Court should strike all allegations in the Indictment pertaining to Senator Currie's legislative activities, *i.e.* conduct relating to the transfer of a liquor license for beer and wine from one Shoppers store in Takoma Park to another Shoppers store in

34

College Park.

## CONCLUSION

The Indictment reflects a pre-*Skilling* mindset.  It is clear that, by this prosecution, the government has attempted to retrofit what is, in essence, a conflict-of-interest honest services theft prosecution—the type of prosecution explicitly barred by *Skilling*—with crude allegations of bribery. The result is an indictment that is thoroughly infused with allegations that betray a pre-*Skilling* analysis.  It is also constitutionally infirm.  For that reason, and for all of the other reasons discussed above, the Court should grant the relief requested.

Respectfully submitted,

JAMES WYDA
Federal Public Defender for the District
of Maryland

_____/s/_____
JOSEPH L. EVANS (Bar No. 02055)

_____/s/_____
LUCIUS T. OUTLAW III (Bar No. 94226)
Assistant Federal Public Defenders

_____/s/_____
SUSIE HENSLER (Bar No. 95180)
Staff Attorney
Office of the Federal Public Defender
100 South Charles Street
Tower II, Ninth Floor
Baltimore, Maryland  21201
(410)  962-3962 (p)
(410) 962-0872 (f)
Joseph_Evans@fd.org
Lucius_Outlaw@fd.org
Susie_hensler@fd.org

Counsel for Ulysses S. Currie

_____/s/_____
Joshua R. Treem (Bar No. 00037)
Schulman, Treem & Gilden, P.A.
401 E. Pratt Street, Suite 1800
Baltimore, Maryland 21202
(410) 332-0850
Jtreem@schulmantreem.com


_____/s/_____
Nicholas Vitek (Bar No. 29062)
Vitek Law LLC
The American Building
231 E. Baltimore St, Suite 1102
Baltimore, MD 21202
(410) 317-8500
vitek@viteklaw.com


Counsel for William J. White

_____/s/_____
Jonathan Zucker (Bar No. 14213)
Patricia Daus
1350 Connecticut Avenue, NW
Suite 202
Washington, DC 20036
(202) 624-0784
jonathanzucker@aol.com
pdaus2@gmail.com


Counsel for R. Kevin Small

36