UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                    Case No. 1:10-CR-532-RDB

ULYSSES S. CURRIE,
WILLIAM J. WHITE,
R. KEVIN SMALL,

        Defendants.

---------------------------------------------------------

**July 25, 2011**

**Transcript of Proceedings**
**HEARING ON MOTIONS**

**Before The Honorable RICHARD D. BENNETT**
**United States District Judge**

APPEARANCES:

For the Plaintiff:    Kathleen O. Gavin
                       Leo J. Wise
                       Assistant U.S. Attorneys

For the Defendants:    Joseph L. Evans
                       Lucius T. Outlaw III
                       Susan Hensler
                       Joshua R. Treem
                       Nicholas J. Vitek
                       Kelly L. Swanston
                       Jonathan S. Zucker

For the Movant:      William C. Brennan

Proceedings recorded by mechanical stenography, transcript
produced with computer-aided transcription.

2

```
1                      P R O C E E D I N G S
2                 THE COURT:  Ms. Gavin, if you'll call the case,
3      please.
4                 MS. GAVIN:  Yes, Your Honor.  The government
5      calls the case of United States versus Ulysses Currie,
6      William White and Kevin Small, case number RDB-10-0532.
7      We're here on various pending motions.
8                 THE COURT:  Yes.  Good morning, Miss Gavin, nice
9      to see you.  And Mr. White is with you.  Nice to see you, Mr.
10     White.
11                And we have Lynn Higgins from the FBI, is that
12     correct?
13                MS. GAVIN:  Yes, Your Honor.
14                THE COURT:  Agent Higgins, I'm not sure if you've
15     been in my courtroom before.  It's nice to see you.  Nice to
16     have you here.
17                On behalf of the defendants.
18                MR. EVANS:  Yes, Your Honor.  Joseph L. Evans,
19     Lucious Outlaw and Susie Hensler seated behind me on behalf
20     of Ulysses Currie, and Mr. Currie is --
21                THE COURT:  Senator, sir, nice to see you, sir.
22     And Mr. Evans, nice to see you.  And Mr. Outlaw and Miss
23     Hensler, all of you, nice to see you.
24                And on behalf of the defendant, Mr. White.
25                MR. TREEM:  Yes, Your Honor.  Joshua Treem and
```

3

1   Nicholas Vitek and Kelley Swanston on behalf of William White

2   who is seated behind us on that chair.

3                    THE COURT:  Yes.  Good morning.  Mr. Treem, nice

4   to see you.  All right.  We have Mr. Vitek and Mr. Treem.  We

5   don't have you, Mr. Outlaw, on the sheet, somehow you got

6   overlooked, but I apologize to you for it.

7                    On behalf of Mr. Small.

8                    MR. ZUCKER:  Jonathan Zucker on behalf of Mr.

9   Small, all by my lonesome, Your Honor.

10                   THE COURT:  Nice to see you.

11                   All right.  So we're ready to proceed.  We have a

12  shopping list of things to attend to today and thank you all

13  for starting a little bit later than we planned this morning.

14                   I would prefer to go through a series of the

15  motions that are now pending before we deal with legal

16  argument on the motions to dismiss that are pending on some

17  of the constitutional issues.  Is that agreeable to you, Miss

18  Gavin?

19                   MS. GAVIN:  That's fine, Your Honor.

20                   THE COURT:  Mr. Evans and Mr. Treem, is that

21  agreeable to you?

22                   MR. EVANS:  Yes.

23                   MR. TREEM:  Yes.

24                   MR. EVANS:  Your Honor, I think I should point

25  out that William Brennan is in the courtroom.

1             THE COURT:  Yes.  With respect to the motion to

2      quash of Shoppers.

3             MR. EVANS:  The subpoena, right.

4             THE COURT:  That's correct.

5             MR. EVANS:  So probably in deference to his time,

6      that should be perhaps one of the earlier matters.  But

7      beyond that I agree with the court that that's an appropriate

8      way to begin.

9             THE COURT:  Yes.  That's fine.

10            Good morning, Mr. Brennan.  Nice to see you.  How

11     are you?

12            MR. BRENNAN:  Good morning.

13            THE COURT:  We have a series of motions, let me

14     summarize the motions that I know are pending, and then we

15     have letters that were submitted last week that summarize

16     additional motions.

17            We have the motion for establishment of a

18     government taint team that we'll address in connection with

19     the overall issue of the subpoena issued by the defendant to

20     Shoppers Warehouse, that was paper number 39.

21            We have paper number 45, the motion to dismiss

22     filed by the defendants.

23            And then we have paper number 59, the motion to

24     compel production of wiretap discovery.

25            We have motion to unseal document for limited

1      purpose, paper number 79.

2                  We have the motion to quash the subpoena by

3      Shoppers Food Warehouse Corporation, paper number 83.

4                  And then we have the motion to seal by Shoppers

5      Food Warehouse, paper number 95.

6                  And then we also have some tangential issues with

7      respect to, it's not actually been listed as a formal motion

8      yet, but it's woven in the responses of the defendants, the

9      response for request for legal instructions to the grand

10     jury.  And then there's the issue of a jury questionnaire.

11                 I think that's a general list of what we have

12     before us.  Does that sound accurate to you, Miss Gavin?

13                 MS. GAVIN:  It does, Your Honor.  There's some, I

14     guess, I think of them as submotions within the motion to

15     dismiss or really that's pretrial motions.  There's a motion

16     to sever, a motion to strike certain portions of the

17     indictment.  So I've sort of been thinking of those as

18     separate motions.

19                 THE COURT:  Yes.  We'll deal with those I think

20     later.

21                 Let me just bring up, first of all, we're going

22     to get to you, Mr. Brennan, in a moment, with respect to your

23     motion to quash the subpoena.

24                 MR. BRENNAN:  No rush, Your Honor.  I'm probably

25     going to watch the whole thing anyway, Your Honor.

1          THE COURT:  That's great to have you here.  I'm

2    sure you're glad behind the railing there as opposed to over

3    it.

4          MR. BRENNAN:  I am.

5          THE COURT:  That's fine, Mr. Brennan.  That's

6    fine.

7          The motion, paper number 59, the motion of

8    defendant Currie to compel production of wiretap discovery,

9    as I understand it, correct me if I'm wrong, the government

10   has given to Senator Currie's counsel information with

11   respect to any recordings of calls intercepted between

12   Senator Currie and Mr. Johnson, the former Prince George's

13   County executive who recently pled guilty before Judge

14   Messitte in the Southern Division.  Basically there were 34

15   recordings and the defendant has the recordings, the

16   transcripts, whatever was in that case as to which Senator

17   Currie was recorded has been given to the defendant.

18         MS. GAVIN:  The recordings have been given, Your

19   Honor.  I don't even know if there are transcripts, but we

20   gave them recordings.

21         THE COURT:  Recordings have been given.

22         MS. GAVIN:  Yes.

23         THE COURT:  Mr. Evans, as I understand it, you

24   seek further information as to wiretap discovery pursuant to

25   18 United States Code Section 2518(9) with respect to a copy

7

```
 1        of the wiretap application and the authorizing court order,

 2        is that essentially what's still at issue?

 3                    MR. EVANS:  Well, Your Honor, on this issue I'm

 4        deferring to my senior partner, Mr. Outlaw.

 5                    THE COURT:  It's just to show how much you've

 6        grayed, Mr. Evans.

 7                    Mr. Outlaw.

 8                    MR. OUTLAW:  Your Honor, that's correct.  We are

 9        seeking the underlying applications, the court order issuing

10        the wiretap, and any reports that were issued to the court.

11                    THE COURT:  So the issue is not that you don't

12        have all of the recordings, the issue is specifically the

13        wiretap application, the authorizing court order and any

14        extensions.  That's what you're seeking.

15                    MR. OUTLAW:  Correct, Your Honor.

16                    THE COURT:  I'll be glad to hear from you.  I

17        understand that essentially your contention is that under

18        2518(9) that your client is a party to the recording or to

19        the wiretap, therefore you believe you're entitled to it and

20        you're seeking essentially the application of the ten-day

21        rule as to that material, is that right?

22                    MR. OUTLAW:  Correct, Your Honor.

23                    And just to back up, give it a little more

24        context, the government has indicated that it doesn't intend

25        to use the recordings in its case in chief, but may use the
```

8

1     recordings or at least reserve their right to use the

2     recordings in any rebuttal case based on the defense's case.

3     And, Your Honor, basically we're trying to, as the government

4     claims in their filings, to streamline the case, and this is

5     really about judicial efficiency and resources and keeping

6     the trial on track, Your Honor.  All we're asking for is for

7     the materials that we would use to challenge the wiretap, if

8     it could be challenged, that's it.  We're not trying to go on

9     a fishing expedition, we just want those materials to take

10    care of that issue now while we have time.

11                THE COURT:  What would be your basis for

12    challenging the wiretap of Mr. Johnson's telephone?

13                MR. OUTLAW:  I don't know, Your Honor.  I don't

14    have the materials --

15                THE COURT:  I can't imagine what it would be.

16                MR. OUTLAW:  I can't say because we don't know

17    what was said.

18                THE COURT:  I'm trying to get to the core of it.

19    What would your basis be to challenge the wiretap of Mr.

20    Johnson's telephone in a case in which he pled guilty

21    recently and in which whatever challenges were to be raised

22    would have been raised by Mr. Johnson in his case?  Where

23    would the standing come with respect to you or anyone who's

24    recorded in those conversations in the context of 18 United

25    States Code Section 2518 in subpart nine?  I don't understand

1     where you would have a basis for it.

2              I had some sympathy for your motion initially

3     when I thought it meant you were just trying to find out

4     where the recordings were, where your client's voice was, but

5     that's been given to you.  What would be your basis for it?

6              MR. OUTLAW:  Your Honor, our basis is they intend

7     to use it and those are recordings with our client in a

8     criminal prosecution of him.  And just because Mr. Johnson's

9     attorney didn't raise any objections doesn't mean that we

10    could not raise any objections.

11             THE COURT:  The wiretaps are on Mr. Johnson's

12    telephone, isn't that correct, Miss Gavin?

13             MS. GAVIN:  Yes, Your Honor.

14             THE COURT:  They weren't on your client's

15    telephone.  And as to whomever Mr. Johnson, whoever he spoke,

16    whoever is recorded there, there are minimization issues that

17    come up obviously and there are extensions that are

18    requested, but I don't really know where you have any basis

19    to --

20             MR. OUTLAW:  Your Honor, that might be correct.

21    We don't know unless we have a chance to look at the order.

22             THE COURT:  What I'm suggesting is there's

23    nothing in the order that would give you any basis, Mr.

24    Outlaw.

25             MR. OUTLAW:  Well, there might be something in

1    the affidavit indicating Mr. Johnson's, allegations toward

2    Mr. Johnson involving Mr. Currie.  We don't know.

3                    THE COURT:  Again, it's a wiretap on Mr.

4    Johnson's telephone.

5                    MR. OUTLAW:  I understand.

6                    THE COURT:  I don't find any basis for this at

7    all, Mr. Outlaw.  There's simply no basis for it.  It's

8    denied.  We have too many important things to spend time on

9    here today.  I won't say it's frivolous, but there's just no

10   basis for it, plain and simple.  And I've looked at the

11   statute.  Essentially with respect to the wiretap

12   application, the authorizing court order and any extensions,

13   Miss Gavin, the government's intention is to disclose that at

14   what point in time; at all, ever?

15                    MS. GAVIN:  At the moment, Your Honor, we have no

16   intention of even using the information, so we do not intend

17   to disclose it.  In the event, as I think as we said in our

18   papers, in the event that something in the defense case that

19   we haven't been able to think of somehow makes one of those

20   conversations relevant, at that point we think then our

21   obligation would be triggered.  And the senate report

22   expressly recognizes that that's a possibility.  But

23   otherwise we have no obligation.  And we're not even close to

24   ten days before any such event anyway.

25                    THE COURT:  And your contention is is that if for

1    some reason that in terms of the ten-day requirement for

2    disclosure, as it's written in the statute, applies to the

3    parties, i.e., Mr. Johnson, the person whose telephone was

4    tapped in that case.

5                MS. GAVIN:  Yes, Your Honor.  But even if that

6    were to be incorrect, even assuming it applied to us, we

7    haven't used it, we don't have any obligation to produce it

8    until ten days before we know we're going to use it.  We just

9    don't have the situation yet.

10               THE COURT:  Mr. Outlaw, your position on this is

11   noted for the record.  There's simply no basis for it.  We

12   have too many other important issues to address.

13               MR. OUTLAW:  Understood, Your Honor.

14               THE COURT:  My only concern, as I said, I just

15   wanted to verify that your client -- the government has

16   represented that your client has every recording with his

17   voice with former county executive, Mr. Johnson, and so you

18   have plenty of time to prepare for that and you can seek to,

19   either side may or may not want to utilize that information

20   and it's up to you.

21               MR. OUTLAW:  Again, Your Honor, can we just put

22   in a request to have the transcripts provided to us to the

23   extent they do exist?

24               THE COURT:  Are there any transcripts, Miss

25   Gavin?

12

 1                    MS. GAVIN:  I don't know, Your Honor.

 2                    THE COURT:  Could you find out?

 3                    MS. GAVIN:  I sure can.

 4                    THE COURT:  Sure.  If there are transcripts, the

 5       government --

 6                    MS. GAVIN:  Absolutely, Your Honor, as long as

 7       there's not going to be some challenge whether they're

 8       completely accurate.

 9                    THE COURT:  I understand.  As it works in the

10       district, as you all well know, to the extent there are

11       recordings played and there are transcripts, they're marked

12       for identification only, they're not marked into evidence.

13       The jury looks at the transcripts and it's up to the jury to

14       determine whether it accurately reflects what they hear on

15       the tape.  So that's fine.  If there are any transcripts,

16       then the government will give them to you, Mr. Outlaw, and

17       with that your client, I think, has been well served on this.

18                    I don't mean to be too quick for this legal

19       issue, but I don't think there's any basis for it and there

20       are too many things to go to that have substance, so as to

21       that, paper number 59, the motion to compel wiretap

22       discovery, is denied.  There's no requirement that it be

23       provided under 2518 subsection nine to Senator Currie anyway

24       because it was in the Jack Johnson case, but it is denied for

25       the reasons indicated here on the record, paper number 59.

13

```
 1                    Now, the Shoppers Food Warehouse motion to quash,

 2     Mr. Brennan, why don't you come forward here on this and let

 3     me summarize where I think we are on this.

 4                    Essentially, as I understand it, the government

 5     presented a search warrant that was signed giving rise to a,

 6     essentially a seizure at some point in time of records in the

 7     possession of Shoppers Food Warehouse, correct?  Is that

 8     right, Miss Gavin?

 9                    MS. GAVIN:  Yes, Your Honor.

10                    THE COURT:  And at some point in time, government

11     agents undertook some type of privilege review to segregate

12     the material that was deemed to be within the ambit of the

13     search warrant as well as take precautions as to privilege,

14     correct?

15                    MS. GAVIN:  Yes, Your Honor.

16                    THE COURT:  And there was, I gather, then a team

17     of government agents that took those steps with respect to

18     the matter of privilege documents?

19                    MS. GAVIN:  Yes, Your Honor.

20                    THE COURT:  And it was not the prosecution team,

21     it was a separate team that undertook that?

22                    MS. GAVIN:  That's correct.

23                    THE COURT:  So that material now is still in

24     possession of the government, correct?

25                    MS. GAVIN:  Well, yes.  Physically.  In the sense
```

1     that it's on a computer image.

2              THE COURT:  Nine computer disks or whatever, it's

3     in the possession of the government.

4              MS. GAVIN:  Yes.

5              THE COURT:  Now, Mr. Evans, you filed a subpoena

6     seeking review of that material in connection with your

7     representation of Mr. Currie in terms of the documents that

8     Shoppers Warehouse, correct?

9              MR. EVANS:  Yes, Your Honor.  Although once

10    again, Mr. Outlaw.

11             THE COURT:  Mr. Outlaw, you might have better

12    luck with this one.

13             So then the subpoena -- you may sit down for a

14    moment.  I'm trying to get to the crux of it.  The subpoena

15    was issued to Shoppers Food Warehouse, and that's still

16    remains pending.

17             And, Mr. Brennan, you filed a motion to quash

18    that subpoena noting certain privilege issues in terms of

19    material attendant thereto that you sought to quash the

20    defense subpoena.  And then in the alternative, as I recall,

21    you suggested that perhaps there could be some kind of taint

22    team set up by the government to review some of that

23    material.  Is that essentially the scenario?

24             MR. BRENNAN:  I think it's a little broader than

25    that, Your Honor.  What happened in June of 2008, a search

1   warrant was executed and as our under seal filing, exhibit C,

2   Your Honor, shows the terms that were used to search the

3   computers, and we filed that under seal.  Those terms are

4   used to search the computers.

5           As exhibit B to our sealed filing indicates,

6   there was correspondence between counsel for Shoppers at the

7   time and the government to make certain that within those

8   search terms that were searched that privilege and other

9   documents were taken out so that they were not given to the

10  government, not violate the attorney-client, the work product

11  privilege.

12          Then the grand jury subpoena was served on

13  Shoppers that had some additional terms, and that's under

14  sealed filing A, and that's terms as well as names.  And

15  again, Shoppers through its counsel cooperated with the

16  government and we scrubbed those for attorney-client work

17  product and everything else.

18          My understanding is that the defense in this case

19  has the results of that because those have been scrubbed both

20  by the government taint team as well as Shoppers.  That's not

21  what they're seeking.  They now want, as I understand the

22  17(c) subpoena, they want everything else that was on the

23  computers that was not listed to those search terms, and they

24  just want to see the entire contents of all nine of our

25  computers beyond what was on both the search terms delineated

—16 —

1    in the search warrant and beyond the search terms that were

2    issued to the grand jury subpoena.  They want everything.

3             THE COURT:  Hold on just one second.  The search

4    terms of the government were with respect to both the search

5    warrant as well as the grand jury subpoena.

6             MS. GAVIN:  Yes, Your Honor.

7             THE COURT:  The position of the defense, Mr.

8    Outlaw, is that's fine, but you don't want to be limited by

9    those search terms in terms of being able to review the

10   material on the computers of Shoppers Warehouse.  You'd like

11   to have your own review not limited by the search terms noted

12   by the government.

13            MR. OUTLAW:  Correct, Your Honor.

14            THE COURT:  And Mr. Brennan, your position is

15   that the defendant, one, should be so limited and,

16   secondarily, it's unduly burdensome to your client to have to

17   respond to that.

18            MR. BRENNAN:  Right.  They haven't told us what

19   they're looking for, Your Honor.  And the problem is, if you

20   take the part as if this were an electronic search and just

21   take this, say it were a paper document search, it's as if

22   the government came in, searched our entire executive

23   offices, seized pursuant to the search warrant, and then the

24   defense wants to come in three years later and say by the

25   way, we now want to search all the documents in your

1    executive suite and we aren't going to tell you what we're

2    looking for.  We just want to look at all your documents.

3    And that's not the purpose of a 17(c) subpoena.  They ought

4    to issue us a subpoena and tell us what they want.  Instead

5    they said we want all your documents, we won't tell you what

6    we want.

7            And we know, Your Honor, we have calculated

8    what's at least on eight of the computers, there are 103.241

9    gigabytes which, Your Honor, translates into a million

10   documents or about five million pages.

11           Now, if they told us what the search terms were,

12   we may be able to run it and find out that there's very few

13   documents that comply, if any, and there may only be a

14   handful that are privileged and maybe none are privileged.

15           THE COURT:  Let me just stop you and get to a

16   practical question.  With respect to the documents, do you

17   have backup documents and backup discs or are we essentially

18   talking about someone having to review documents that are in

19   the possession of the government?

20           MR. BRENNAN:  No.  We have obtained mirror image

21   copies of what was seized at the time of the search warrant.

22   We have nine, excuse me, eight hard drives, Your Honor, plus

23   a laptop computer in our possession.  And our calculation is

24   that they -- without the laptop because you have a little

25   difficulty figuring out a password to get into that.  Putting

18

1    that aside, Your Honor, the nine computers in our possession

2    have 103.241 gigabytes.  Under the accepted industry

3    standards, Your Honor, that translates to about 1,330,000

4    documents and 5,150,000 pages.

5              Now, we have to review all five million pages to

6    find out what's a privileged document in there because they

7    won't tell us what they're looking for.  If they told us what

8    they're looking for, it may not be five million pages; it may

9    be two pages, it may be 200.  We don't know.  And they

10   haven't said.

11             So that's our problem, Your Honor.  They've sent

12   a 17(c) over saying give us all your documents, don't tell us

13   what it is they want.  That's not what 17(c) is.

14             And if Your Honor looks at what what's already

15   been searched and scrubbed by both the government and

16   Shoppers back in June of '08, all those search terms have

17   already been done throughout the search warrant as well as

18   the grand jury subpoena, yet they won't tell us what they

19   want in this five million pages.  And we've got to then

20   assign lawyers to look at five million pages worth of

21   documents to see if the attorney-client privilege applies.

22   And that's going to cost us hundreds of thousands of dollars,

23   Your Honor.

24             THE COURT:  It would cost your client hundreds of

25   thousands of dollars.

19

```
1            MR. BRENNAN:  Or the defense.  If they want to
2      pay for it.
3            THE COURT:  All right.  Fine.  Miss Gavin, from
4      your point of view, your response has been in terms of any
5      suggestion of the government taint team reviewing what's on
6      file with the government.  I've read your objection to it,
7      but from the point of view of the government, clearly the
8      defendant can file a 17(c) subpoena, it can be under seal,
9      the defendant can deal with Shoppers Warehouse whatever way
10     they want, the subpoena can be limited, there can be a
11     confidentiality order.  The government isn't seeking to find
12     out what the terms are or what information the defendant gets
13     from Shoppers Warehouse.  It's strictly between them.
14            MS. GAVIN:  Your Honor, we would certainly ask
15     that if the computers are made available in their entirety to
16     the defense, that we also have --
17            THE COURT:  I understand.  Because they were
18     initially limited in terms of the search warrant.
19            MS. GAVIN:  They're still limited, Your Honor.
20     That's really the crux of it is that we conducted a search
21     warrant and the documents and the evidence that the
22     government is actually in possession of, not physically a
23     computer, but actually in possession of, are all the hits
24     from the search terms pursuant to the search warrant, and
25     we've given them every single hit in their native format.  So
```

1    our view is we don't have that information and the defense

2    doesn't have it, whatever it is they're looking for beyond

3    that.  So our view is whatever they get, we may ask for it.

4              THE COURT:  You may or may not be entitled to it.

5    You can ask for it.

6              MS. GAVIN:  Yes.  There are also rules of

7    discovery.

8              THE COURT:  I'm just trying to crystallize what

9    this is all about reading through all this paper because it

10   seems to me it's not all that complicated.

11             Mr. Brennan, one of the issues here that lingers

12   is is that your client is the former employer of two of the

13   defendants in this case.

14             MR. BRENNAN:  That's correct.

15             THE COURT:  And there are allegations of

16   impropriety that have been made by the grand jury as to Mr.

17   White and Mr. Small based upon the performance of their

18   duties in the employ of your client, correct?

19             MR. BRENNAN:  I understand.  They've been

20   indicted, Your Honor.

21             THE COURT:  So Mr. White and Mr. Small

22   essentially, the position is to say having been accused of

23   impropriety in the context of our performance, totally apart

24   from the interests of Senator Currie, we want to have access

25   to look through these files to seek information that we

21

1    believe may be germane to our defense.

2             Miss Gavin's contention as to the government

3    being limited notwithstanding, that is essentially the thrust

4    of the defense position; correct, Mr. Zucker and Mr. Treem,

5    that's essentially it in a nutshell, is that correct?

6             MR. TREEM:  It is, Your Honor.

7             THE COURT:  They're basically saying we used to

8    work there and we want to have access to the computers.

9    We're not limited to probable cause in terms of limiting it,

10   we want to be able to look at the computers because we

11   believe there may or may not be information in the computers

12   that certainly enure to our benefit, from the point of view

13   of Mr. Small and Mr. White, and it may or may not enure to

14   the benefit of Senator Currie.

15            So it seems to me the real crucial issue here is

16   just the matter of the breadth of the subpoena.  And I'll

17   hear from Miss Gavin in a moment on the matter of the

18   government's contention that the government should have the

19   same access.  This becomes a matter of I think a little bit

20   different issue, Miss Gavin, quite frankly, it's a matter of

21   what the defendants find that they want to use, then there's

22   reciprocal discovery, they then give you that.

23            MS. GAVIN:  Absolutely, Your Honor.  I was

24   responding to the concept of giving them the entire computer

25   since we've been barred from that.

1          MR. BRENNAN:  I think what concerns my client,

2     Your Honor, to use the court's words, *may be germane*.  That

3     sure sounds like a fishing expedition, Your Honor.  I don't

4     think that's the purpose of a 17(c).  I think a 17(c)

5     subpoena directed to Shoppers that said please give us all

6     the emails that involve William White, we certainly -- that's

7     relevant, that's narrowly focused, we certainly would comply

8     with that.  And indeed, Your Honor, I think under the search

9     terms that's already been done.  I think when they're talking

10    about looking at the full contents of nine computers with the

11    concept of *may be germane*, that, Your Honor, is a fishing

12    expedition, that's not the purpose of a 17(c).

13          THE COURT:  I think we've crystallized this

14    enough.  I'll hear from Mr. Outlaw and then Mr. Zucker and

15    Mr. Treem.

16          Mr. Outlaw, essentially the issue becomes a

17    matter of breadth, so I think you need to address this.

18          MR. OUTLAW:  Your Honor, just to kind of go back

19    in a little bit of history, this is not the position that --

20    we didn't want to be in this position right here.  We first

21    tried to get the same materials from the government.  The

22    only thing that we were asking for is we wanted to search

23    those materials without the government looking over our

24    shoulder.  They were saying give us the search terms, we'll

25    run it and give you the responses.  And that to us was not

23

1    acceptable.

2              THE COURT:  The other side didn't ask any

3    questions with regard to that because I agree with you.

4    That's fine.

5              MR. OUTLAW:  So when we came before the court,

6    the court directed us, why don't you go directly to Shoppers

7    and get the information from them because you will not be

8    under the same restrictions as the government?  Which is what

9    we did, Your Honor.  And we're not interested in every

10   document in that computer.  We have no interest in what

11   Shoppers paid for lettuce three to five years ago.  We have

12   no interest.  But I think you hit the nail on the head that

13   this is critical information.

14             One of the computers, Your Honor, one of the

15   computers was the secretary of Mr. White and it has the most

16   data on it, and that's because she was handling the affairs,

17   the correspondence, the communications of Mr. White.  And if

18   that information is not critical, I don't know what

19   information is critical to this, and we should have access.

20             Mr. White should have access to that information.

21   He had access to it once and now all of a sudden he's barred

22   from it and that is prejudicing his defense.  There is no

23   reason why he should not be able, all the defendants, to

24   search that material.

25             Now, Your Honor, they have provided us with their

1    hits and in our papers we said we want to conduct our own --

2    their search terms is based on their view of the case.  And

3    I've gone through that, I've started going through that

4    material.  And in their papers they said a lot of that stuff

5    is duplicative of what we've already received.

6            Your Honor, that is not turning out to be the

7    case.  I've started going through the materials and I already

8    have a two-inch stack of documents that we have never seen

9    before that are critically relevant to this case.  It's

10   bringing up people we've never heard of, things that have

11   happened that we had no idea about.  These materials are

12   turning out to be critical.  And that is why we want to

13   conduct our own searches because their search terms might not

14   have captured what is important to us.

15           THE COURT:  Mr. Outlaw, as you probably can tell

16   by the thrust of where we're going on this, the court has no

17   problem with that.  The bottom line is, I think we can put

18   aside the matter of the government taint team here, that it's

19   a much broader question than that, it gets to the matter of

20   the breadth and the cost, and that's really what we're

21   getting to.

22           Mr. Brennan is saying this is, quite frankly, if

23   cost is -- Mr. Brennan, I understand your position to be if

24   cost is no factor and if the defendants are prepared to pay

25   the costs for it, then from your point of view we don't have

25

1    any probable cause determination necessary as to Mr. White

2    and Mr. Small, having been former corporate executives of

3    Shoppers, wanting to go through the computers if they're

4    willing to spend the time and the money from your point of

5    view.

6                MR. BRENNAN:  Right.  They have to pay our

7    lawyers to do the privilege search term, but if they want to

8    pay for it, Your Honor, then knock themselves out.

9                THE COURT:  So then the question becomes, Mr.

10   Outlaw, and I want to hear from Mr. Zucker and Mr. Treem on

11   this, the question becomes the matter of proportionality and

12   the cost factors on this and how it's to be shared.

13               MR. BRENNAN:  Your Honor, while they're

14   consulting, if Your Honor looks at the attachments, I mean

15   the name William White, for example, has already been

16   thoroughly searched on both the search warrant as well as the

17   grand jury subpoena.  You know, the name Currie has been also

18   searched on both the grand jury and the search warrant.  And

19   if you look at the other names on there, and the word liquor

20   is there, for example.  I mean you go through those search

21   terms, Your Honor, and you pretty much see, at least in our

22   judgment, I mean senate is there, Currie is there.  They

23   won't tell us what they want us to search.

24               THE COURT:  Here's the bottom line, Mr. Brennan.

25   I understand what you're saying, but Mr. Outlaw doesn't need

1    to divulge in open court what kinds of things he's looking

2    for.  They're free to do it up to a reasonable extent.  The

3    question is the matter of cost and whether it's unduly

4    burdensome or not under Rule 17(c).  So that's where we go

5    from there, Mr. Outlaw.  What suggestions do you have to make

6    on this?

7                 MR. OUTLAW:  Your Honor, there's a couple of

8    alternatives.  The first is we can provide search terms to

9    Shoppers.  The issue that in doing that, that raises the same

10   issue we had with providing them to the government.

11                 Now, Shoppers is hampered by the deferred

12   prosecution agreement, and under that agreement it could be

13   read that any information that they provide to us that they

14   automatically have to turn over to the government.  So then

15   we're right back to where we started from is where the

16   government looking over our shoulder.

17                 Now, if there's a way --

18                 THE COURT:  Let's just address that right now.

19   Miss Gavin, do you interpret the deferred prosecution

20   agreement of Shoppers to be that to the extent that there is

21   a 17(c) subpoena filed by the defendants and they seek to

22   narrow it down, they come up with their own search terms, do

23   you interpret the deferred prosecution agreement to be that

24   Shoppers has to pick up the telephone and tell the

25   government?

1          MS. GAVIN:  We would ask Shoppers to give us

2     copies of whatever they give to the defense.

3          THE COURT:  I might have a problem with that.

4          How do you interpret that, Mr. Brennan?

5          MR. BRENNAN:  We determine the deferred

6     prosecution agreement the way the government does, Your

7     Honor.  We are not here to do anything at all to breach the

8     deferred prosecution agreement.  The corporation's position

9     is we intend to abide 100 percent with the terms of that

10    deferred prosecution agreement.

11         THE COURT:  And you interpret it to be that any

12    subpoena served on Shoppers in any fashion would require you

13    to notify the government part and parcel of all of the

14    contents?

15         MR. BRENNAN:  I think if the government requests,

16    Your Honor.  There is a paragraph, I don't have it right at

17    my fingertips --

18         THE COURT:  Nor do I.

19         MR. BRENNAN:  -- but there is a paragraph in the

20    deferred prosecution agreement that requires us to continue

21    to cooperate with the government.  And again, our position is

22    that we will comply 100 percent with the terms of the

23    deferred prosecution agreement.

24         THE COURT:  Miss Gavin, let me just say to you on

25    this, I have a little bit of a problem with the government's

1    position on that, and I know you haven't briefed this

2    exhaustively, you've briefed loads of issues here, but it

3    just seems to me that in terms of fundamental fairness,

4    particularly looking at it in context of two of the three

5    defendants, Mr. White at one point in time was the president

6    of Shoppers Food Warehouse and Mr. Small was the

7    vice-president of real estate development, and they're no

8    longer employed there and they've been indicted, and it's

9    been alleged by the grand jury they've engaged in criminal

10   activity in the context of their employment there, and

11   they're seeking to look at their old computer files with

12   respect to preparing their defense.

13          And certainly to the extent that they have any

14   documents that they seek to introduce, any emails, under

15   reciprocal discovery that has to be disclosed to the

16   government under Rule 16, here is what we intend to produce.

17   But I'm hard pressed to not have some sympathy with the fact

18   that they're entitled, regardless of what search terms have

19   been used by the government from the government's

20   interpretation -- and the government had certain constraints

21   in terms of the search warrant obviously and the search terms

22   as to the grand jury subpoena -- essentially I'm hard pressed

23   to understand why a defendant doesn't have a right to conduct

24   his own inquiry because he believes that somewhere there's an

25   email that he recalls back in 2005 that he believes may

1    exonerate him in some way or there may have been some point

2    of confusion.  They have the right to go through that.

3              MS. GAVIN:  We're not stopping them, Your Honor.

4              THE COURT:  I know.  But my point is I think they

5    have the right to go through that.  I guess the best analogy

6    it seems to me, Miss Gavin, before the day and age of

7    electronically stored information, if there's a room full of

8    documents, and I'm aging myself when I was an Assistant U.S.

9    Attorney, but there would be a room full of documents, the

10   defendant was perfectly free at some point in time to go

11   through all the documents and they could decide what they did

12   or didn't want to introduce.  They didn't have to tell me

13   what documents they went through.  They didn't have to tell

14   me they look at some documents, they went whoops, we think

15   that hurts us, we're not going to use that after all.  It was

16   a confidential inquiry that they could make with respect to

17   their defense, correct?  That's how it would work.

18             MS. GAVIN:  But, Your Honor, the premise of that

19   analogy is that the government is in possession and has equal

20   access to those documents.  What they're asking for we're not

21   in possession of.

22             THE COURT:  I understand that.

23             MS. GAVIN:  I think it's a significant

24   difference.

25             THE COURT:  You may have to brief this.  I don't

1          know where the government is necessarily entitled to any more

2          than you got from the grand jury subpoena or from the search

3          warrant.

4                    MS. GAVIN:  Shoppers can voluntarily give it to

5          us.  It's just like with a cooperator.

6                    THE COURT:  They may or may not.  That's correct.

7          They're perfectly free to do that.  Here's the point.  You

8          have it all.  You're free to go back -- I guess the point

9          you're making is you're not free to go through except what

10         they assert as to privilege.

11                   MS. GAVIN:  And the search warrant terms, we're

12         bound by that.  If they go look at things that are beyond the

13         bounds of the search warrant, we don't have access.

14                   THE COURT:  Let me get to the core of this

15         because I really think common sense applies here.

16                   Obviously as to privileged material,

17         attorney-client material, work product privilege, or for that

18         matter, Mr. Brennan, who knows, confidential medical

19         information of pharmaceutical recipients, it's all

20         privileged.

21                   MR. BRENNAN:  It's a highly regulated industry,

22         Your Honor.

23                   THE COURT:  So the point is you assert those

24         privileges.  That to the extent that Shoppers has entered

25         into a deferred prosecution agreement with the government, is

1    agreeing to cooperate with the government, but for there

2    being a privilege, be it work product, attorney-client or

3    what I'll call a pharmaceutical privilege of some sort, a

4    medical privilege, from the point of view of Shoppers

5    Warehouse, Shoppers doesn't view the government as being

6    limited by the search warrant or the grand jury subpoena to

7    whatever's in those files if the government wants to conduct

8    further inquiry now that you're cooperating with the

9    government.  Absent assertion of a privilege, the government

10   is in a position to do so.

11          MR. BRENNAN:  Right.  We are in a position of

12   cooperating with the government pursuant to the terms of the

13   deferred prosecution agreement, yes, Your Honor.

14          THE COURT:  Which means, Miss Gavin, you're not

15   limited by the search warrant or the grand jury subpoena if

16   you choose to conduct --

17          MS. GAVIN:  But, Your Honor, we would be in the

18   sense that we would have to have Shoppers again go through a

19   taint attorney-client analysis, essentially what the defense

20   is claiming they want Shoppers to do, so all we're asking is

21   if Shoppers gives information to the defense after having

22   done that process, we just want the same access.

23          THE COURT:  There's the nub of it.  The nub of it

24   is this:  You are certainly free to have the same access, but

25   I think the nut here is is that to the extent you get to see

1   what the defense wants, that's the problem.  In the sense

2   that you are certainly free to have access, and we're back to

3   the old analogy of going through the documents, Miss Gavin.

4   The U.S. Attorney's Office was never free to stand there next

5   to a defense lawyer and look at every document he or she

6   looked at to know exactly what the nature of their inquiry

7   was.  You and I both know that.  An FBI agent could sit and

8   watch and make sure no one took files as they went through

9   the files.

10            MS. GAVIN:  But, Your Honor, at the same time,

11   the U.S. Attorney's Office has always been free to ask

12   witnesses what did you tell the defense?  What documents did

13   you give the defense?  Please give us a copy of the documents

14   you gave to the defense.  What did they ask you for?  That's

15   exactly this situation.

16            We simply, our position is we're entitled to ask

17   Shoppers to give us a copy of whatever they give to the

18   defense.  They are a third party in this case, they are not a

19   defendant.  We're entitled to ask witnesses and cooperators

20   for copies of what they give to the defense.  And that's all

21   I'm asking for.

22            THE COURT:  So then the point being that in terms

23   of -- there's a distinction there.  Then in terms of

24   necessarily an inquiry as to what they've asked for as

25   opposed to what was given, you're certainly free to ask a

1      cooperating witness what he or she has said to the --

2                  MS. GAVIN:  I believe that the government is also

3      free, Your Honor, to ask what did the defense ask you, a

4      witness?  If the witness is willing to tell us, we can get

5      everything that the defense asked them, and that's exactly

6      this, including search terms.

7                  THE COURT:  Okay.  I understand your point.

8      Point well taken.  All right.

9                  So whittling this down, Mr. Outlaw, if there's a

10     cooperation agreement by Shoppers and that's the agreement,

11     and there's a deferred prosecution agreement, we're going to

12     get to the matter of how we make this happen somehow in terms

13     of your being able to search.  You're not going to be limited

14     just to the government search terms, we're going to figure

15     out how we do this, but in terms of Shoppers having entered a

16     deferred prosecution agreement pursuant to which they have

17     full cooperation with the government, what would be the basis

18     of their not disclosing to the government whatever additional

19     documents they give defense?

20                 MR. OUTLAW:  Your Honor, I think it kind of goes

21     back to what your analogy about the documents in the room.

22     Essentially what Shoppers and the government is saying is,

23     no, we won't let you into the room, but you stand outside,

24     you tell us what you want, we'll go look to see if it's in

25     there, and then if we do find it, we'll tell the government

1      that it's in there.  You ask for it and we'll give it to you,

2      too.

3                  THE COURT:  No, no.  Miss Gavin's argument is

4      that whatever documents you take, they're going to get copies

5      of them.

6                  MR. OUTLAW:  Your Honor, that's the whole point

7      of them looking over our shoulder in terms of what our trial

8      preparation.  And we put forward that alternative to reduce

9      the burden on Shoppers.  But if that's going to be their

10     position, then we want the images of the computers to conduct

11     our own searches.

12                  And, Your Honor, this further could be limited

13     by, you know, consultation with the other defendants

14     targeting which computers we want.  We don't necessarily need

15     all nine computers.  That's not necessarily what we want or

16     need at this point, Your Honor.  We don't necessarily want

17     all of the data in the world because we're getting close to

18     trial so we need to be efficient in what we're doing.  So

19     that's another alternative.

20                  The problem is, Your Honor, is that at each step

21     of the way we're trying to make an accommodation, and that

22     accommodation leaves the government looking over our

23     shoulder.

24                  THE COURT:  If you locate certain electronically

25     information you want and you notify Mr. Brennan, this is what

1    we want, please give it to us.  Okay?

2              MR. OUTLAW:  Yes.

3              THE COURT:  Under the terms of his deferred

4    prosecution agreement he's permitted to say to the government

5    these are the copies of the documents that I gave to the

6    defense.

7              MR. OUTLAW:  That's why we asked the court to

8    fashion some remedy or order that they don't have to do that,

9    that that's not a violation --

10             THE COURT:  I think this has been helpful to me

11   because when you get right down to it, Mr. Outlaw, going back

12   to the old days when people stood in a room, the defense

13   lawyer was perfectly free to go through all the files without

14   the Assistant U.S. Attorney walking behind him, and in the

15   old days the FBI agent would sit there at the table and just

16   watch the lawyers go through all the files and ultimately the

17   lawyer would tag all the files they wanted and they'd say to

18   the government we need to have this reproduced and it was

19   reproduced.  And if it it's being reproduced by a company or

20   a witness that's cooperating with the government, there's no

21   gag order placed upon the cooperating witness.  They're free

22   to tell the government this is what we gave to the defense.

23   That's the nub of it.  You're seeking to have an exception be

24   applied to their cooperation agreement.  That's the nub of

25   it.

1          MR. OUTLAW:  But, Your Honor, in that situation,

2     in my limited experience, it's not, okay, we're going to flag

3     this one document out of this box.  In that way you're

4     flagging to the government what you're looking at.  You would

5     say give me the whole box.  And here in this situation it's

6     different.  They're going to say, well, give us each

7     individual document that you've provided to the defense.

8     And, Your Honor, that's the problem that, as you said, Mr.

9     White certainly at one point in time had access to his

10     secretary's computer to get that information.  Now, when his

11     freedom's on the line, he can't access that information

12     without the government looking over his back.  And there's

13     the prejudice.

14          THE COURT:  Isn't that a result of the fact that

15     his former employer, Shoppers Warehouse, has entered into a

16     deferred prosecution agreement and agreed to cooperate with

17     the government and part of that obligation is to notify the

18     government of any and all information it gives to anybody,

19     whether it's your client or whether it's Mr. White or Mr.

20     Small?

21          MR. OUTLAW:  Yes.  But Mr. White had no control

22     over that decision, Your Honor.  That was made by Shoppers.

23     He certainly has not entered into that cooperation agreement.

24          THE COURT:  They're not his documents, they're

25     Shoppers' documents.

37

1          Mr. Treem, do you want to be heard on this?

2          MR. TREEM:  Your Honor, you and Mr. Outlaw are

3     doing just fine.

4          THE COURT:  I'm not sure how well we're doing.

5          MR. OUTLAW:  Your Honor, I would also argue that

6     at one point in time he did have a right to those documents

7     and I don't think that right has now extinguished,

8     particularly when he's on trial for his freedom.  To say

9     that, well, Shoppers dictates how and when he can look at

10    those documents that are critical to his defense I think is

11    very prejudicial.

12         THE COURT:  I don't really know that Mr. Brennan

13    is suggesting that.  His point is that you can go ahead and

14    look at a computer disk, but they've got to go through the

15    process of scrubbing and having privilege here.

16         MR. EVANS:  Your Honor, could I?

17         THE COURT:  Go right ahead, Mr. Evans.

18         MR. EVANS:  I'm sorry to butt in here.

19         THE COURT:  Go right ahead.

20         MR. EVANS:  There is a way to avoid all of the

21    17(c) issues, and there is a way to avoid all of the deferred

22    prosecution issues, and there is a way to avoid all of the

23    expense issues.  And I guarantee you, based on my

24    conversations with co-counsel, neither Mr. White nor Mr.

25    Small have the means to pay anything close to what the

1    scrubbing would do.

2              We originally requested that we give search terms

3    to the government for what it has in its possession and that

4    those search terms be kept confidential from the prosecution

5    team.  That's all we wanted.  That was our whole entire

6    request.  The government said no.  The government said we had

7    to file a 17(c) subpoena.  The court encouraged us to file a

8    17(c) subpoena.  We filed the 17(c) subpoena.  We're not

9    really interested in the 17(c) subpoena.  We were boxed in on

10   the 17(c) subpoena.  All we want is for a government agent,

11   not involved with the prosecution, to run a couple of search

12   terms through the information.

13             THE COURT:  You said a couple of search terms?

14             MR. EVANS:  Let's say ten.

15             THE COURT:  Now we're getting somewhere.

16             MR. EVANS:  A limited amount of data, okay, by

17   someone who is not looking over our shoulder.  Okay.  We

18   don't care about the deferred prosecution.  We don't care

19   about the cozy relationship between Shoppers and the

20   government.  That stuff is all irrelevant to us.  All we want

21   is what we first requested last March is have someone

22   uninvolved in this, amongst these folks here, run some search

23   terms on request and not tell them.  And that they can do

24   with almost no expense, certainly not the kind of expense

25   that's being talked about here, and we can get our couple of

1      inches of documents without the prying eye of the government

2      prosecution team.  It's really very easy.  That's what we

3      requested in March.  That's all we want.  We didn't even, we

4      didn't file a -- we filed a 17(c) subpoena to join the issue.

5                  THE COURT:  All right.  I understand.  Thank you,

6      Mr. Evans.

7                  The fact you said you might be talking about ten

8      search terms is very pleasing to my ears.  I don't know if

9      it's pleasing to the others.

10                 From your point of view, Mr. Brennan, that's

11     acceptable to you, right?

12                 MR. BRENNAN:  Yes, Your Honor, as long as the

13     government taint team preserves the attorney-client

14     privilege, work product doctrine and other concerns we have.

15     You can see by the correspondence on sealed exhibit B, Your

16     Honor, we went to great pains to make certain that the

17     government's taint team earlier preserved the attorney-client

18     privilege in that.  But as long as the attorney-client

19     privilege, the work product doctrine and our confidentiality

20     issues that Shoppers has are preserved, we're fine with that,

21     Your Honor.

22                 THE COURT:  Miss Gavin, we've gone back full

23     circle on this, but let me ask you this:  I started with the

24     inquiry on this issue a little while ago, I said there

25     already was a taint team obviously.  Who reviewed it?

```
 1              MS. GAVIN:  Your Honor, we are adamantly opposed

 2    to this.  This would take an extreme amount of time by the

 3    FBI which is overwhelmed with all the computer searches that

 4    they have to do and, as the defense well knows, it would take

 5    an extraordinary amount of expense.  We would have to assign

 6    an AUSA, at least one agent, plus the CART agent, plus we

 7    would have to deal with Shoppers.  It took us months to get

 8    through those records.  And what the defense has is

 9    everything we have.  And they just want somebody, they want

10    to have agents of the government taken away from their cases,

11    taken away from the work that they're doing because they have

12    to be completely unrelated to this, to do searches at their

13    behest.

14              And what if there's a claim that somehow the

15    search wasn't done properly, or they don't like what the

16    agent came up with and it's going to have to go through

17    Shoppers.  This is so beyond, Your Honor, anything that the

18    government should have to take on in either expense or time

19    especially as we're getting ready for a trial.

20              The government's resources are not unlimited and

21    the FBI is stretched very thin right now.  We have one case

22    agent on this case.  There are seven lawyers on the other

23    side.  It is inappropriate, there is no basis whatsoever to

24    require the government to act as an investigative team for

25    the defense.  We have given them every single document that
```

1     we have via all of the information that was produced by grand

2     jury subpoena.  We gave it to them, native format,

3     electronically, hard copies.  We gave them --

4              THE COURT:  I understand.  Miss Gavin, that's not

5     the issue.

6              MS. GAVIN:  It's just inequitable.  It really is,

7     Your Honor.

8              THE COURT:  I understand your argument.  The

9     bottom line is is that we're going to fashion something

10    because the defense is entitled, the defense is entitled to

11    go through documents without having to explain to the

12    government what they're doing.  And we're trying to fashion

13    something that doesn't cost your client an inordinate amount

14    of money, Mr. Brennan.  But here's the fundamental fact, if

15    you all can't work this out, the court will fashion a remedy.

16    But the defendant is entitled to look through documents and

17    determine what he or she in any case wants to utilize as to

18    documents and they are not required to have to be screened by

19    the government.  And, quite frankly, the position of the

20    government is not that they want to screen it, the position

21    of the government is they don't want to take the time and the

22    expense.  And the issue of what position your client takes as

23    to the deferred prosecution agreement and disclosure

24    requirements is a totally separate matter from that.

25              Like it or not, the defendants are stuck with the

1    fact that every piece of paper supplied by your client to any

2    of the three defendants will be handed over to the government

3    pursuant to the deferred prosecution agreement.  There is no

4    basis for the defendants to have any objection to that at

5    all.

6         So then the question becomes just their right to

7    be able to go through the documents.  So if somebody has a

8    suggestion here, or we're going to have to come up with some

9    solution because all I'm hearing, Mr. Brennan, is, quite

10   frankly, we have very significant issues on both sides of the

11   aisle here and in the middle we have money, your client's

12   issue as to money.  And I hear it, but the fundamental fact

13   is is that at some point in time your client might have to

14   spend a lot of money, Mr. Brennan, because if I have to

15   balance the rights of the government and the defendant's to

16   your client's concern over time and money, it's a tough road

17   to hoe.  But two of your employees, former executives, are

18   charged with wrongdoing.  So that's where we are and that's

19   why I was trying to get Mr. Treem or Mr. Zucker want to chime

20   in here because I'll tell you all right now, no matter what

21   documents you receive, Mr. Outlaw, there is absolutely no

22   basis for those documents not to be revealed to the

23   government.

24        Mr. Evans' argument is separate from that.  Mr.

25   Evans says we're entitled to search for whatever we want to

1    search for without question.  And Mr. Evans is quite correct.

2    The government doesn't have any right to know what you're

3    searching for.  But whatever you ultimately obtain from

4    Shoppers becomes discoverable pursuant to not only Rule 16

5    but the deferred prosecution agreement and it will be handed

6    over.

7              So that's essentially where we are.  So if

8    anybody -- Mr. Zucker, do you want to be heard on this?

9              MR. ZUCKER:  No.  I think you got the point.  We

10   want to be able to look -- the quandary is we want to be able

11   to look without the government being over our shoulder, and

12   then we said okay, we propose if they don't want to allow us

13   to look, to have their prosecutors look.  They say we're not

14   going to do your work.  So we're not allowed to do our work

15   ourselves without being watched, and they won't do it for us.

16   If the complaint is money, we will conduct the searches

17   ourselves in the presence of Shoppers Food Warehouse.

18             THE COURT:  The bottom line is is that the

19   government doesn't have a right to look over their shoulder.

20   Miss Gavin is not contending that they have a right to look

21   over their shoulder.  And whatever ultimately is given to

22   them, whatever is copied, whatever document they determine

23   they want is going to be discoverable and be given to the

24   government under the discovery agreement.  So Mr. Brennan,

25   you're up at bat here.  You come up with a solution here.

1          MR. BRENNAN:  If the court, if we're at the

2     position, which I think the court's right, that is that

3     whatever documents that we turn over, the government says

4     what did you turn over, we have to turn over pursuant to the

5     deferred prosecution agreement, I'm going to agree with that.

6     We're going to comply with that deferred prosecution

7     agreement.  What then becomes the problem is this, Your

8     Honor, is if the defense gave to us the search terms -- now I

9     don't know how many there are, but let's take the number

10    ten -- and we ran that, and we found out that there may only

11    be 20 documents that have a hit on those search terms, and we

12    look at those 20 and there's no attorney-client privilege, we

13    turn the 20 over.  It's not expensive to us, it's easy to do,

14    I can do it probably in an afternoon.  The problem is when

15    the defense has not given us the search terms we first have

16    to go through all one million documents, pull out the

17    privileged, the work product and then -- so when they aren't

18    giving us the search terms, we have to look through all five

19    million pages --

20          THE COURT:  Stop there for one moment.  What is

21    the difficulty in giving Mr. Brennan, Mr. Brennan, the search

22    terms?  What is the difficulty there?

23          MR. OUTLAW:  Your Honor, not to harp on it.  The

24    problem is is that then those search terms go immediately to

25    the government and the government is not just -- that is a

1    critical look into our trial preparation strategy of what

2    we're looking at.

3                    Another alternative, Your Honor, is in talking

4    with co-counsel, we are really interested in three of the

5    computers and it would seem that the burden is not five

6    million documents.  Of the three computers, the alternative

7    is that we get a mirror image, just as the government did, of

8    those three computers, and we are allowed to search those

9    ourselves.  And the government already has those three

10   computers, the complete mirror image.

11                   THE COURT:  Miss Gavin, do you have a complete

12   mirror image of the three computers to which he's

13   referencing?

14                   MS. GAVIN:  We do physically, but we believe

15   they've been walled off in terms of part of their contents by

16   the privilege review that Shoppers did plus the search terms.

17   So it's walled off to us, just hits on the search terms and

18   it's been scrubbed for privilege.

19                   MR. BRENNAN:  They won't give us, Your Honor,

20   even the search terms.  Mr. Outlaw did tell me what computers

21   he thought he'd be interested in.  I did some quick math on

22   it, Your Honor, it still comes out to 2,900,000 pages.  It's

23   still almost three million pages, the computers that he's

24   limited to.  So without telling us the search terms, we are

25   still stuck with looking at three million pages worth of

46

1      documents that we don't have to look at if they told us what

2      they're looking for.

3                 MR. OUTLAW:  Your Honor, that's not correct.

4      Because we're also only talking about a specific time period.

5      We can limit it by date.

6                 THE COURT:  We're getting it smaller here.

7                 MR. OUTLAW:  We can limit it by dates.  So it's

8      not the complete --

9                 THE COURT:  Limit it now.  What are the dates?

10     What are the dates?

11                MR. OUTLAW:  We can limit each one, well, at

12     least, I would say the time period of the indictment until --

13                THE COURT:  The indictment is December of --

14                MR. OUTLAW:  Until spring of 2008.  Beginning of

15     2002 to end of 2008.

16                THE COURT:  2002 to 2008 as to three computers.

17                MR. OUTLAW:  Correct, Your Honor.  And if we

18     could get the complete mirror image of that, and that is

19     something the government already has, so there's no violation

20     or problems with the deferred prosecution agreement, we can

21     conduct our searches ourselves without them looking over the

22     shoulder, and they have everything that we have, everybody's

23     equal.

24                THE COURT:  How much are we talking about now,

25     Mr. Brennan?

1            MR. BRENNAN:   I don't know, Your Honor.   But I

2     suspect that from 2002 to 2008, depending on when those

3     computers were purchased, I think that still encompasses all

4     the gigabytes on those computers.   But, Your Honor, we aren't

5     willing to turn over our hard drives because we have

6     attorney-client privilege, and what Mr. Outlaw is suggesting

7     is, okay, we're only asking for three computers, not all

8     nine, give us the three.   I'm not waiving the attorney-client

9     privilege, work product and other privileges with respect to

10    those three computers.   Whether it's one computer or nine

11    computers, Shoppers still has to conduct, look at what every

12    single document is on those computers and assert

13    attorney-client, work product, other privileges that may

14    apply because they won't tell us the search terms.

15            THE COURT:   The reason they won't tell you the

16    search terms is because clearly the government has a right,

17    and Miss Gavin's point is well taken, to the extent that they

18    talk to any witness and ask for information, the witness is

19    free to tell the government what the question was.   There's

20    no gag order applied.   So the thrust of the defense is they

21    don't want to divulge that because then you have to disclose

22    it to the government.   Which is fine.   You're in compliance.

23    So I'm afraid, Mr. Brennan, where we're headed is you have

24    legitimate interests of the government, legitimate interests

25    of the defense, and you've got cost factors of Shoppers.   And

48

1     Shoppers has a deferred prosecution agreement and they're out

2     of the case, but two former executives of Shoppers have been

3     charged in this indictment and they are entitled to have

4     access to this information.  So we're doing our best to

5     whittle down the cost to you.  That's where we're headed.

6             MR. OUTLAW:  There might be another alternative

7     that saves them all the money in the world and that is we get

8     the scrubbed version from the government.  The government has

9     gone through that and scrubbed those images of the three

10    computers.

11            MS. GAVIN:  They have it, Your Honor.  Limited to

12    the search terms because that's all we have.

13            THE COURT:  That's all they have.

14            MR. OUTLAW:  Your Honor, the fact is, the three

15    computers, we're talking about three computers, limited time,

16    there's other work around.  I highly doubt there's extensive

17    attorney-client communications between Shoppers --

18            THE COURT:  You say that, Mr. Outlaw.  Mr.

19    Brennan has to conduct the inquiry.  It's as simple as that.

20            MR. BRENNAN:  Your Honor, I don't mean to

21    interrupt, but let me make this point.  The 17(c), Your

22    Honor, is not a fishing expedition.  I mean if this were for

23    documents, they should say what are you looking for.

24            THE COURT:  Mr. Brennan, here's the thrust of it.

25    It is not a fishing expedition.  The thrust of the problem is

1    this:  Every word out of their mouths inquiring of your

2    client goes to the government.  It's not the government's

3    fault, it's not their fault, it's the nature of your deferred

4    prosecution agreement.  A defense lawyer justifiably can say

5    I would prefer the government not to know every inquiry I'm

6    making, just as in the old days the defense lawyer didn't

7    have the government lawyer looking over his or her shoulder

8    every time they opened up a file drawer.  And that's the

9    thrust of the problem.

10            Your client has entered into that deferred

11   prosecution agreement with definite obligations.  The

12   defendants are not willing to be bound by that from their

13   point of view so that every inquiry they make, as Mr. Evans

14   has said, has someone looking over their shoulder.  Miss

15   Gavin's point is I'm not looking over anybody's shoulder, but

16   I'm not doing their work.  And Shoppers has an obligation.

17   So it comes down upon your client.

18            We're not going to spend all morning on this.

19   Your client is going to incur a huge cost, Mr. Brennan.  It's

20   as simple as that.  Two former executives of Shoppers are

21   charged in this indictment.  Shoppers has a deferred

22   prosecution agreement pursuant to which it has obligations.

23   Your client has made the bed in which it now lies and we've

24   done as much as we can do to address the cost of your client.

25   So that's where we are.

1          So the bottom line, Mr. Outlaw, if you would

2     amend your 17(c) subpoena as you suggested, you're entitled

3     to have it under seal, it's entitled to be under seal as

4     17(c) subpoenas are, you will amend it in that fashion,

5     presumably to three computers.  The more narrow you can make

6     it the better from the point of view of the cost as to

7     Shoppers, and then Shoppers will have to comply with that

8     subpoena.  And then in that fashion, Mr. Outlaw, the defense

9     lawyers are free to make their own inquiry without having to

10    give information to Shoppers that would then automatically be

11    given over to the government.

12          And at some point, whatever those documents are,

13    under Rule 716 at some point that information has to be

14    turned over to the government in terms of reciprocal

15    discovery.  It's as simple as that.

16          Any further questions from the point of view of

17    the government on this, Miss Gavin?

18          MS. GAVIN:  No, Your Honor.

19          THE COURT:  Anything further from the defense?

20          MR. OUTLAW:  The only I would ask, Your Honor, is

21    to have some sense of time when Shoppers would have to comply

22    with that order.

23          THE COURT:  Well, the trial is two months off, so

24    we've got time here.  It seems to me that you could be given

25    four, five weeks, Mr. Brennan, is that a sufficient amount of

1      time?

2                  MR. BRENNAN:  Your Honor, I understand the

3      court's ruling.  I don't wish to quarrel with the court.  But

4      our expectation, Your Honor, is there's going to be 2,900,000

5      pages to go through.  We've got to staff that with lawyers.

6      We've got to do that.  I cannot commit, Your Honor, that

7      we're going to be able to do that in X number of weeks.

8      That's going to cost us hundreds of thousands of dollars, it

9      really is, Your Honor.

10                I think the defense should pay for that, Your

11     Honor.  They really should.

12               THE COURT:  I haven't gotten to that.  Defense

13     might pay for some of it.  I haven't gotten to that.  I'm not

14     saying that Mr. White and Mr. Small aren't going to wind up

15     having to pay for some of it.  They may have to incur some

16     costs.  We'll put rubber to the road on it.  We've spent a

17     lot of time on this and I'm not saying the defense isn't

18     going to have to make some contribution.  Senator Currie is

19     represented by court-appointed counsel and is in a financial

20     position where no cost is going to be imposed upon Senator

21     Currie because the public defender's service can't afford it

22     in terms of the government cutbacks, but we will have to

23     address it.

24               Let's put it this way, the more narrow you draft

25     it, the less of an issue it becomes.  And I think Mr. Zucker,

1    maybe you can get involved in this in terms of the scope of

2    the 17(c) subpoena.  From Mr. Outlaw's point of view, he's

3    really concerned about it.  From your client's point of view,

4    it becomes a factor.  So the reality of it is you have to

5    draft the subpoena.  Mr. Brennan, you make an estimate of how

6    much it's going to cost, and we'll put a tentative time

7    period on this so that there would be production five weeks

8    from this Friday would be what date, Miss Preston-Banks?

9                 THE DEPUTY CLERK:  August 29.

10               THE COURT:  All right.  We'll put it down by

11   Wednesday, August 31, there would have to be that production

12   and we'll just do the best we can do on this.

13               Mr. Zucker, do you want to be heard further on

14   this?

15               MR. ZUCKER:  Please.  Because I think there might

16   be, I think the analogy you drew of defense counsel looking

17   through boxes of documents and then deciding which one they

18   want to have copied and produced, and the government knowing

19   of that, I mean it's precisely what Miss Higgins and I did

20   last week with documents that are already in the FBI's

21   possession.  And I think there might be a more feasible

22   solution here, although I will confess technological

23   ignorance.  But it would seem to me that if we were permitted

24   to do our searches in the company of a representative of

25   Shoppers Warehouse so that they could simultaneously review

—53—

1    the results of those searches and invoke any privilege they

2    want, that might be a more cost effective way of doing it.

3    At that point, having looked at the document, we make a

4    decision as we would with the hard paper version of it and

5    say, okay, this is one we want, one we don't want.  If we

6    want it, we do so at our peril knowing that it gets turned

7    over to the government.  If we make the decision, you know

8    what, we don't want it, once they're reviewed the document

9    for privilege, okay, you may see this, we have a chance to

10   look at it and make a decision right there on the spot.  We

11   don't want it.  If we don't want it, then we're in the same

12   position we would be as if we looked at the document in the

13   file in the old days when you were doing this.

14            THE COURT:  I was very young at the time, Mr.

15   Zucker.

16            MR. ZUCKER:  I was trying to catch up.  But

17   anyway, we would then be in the same position, it would be

18   analogous.  We would say, okay, we have looked at it, we

19   don't want it and the government doesn't know about it and we

20   haven't shot ourselves in the foot.

21            THE COURT:  Miss Gavin, what is your response to

22   that?  It seems like that's workable.  What is your position

23   on that?  Essentially we're trying to structure something to

24   get this moving and it seems to me it's not putting an

25   obligation on the government.  It's just trying to interpret

1    what your view of what Mr. Zucker's suggestion is here.

2              MS. GAVIN:  I think whatever he works out with

3    Shoppers is fine.  It's just that I'm going to ask Shoppers

4    what's going on and what information are you giving and what

5    did they say to you, what did they ask you to do.

6              THE COURT:  The fewer questions, Mr. Zucker, to

7    the extent that somebody on the defense team can do it by

8    themselves with Shoppers just standing there is going to make

9    it easier.  I mean we're in this conundrum, and the deferred

10   prosecution agreement is what it is and it can't be redrafted

11   by the court nor can it be limited by the court and it is an

12   agreement between Shoppers and the government.  And Shoppers

13   has to live by it, which is why Shoppers is about to incur

14   big costs as a result of it.  So to the extent that you can

15   work it out, you can figure out a way if somebody's more

16   technologically more astute than someone else to go through

17   the process without verbalizing things with Shoppers, that

18   seems to be fine.  The government's not disputing that.

19             MR. ZUCKER:  Except the government is taking the

20   position that makes it impossible for us to do our

21   investigation without them looking over our shoulder.

22             THE COURT:  But that's the government's right to

23   do it because they have the agreement with Shoppers.

24             MR. ZUCKER:  I'm trying to structure a way to do

25   the inquiry that we maintain our privacy rights and they

1    still get everything --

2              THE COURT:  And the difficulty is you can't.

3              MR. ZUCKER:  Well, but I think we can, Judge.  I

4    think the court has authority to limit this.

5              THE COURT:  I do not.  This court does not have

6    the jurisdiction to redraft the deferred prosecution

7    agreement and impose some confidentiality order upon

8    Shoppers.  The court doesn't have the jurisdiction to do

9    that.  Shoppers has made its decision, which may prove to be

10   an extraordinarily expensive position to take, but they have,

11   their position is they have this deferred prosecution

12   agreement and they have an obligation to answer any and all

13   questions and cooperate fully with the government, and that

14   certainly includes the analogy Miss Gavin drew of being able

15   to ask a cooperating witness exactly what was asked of you

16   one way or the other.

17             So you all -- we've spent enough time on this.

18   You all try to structure it whatever way you want.  The first

19   step is by August 31, the most immediate step is the

20   defendant will first redraft the 17(c) subpoena, more

21   narrowly draft it, Mr. Outlaw, to get that in by tomorrow.

22   Okay.  I will sign the subpoena and you can get it to Mr.

23   Brennan, that's the first step.  Mr. Brennan will then

24   determine what the cost factor will be, as best he can.  And

25   then I will address what costs may have to be assumed by Mr.

1    Small and Mr. White.  And that's where we are.

2              MR. ZUCKER:  I understand.  And can I just

3    respond very briefly on that point alone?

4              THE COURT:  Sure.

5              MR. ZUCKER:  That this is being done as a result

6    of an agreement between the prosecution and Shoppers Food

7    Warehouse with no involvement from the defendants and to

8    incur -- and the result of that is going to be incredibly

9    costfull (sic) to the point that I think that Mr. White and

10   Mr. Small simply are going to be denied access to this if the

11   cost of Shoppers reviewing it for preserving their privilege

12   is, if the onus of that is put on the defendants because we

13   are simply not -- I don't know about Mr. White.  I know Mr.

14   Small is at the brink already and this, the costs of this

15   defense are already putting him close to, close to the point

16   where he'd qualify for public defender.

17             THE COURT:  I understand.  And the bottom line on

18   it --

19             MR. ZUCKER:  So if you put those costs on us as a

20   result of an agreement that the other two parties made,

21   you're putting us in a position of --

22             THE COURT:  No, not really.  Because these

23   factors come up many times as you well know, Mr. Zucker,

24   anytime a party to litigation serves a subpoena upon an

25   individual and the cost may or may not be unduly burdensome,

1    and if the court determines that there's a huge cost factor,

2    that is weighed in terms of the subpoena upon the third

3    party, and then that becomes a matter of weighing the cost.

4    We'll have to determine what the costs are and we'll try to

5    be as equitable as I can be.

6              I will tell you, Mr. Brennan, I'm not suggesting

7    that the cost be divided in three.  I'm not suggesting, Mr.

8    Zucker or Mr. Treem, that your clients pay one-third,

9    one-third and Shoppers pays a third.  I'm not suggesting that

10   at all.  There may be some financial contribution that's

11   required in light of the breadth of the subpoena.

12             So the first step is to redraft the subpoena, do

13   it as narrowly as necessary, Mr. Outlaw, to try to achieve

14   the purpose you're trying to achieve, and from there we'll

15   move forward.

16             MR. BRENNAN:  Again, the company's position, Your

17   Honor, always has been that a narrowly drafted subpoena that

18   goes to specific issues or documents may not be unduly

19   burdensome.  But the way it's drafted now, Your Honor, it

20   becomes that.

21             THE COURT:  I have strong reason to believe that

22   Mr. Treem and Mr. Zucker on behalf of Mr. White and Mr. Small

23   are going to have to some voice with Mr. Outlaw in terms of

24   the breadth of this subpoena, so you try to move forward on

25   it in some fashion.  I have no intentions of redrafting the

1    agreement that your client has with the government.  It's as

2    simple as that.  But we'll try to get there.  But the reality

3    is we have legitimate interests being waived by both the

4    government and the defendants and the main interest of your

5    client is money.  And that's really the blunt summary of it.

6    And the difficulty is is that your client faces this monetary

7    threshold in no small measure because of positions it has

8    taken and agreements it has reached with the government, and

9    that's where it is.  And there are cost implications to it.

10          So unless there's anything further, for the

11   reasons indicated on the record, albeit not as clearly as one

12   would want and after a rather interesting circular round-up,

13   I see all the lawyers laughing here, so Tony, if you'll just

14   translate all this for me when you do the transcript, please.

15   But the Shoppers Warehouse motion to quash the subpoena,

16   number 83, is going to be denied for the reasons indicated on

17   the record.

18          MR. BRENNAN:  Should it be granted and a new one

19   issued, Your Honor?

20          THE COURT:  No, no.  It's going to be denied,

21   your motion to quash is denied.  The defendant Currie's

22   motion for establishing a government taint team to conduct

23   the requested searches, despite Mr. Evans pointed eloquence

24   and zeroing in on the issue, that is going to be denied as

25   well.

1          So 39 is denied, 83 is denied; all for the

2     reasons stated on the record.  And a new subpoena, but having

3     said that, the tangentially it is -- strike that.  Strike

4     that.

5          83 is denied in part and granted in part.  It is

6     denied with respect to the motion to quash, but it is granted

7     with respect to the breadth of that subpoena.  The defendants

8     will draft another subpoena, hopefully more narrowly drafted,

9     that achieves the result they want to achieve.  And then, Mr.

10    Brennan, as I've said, you have until August 31 on this and,

11    Miss Preston-Banks, my chambers will prepare the order on

12    this.  And you'll have until August 31 to make the

13    production, and the first step is to give a reasonable cost

14    estimate of how much you believe it's going to cost and Mr.

15    Small and Mr. White will be required to make some

16    contribution towards it.

17         Mr. Zucker, I'm sensitive as to the financial

18    implications there, so it is not going to be, as I said, on a

19    one-third, one-third, one-third basis, but there will be some

20    costs required by Mr. Small and Mr. White to be paid as a

21    result of this subpoena.

22         So with that, I think the next motion we have, in

23    no particular order, the next motion we have to unseal for

24    limited purpose, paper number 79.  Paper number 59, the

25    motion to compel production of wiretap discovery was denied,

```
 1    so we're now at paper number 79, motion to unseal document

 2    for limited purpose by the defendants.

 3              Essentially the thrust of this motion is that on

 4    April 20 of this year I granted the defendant's motion for a

 5    bill of particulars, which was paper number 38, as to the

 6    names of the defendants' alleged known co-conspirators, and I

 7    ordered that the identities of those alleged known

 8    co-conspirators be filed under seal.  And the government

 9    complied with that order, on April 25 of this year the

10    government filed the notice of alleged known co-conspirators

11    listing two individuals that was placed under seal, paper

12    number 66.

13              The defense counsel essentially are seeking an

14    ability to communicate with the counsel for those two named

15    co-conspirators and essentially they are seeking an unsealing

16    for the limited purpose of being able to contact the lawyers

17    for those two people.

18              Is that a correct summary of this particular

19    motion from the point of view of the defense, Mr. Treem?

20              MR. TREEM:  It is, Your Honor, and we'd be happy

21    to have the government make the notification as they

22    suggested in their papers.

23              THE COURT:  The government has opposed it, but

24    has come up with language that would essentially read --

25    well, I'll hear oral argument in a moment, I'm just putting
```

1    it in context for the moment for the record.  The government

2    has opposed this motion, but the government has suggested

3    that if the court grants the motion to unseal for purposes of

4    defense counsel contacting lawyers for those two individuals

5    that the government provide the letter that would read as

6    follows -- Miss Gavin, if I don't have this correct, you

7    summarize it for me, or Mr. Wise.

8              We are writing to inform you that your client has

9    been identified as a named co-conspirator in a sealed filing

10   in United States versus Currie, et al.  The filing was

11   ordered by the court on a motion from the defense.  We are

12   notifying you at this time solely because that disclosure has

13   been made to the defense in this case.

14             It would still remain under seal, but you would

15   then be free to contact the two lawyers, correct, Mr. Treem?

16             MR. TREEM:  Exactly, Your Honor.

17             THE COURT:  Anything further?  I' just trying to

18   set the posture of this.  Anything further you want to add on

19   this?

20             MR. TREEM:  No, Your Honor.  We're not seeking to

21   intrude on the government's privilege or executive powers,

22   but the circumstances of this case I would submit are

23   somewhat unusual and it's just, we think it's a matter of

24   fundamental fairness and our ability to represent our

25   clients.  So we're not -- if the court wants to simply deny

1          the motion but instruct the government to -- take the

2          government up on its offer to write the letter, we're happy

3          with that.

4                    THE COURT:  I understand.

5                    Miss Gavin.  Mr. Wise.  Do you wish to be heard

6          on this?

7                    MR. WISE:  Yes, Your Honor.  Just briefly.

8                    THE COURT:  Go ahead.

9                    MR. WISE:  As we said in the papers, we don't

10         think there's, we don't think there's authority for the

11         defense to do this.  We as a practical matter don't call up

12         witnesses unless there's some reason to do so and tell them

13         their status.  And the defense hasn't articulated what the

14         reason is other than saying in the interests of candor that

15         they want them to know their status.  But if there is a

16         determination that it's appropriate to tell them, then we

17         think it's properly done through the communication we've

18         outlined because we don't want there to be any hint or

19         misunderstanding as to why we're contacting them, that we're

20         trying to dissuade them from talking to them or intimidate

21         them or anything like that.

22                   THE COURT:  Thank you, Mr. Wise.

23                   As far as I'm concerned, for the same reasons

24         that I indicated when I granted a portion of the motion for

25         bill of particulars, I think to the extent that defendants

1    are charged with a conspiracy and that there are

2    co-conspirators who are known and unknown to the government,

3    the defense has a right to know, well, who are the known

4    conspirators.  If that's the charge, who are the known

5    conspirators?  And so for that reason I granted the motion

6    for bill of particulars, I allowed it to be placed under seal

7    in terms of their own personal privacy.  At some point in

8    time presumably their names are going to be involved in the

9    public trial here in September.  And the defense counsel has

10    a right to contact any witness whom they want to call, either

11    ones that the government intends to call or whom they want to

12    call or inquire.  And properly so, they can't contact these

13    witnesses because apparently I think we're talking about two

14    people apparently and they're represented by lawyers.  So to

15    me it's perfectly reasonable to unseal for that limited

16    purpose.

17            So paper number 79 will be granted, the motion to

18    unseal for limited purpose will be granted.  It will granted

19    with the proviso that the government will provide a letter to

20    the lawyers for those two co-conspirators of their status,

21    and then defense counsel will be free to contact the lawyers

22    for those individuals, and those lawyers may or may not have

23    their clients talk with the defense counsel.  It's strictly

24    up to those lawyers and the position of their respective

25    clients.  Mr. Wise has certainly indicated the position of

```
 1      the government, has indicated the position of the government

 2      with respect to not in any way trying to impede that inquiry.

 3      It's really up to the lawyers for those individual people.

 4      So the motion will be granted.

 5                  MR. TREEM:  Thank you, Your Honor.  Could we get

 6      some indication from the government as to when that might

 7      happen?

 8                  THE COURT:  I'll issue the order tomorrow.  You

 9      can send the letter out by Wednesday, could you not?

10                  MR. WISE:  Absolutely.

11                  THE COURT:  You probably can contact those people

12      by the end of the week, Mr. Treem.

13                  MR. TREEM:  I look forward to it.  Thank you,

14      Your Honor.

15                  THE COURT:  That motion will be granted.

16                  Okay.  We have the motion of Shoppers Food

17      Warehouse, paper number 95, the motion to seal by Shoppers

18      Food Warehouse with respect to grand jury documents.

19                  Mr. Brennan, do you want to be heard further on

20      this?

21                  MR. BRENNAN:  No, Your Honor.

22                  THE COURT:  Hopefully these won't be as expensive

23      to your client as the last time you came to the microphone.

24                  MR. BRENNAN:  Those are exhibits A, B and C to

25      our papers, Your Honor.  I didn't feel it was up to us to
```

1    make those part of the public record and I thought since they

2    were search warrant and grand jury and correspondence between

3    counsel, I thought it most appropriate that they may be

4    sealed.

5              THE COURT:  I thought it might just be the tail

6    end.  Any objection by the government as to this, Miss Gavin,

7    sealing this?

8              MS. GAVIN:  No.  We would prefer it being sealed.

9              THE COURT:  Mr. Evans, Mr. Treem, Mr. Zucker; no

10   objection to this motion?

11             MR. TREEM:  No objection, Your Honor.

12             THE COURT:  This motion will be granted and the

13   motion to seal those materials is granted.

14             We still have pending and probably be addressing

15   it after lunch, we still have pending obviously the motion to

16   dismiss and the legal argument attendant thereto.

17             Perhaps another issue we can address in the

18   interim, as to a jury questionnaire that has been suggested

19   in Mr. Evans' letter of last week and, Miss Gavin, your

20   response, you would agree that a jury questionnaire would be

21   appropriate and you all, I'd certainly be willing to

22   undertake that from the point of view of the clerk's office

23   and the court will do that.  You've indicated that at least

24   the first step was looking at recent effort I undertook in

25   the Drake case.  I see Miss Boardman is here, she's probably

1    here as an expert on that.  I don't know how apt the Drake

2    case would be.  The jury questionnaire is just essentially

3    you would structure it how you want and hopefully you all

4    could come up with a joint jury questionnaire in terms of

5    interest in politics or lack thereof, political points of

6    view, there are all kinds of issues that come up.

7              MS. GAVIN:  As I mentioned in my letter to the

8    court, Your Honor, the government had agreed with the concept

9    which was presented to us as for the purpose of culling out

10   people who had been subject to pretrial publicity.  So I

11   think we need to work out sort of, the defense's story from a

12   much broader questionnaire that's much more extensive.

13             THE COURT:  How much all do you want on that, a

14   month or so?

15             MS. GAVIN:  I don't know how much time the

16   clerk's office needs to send them out and get replies.

17             THE COURT:  Katie, we need them a good month

18   ahead of time or five weeks?  This trial is scheduled to

19   begin on Monday, September 26.  It would seem to me that we

20   could get -- let's put it this way:  The jury questionnaire

21   should go out by Friday, August 26.  I think that, would that

22   give enough time, Miss Preston-Banks, I would think, a good

23   month ahead of time?  The trial is scheduled for September 26

24   and the questionnaire will go out on August 26.

25             And what we will do is as we've done before, I

1      did it in the death penalty case about two years ago and as

2      we were prepared to do in Drake as well in terms of getting

3      responses, we get them, I would discuss them with counsel in

4      terms of an person that clearly would be stricken and we

5      start culling it out and we whittle it down.  Actually we did

6      start doing that in the Drake case, Miss Boardman, did we

7      not?

8                    MS. BOARDMAN:  Yes.  Several were stricken.

9                    THE COURT:  We started going through it.  We do

10     it here in open court and we can figure it out.

11                   So just do your best to get a joint jury

12     questionnaire by Friday, August 26.  You all can notify me if

13     you're having difficulty or objections one way or the other,

14     and then I'll rule upon those fairly quickly.  We can do it

15     on telephone conference.  I'll just go up or down in terms of

16     questions and we'll get to an agreed jury questionnaire by

17     Friday, August 26, so the clerk's office can get that out.

18                   MR. EVANS:  Just so that the record is clear, the

19     jury questionnaire that we forwarded to the government was

20     the Drake questionnaire with the national security issues

21     eliminated and with the, you know, obviously the issues more

22     appropriate for this case.  So it's not a jury questionnaire

23     just limited to questions of pretrial publicity.  And if the

24     government is going to take the position that a jury

25     questionnaire can only be limited to pretrial publicity, that

1    it be two pages of that kind of stuff, then there's no point

2    in doing it.

3         THE COURT:  I don't think the government is

4    taking that.  Let's wait and see how it works out.  The

5    bottom line is I can help you all with this.  I think a jury

6    questionnaire certainly is not limited to just pretrial

7    publicity.  In the Drake case it had to do with impressions

8    of national security issues, the attitudes of people one way

9    or the other.

10        MS. GAVIN:  I understand that, Your Honor.  And

11   I've done it also, Your Honor, in other large cases, but I

12   don't think, for example, we should be sending out jury

13   questionnaires that ask people how many children they have

14   and how old they are in a jury questionnaire.  I don't think

15   that is really the type of stuff that is necessary in this

16   type of case.  We don't ask people that in regular voir dire.

17   That's sort of my -- it's not relevant.

18        THE COURT:  But the point is just do the best you

19   can, and clearly the jury questionnaire should be addressed

20   towards the political attitudes or lack thereof of people

21   with respect to their view of government and where they come

22   from philosophically.  Both sides are free to look into that.

23        Just let me know how you deal with that and the

24   deadline, the clerk's office is going to have to get it out

25   by Friday, August 26, so we'll need some time on that.

1            All right.  With respect to the Jencks material,

2    the defendant has essentially inquired as to the due date for

3    the discovery of Jencks material.  The government has

4    indicated the existence of the discovery agreement signed

5    last fall essentially noting that it's one month before the

6    start of trial and it's so set in the discovery agreement and

7    that's the position of the government, correct, Miss Gavin?

8    That's the government's position.

9            MS. GAVIN:  Yes, Your Honor.  But we have agreed

10   to produce even earlier, as I said in my letter we'll do it

11   on the 27th to accommodate the defense.

12           THE COURT:  Does the defense want to be heard on

13   that?  Obviously you'd like to have the Jencks now, but

14   there's no requirement legally to do it and there is an

15   agreement that defense lawyers signs with the government, so

16   if anybody wants to be heard why they should get Jencks

17   before August 22, that seems perfectly appropriate to me.

18           MR. TREEM:  Your Honor, just so the record is

19   clear, there was some discussion when I think the trial date

20   was moved to September 16 I think was the date prior to this

21   last date that we got, that in fact Jencks would be produced

22   substantially in advance of four weeks and even five weeks.

23   There was some recollection on the part of the defense

24   counsel that Jencks was going to be produced sometime in

25   July.  Now, we understand we're past that and we have a

1    September 26 trial date.  But the practical effect of the

2    production, even in the last week in August, is to

3    significantly limit the time in which we're going to be able

4    to make effective use of the statements.

5         First of all, Your Honor, I would submit that any

6    reasonable production of Jencks on August 22 or August 26 or

7    August 5 is tempered by the volume of Jencks that we are

8    going to get.  If we get a million pages of Jencks on August

9    22, the difference between August 22 and August 26 is not

10   going to make any difference.  If we're only getting 20 pages

11   of Jencks, then I will thank the government for the extra

12   four days.

13        But the point is, Your Honor, that we are in a

14   summer vacation season.  We have to make decisions as to who

15   as defendants we need to call.  The government's not going to

16   give us a witness list.  The only way we're going to have

17   some idea of who the government's going to call is from the

18   Jencks.

19        If the government was going to tell us today, for

20   instance, here are the people we are anticipating calling as

21   of today, it doesn't have to be chiseled in stone, we'd be

22   very happy with that and could probably then live with August

23   22 because then we'd be in a position to make some decisions

24   as to who we need to contact.  And as the government has

25   already run into a problem with one of its key witnesses

1     which necessitated the change to September 26 as the trial

2     date, we're going to be running into problems with witnesses

3     who have already set their fall schedules in stone.

4               And so we need more notice, Your Honor, just as a

5     practical way of effectively representing our clients.  And

6     we understand what the rules say, but we think we've been

7     very accommodating with the government, and we acknowledge

8     that the government's been accommodating with us up to a

9     point.  The point is that given the timing of this case, the

10    holiday and, by the way, there are also religious holidays

11    that fall prior to the trial date that are going to

12    necessitate at least some counsel on the defense side not

13    being able to deal with the Jencks material that we need more

14    time.

15               THE COURT:  Well, Mr. Treem, you and I both know

16    that the reality is is that under the Jencks Act there is no

17    legal obligation on the government under the statute to

18    provide information as to witness statements technically

19    until after the witness testifies.  Now, the U.S. Attorney's

20    Office never goes to that draconian point of view.  The

21    discovery agreement in the case specifically provided for one

22    month and that was part of the arrangement in the discovery

23    agreement which was signed by everyone, so this issue is not

24    unique.  This comes up in all cases obviously defense

25    attorneys wants Jencks as quickly as they can get it and the

1    government holds back as long as they can.  I think that

2    Monday, August 22, is more than reasonable in light of a

3    Monday, September 26 trial date, so Jencks production will be

4    due by Monday, August 22.

5                   Now, as to the witness list, Miss Gavin, you're

6    also prepared to provide -- I'm sorry -- the witness and

7    exhibit list, you're also prepared to provide the exhibit

8    list by August 22, correct?

9                   MS. GAVIN:  Yes, Your Honor.

10                  THE COURT:  And that will be done.

11                  Let's address the matter of the witness list,

12   Miss Gavin.  To what extent is there a huge variance between

13   the Jencks list and the witness list?

14                  MS. GAVIN:  I think there will probably not be a

15   huge variance, but I think it is inappropriate for the

16   government to have to give a witness list of its decisions as

17   to who it's actually going to call a month before trial or

18   anytime ahead of trial.  You know, the government has its

19   interests in preserving its strategy, how it's going to

20   present its case, and the defense is being given everything

21   they're entitled to and more.  And there's no basis to

22   require the government to lay out its trial strategy ahead of

23   time.

24                  THE COURT:  Well, let me respond to that because

25   I think that with respect to the matter of trial strategy, I

1    don't know that witness lists always disclose trial strategy.

2    From the point of view of any litigant who is seeking to

3    prepare to respond to the testimony of a witness, the very

4    reason why I think that August 22 is appropriate as to

5    Jencks, I think it's fair on the part of the government so

6    the defense has an opportunity to review grand jury

7    transcripts and prepare for cross examination and possible

8    attack on credibility of a particular witness as to whom

9    there's Jencks.  And I would presume that in this case, as

10   thoroughly as I gather the government has taken the time to

11   present this case to the grand jury, that the reason I ask to

12   what extent there's a variance between the witness list and

13   the Jencks list because I have a strong suspicion there's not

14   much of a variance in terms of most of the witnesses, I

15   suspect, there is Jencks material as to them.  Is that not

16   the case?

17            MS. GAVIN:  That's correct, Your Honor.  And it's

18   fairly obvious and the defense, I would point out, Your

19   Honor, since this past winter, has been in possession, we

20   have produced to them nearly every 302 produced in this case.

21   So they are on notice.  They know who the witnesses are, and

22   their clients know who the witnesses are that have

23   information on the things that are laid out in very detailed

24   fashion in the indictment.

25            THE COURT:  My point is this:  Given that there's

1    not a great variance and given that the government is, I

2    think, being very magnanimous about handing over of the

3    Jencks material and the exhibit list on August 22, I'm

4    suggesting that you extend your magnanimity because I think

5    that I'm not finding a lot of basis for there to be a

6    distinction here between the Jencks list, the exhibit list

7    and the witness list.  It seems perfectly appropriate.  No

8    one is asking you to divulge trial strategy.  To the extent

9    that there are loads of 302, I think in light of the nature

10   of the charges in this case, Miss Gavin, and in light of the

11   preparation that both sides need to undertake, I'm just, I

12   find, again, there's no jurisdictional basis for the court to

13   order this because, quite frankly, the government could

14   decide it didn't want to turn over Jencks until after the

15   witness testified.  I'm just suggesting that I think that

16   you've been very fair in your approach as to the Jencks and

17   to the exhibit list, and I think you should extend it to the

18   witness list.  I don't find any great jeopardy to the

19   government.  I don't find any great prejudice to the

20   government.  The defense may or may not already know these

21   witnesses, but it seems to me that it makes perfectly good

22   sense that we have Monday, August 22, be the day that here's

23   our exhibit list, here's our witness list, and as to 80 or 90

24   percent of the witnesses here is the Jencks material as to

25   those witnesses and there it is, it's five weeks before

1          trial.  It seems to me to be fair.

2                     MS. GAVIN:  Your Honor, will the court order the

3          defense to produce to us an exhibit list and a witness list?

4                     THE COURT:  Yes.

5                     MS. GAVIN:  Will they produce that on August 22.

6                     THE COURT:  We're about to find out.  Given that

7          there is reverse Jencks and reverse exhibit and witness lists

8          and what have you, I don't see any basis, one of the lawyers

9          can try to convince me why you all shouldn't be, but it's

10         going to be tough sledding.  So don't make Mr. Outlaw be the

11         one to do it, he's had tough sledding.  Let somebody else try

12         to carry that banner.

13                    MR. TREEM:  Your Honor, I will try at least

14         initially.  On behalf of Mr. White, I have no problem

15         producing reciprocal discovery.  But as I think the court

16         knows from prior correspondence or hearings that Mr. White

17         retired from Shoppers in 2006.  So our reciprocal discovery

18         is going to depend almost entirely, if not entirely, on

19         whatever it is the government has designated they're going to

20         introduce.  So what we need -- we don't need August 22

21         because that's going to be an impossibility to do.  If the

22         court wants to give us a deadline in the middle of September,

23         we can do that.

24                    THE COURT:  We're going to move it up a little

25         more than that, Mr. Treem, but I hear what you're saying.

1                    Mr. Zucker, do you want to be heard on this?

2                    MR. ZUCKER:  I didn't want to cut Mr. Treem off.

3                    Your Honor, it's impossible for us to do until we

4          hear the government's case is really what it comes down to.

5                    THE COURT:  Mr. Zucker, don't even try to go down

6          that path.  Don't suggest for a minute that you have to hear

7          the direct evidence and maybe during the trial you'll let us

8          know who the witnesses are.  Everyone can supplement.  We're

9          being fair here on this.  There's no great secret.  All you

10         lawyers have worked very hard in the case.  You're very

11         familiar with the case.  I think everyone understands that

12         there's not a lot of surprises here.  We understand the legal

13         theory, we're going to be discussing that after lunch.  I

14         understand Mr. Treem's point that he needs to see perhaps the

15         exhibit list and the witness list, but the basis of saying

16         that you can wait until the eve of trial or hear what the

17         witnesses say, that's just not going to cut it with me.  So

18         give me a date.  Don't even try to go there.  Give me a date.

19         What's the date?

20                   MR. ZUCKER:  I'll just ask that the last date the

21         court can live with.

22                   THE COURT:  The last date I'm going to live with,

23         I think it's fair for the defense to have about a week or so

24         to see what the government has listed as witnesses.

25         Obviously to the extent that there is, that there is some

1    amendment to trial strategy, both sides aren't going to be

2    thrown over the coals on that, but I certainly think Tuesday

3    after Labor Day would give the defense a week and a half to

4    look at the exhibit list, the witness list, and have some

5    feel for who their witnesses are going to be, and that's what

6    I'm inclined to do.

7              MR. TREEM:  Your Honor, I'm not here the week

8    before and several days after Labor Day.

9              THE COURT:  Well, you're going to have to do it

10   ahead of time, Mr. Treem.

11             MR. TREEM:  I'm not going to be able to, Your

12   Honor, because the government will not produce it to me.

13             THE COURT:  We're going to have some fairness

14   here.  That's the way it's going to be

15             MR. TREEM:  Your Honor, the point is, if you want

16   fairness, that's not fair.  I need at least another week.  I

17   need until sometime in the middle of September.

18             THE COURT:  You're not going to get until the

19   middle of September.  I'm willing to give you --

20             MR. EVANS:  I was going to suggest September 12.

21             THE COURT:  That's the Monday after Labor Day.

22             MR. EVANS:  Correct.

23             THE COURT:  I think that that's, trying to do gas

24   pedal and clutch here, nobody's totally satisfied.  I'll take

25   Monday, September 12, for reciprocal defense discovery with

1    witnesses, exhibit lists back to the government, that's two

2    weeks prior to trial, Miss Gavin, so I am going to order

3    reciprocal discovery.  And Miss Cole, we'll do a separate

4    letter order on this.

5              Go ahead, Mr. Evans.

6              MR. EVANS:  I'm sorry.

7              THE COURT:  Go ahead.

8              MR. EVANS:  The discovery -- I just want to make

9    sure everyone understands that the discovery obligations are

10   different for the defense than they are for the government.

11   In other words, we are obliged to disclose documents that we

12   intend to introduce in our case in chief and to the extent I

13   just want to, I don't want anyone to think we're being coy or

14   disingenuous, but to the extent that we have documents which

15   we would introduce in cross of government witnesses, that is

16   not covered in Rule 16.

17             THE COURT:  I think that's generally correct.

18   That's right.  Just as the government is not required with

19   rebuttal, for example.  The government is not required

20   discovery with respect to rebuttal.

21             MS. GAVIN:  That's also one of the reasons, Your

22   Honor, that the government witness lists are not usually

23   required to be produced so far in advance of trial because

24   the defense then has an opportunity -- they have not produced

25   one piece of paper in reciprocal discovery which is required

1    under our discovery agreements to date.  And the defense

2    generally takes the position, well, we don't know what we're

3    going to introduce in our case in chief.  That's always the

4    answer and why the government never really gets any

5    reciprocal discovery.

6              So now the government is getting pushed into a

7    position where it's saying it's only fair for the government

8    to produce a witness list, you know, five weeks before trial,

9    still not having received any reciprocal discovery.  And then

10   the defense is saying that, well, we're not going to be able

11   to make any decision about some of this stuff until we see

12   what comes in through the government's case.  So that we're,

13   you know, this is not fair basically is my view.

14             MR. EVANS:  Virtually every document that we

15   presently contemplate introducing has been supplied to us by

16   the government.  There is a small portion -- I'm just

17   speaking now for Senator Currie -- there's a very small

18   portion and, you know, and to the extent that we don't think

19   we can introduce it through a government witness, it will be

20   disclosed.  We understand our discovery obligations.

21             THE COURT:  It will be disclosed by September 12.

22             MR. EVANS:  Absolutely.

23             MR. TREEM:  Your Honor, I'd just want to make one

24   point in response to Miss Gavin's lament about not getting

25   reciprocal discovery.  I think the fair inference to be drawn

1    from the fact that we have not produced on behalf of Mr.

2    White any documents as part of our reciprocal discovery

3    agreement is that we don't have any.  That would be the fair

4    inference.  As opposed to the government chastising us for

5    somehow implicitly violating our obligations.

6              THE COURT:  No reason to get angry.  We're

7    getting ready for lunch.  Everybody's getting hungry here

8    now.  We're going to take a break for lunch in a minute and

9    continue after lunch.

10             All right.  We resolved the witness and exhibit

11   list, the Jencks production date, the jury questionnaire.  I

12   think that we have one last matter to address before we get

13   to the legal argument on the motion to dismiss the

14   indictment.  I think one last matter has to do with the

15   request, I think it's part of the pretrial motions, but it's

16   also referenced in, it's referenced in Miss Gavin's letter

17   with respect to grand jury transcripts.

18             There's reference in your letter, Miss Gavin, you

19   addressed the issue with respect to grand jury transcripts.

20   Mr. Evans has asked for the full version of those transcripts

21   and there's some suggestion in the motions, at least we can

22   start looking at this with respect to the court's in camera

23   review of grand jury instructs.

24             MS. GAVIN:  Two separate issues.

25             THE COURT:  Okay.  What is it with the grand jury

1    transcripts -- well, no, Mr. Evans mentioned in his letter to

2    me of last week the issue of disclosure of legal instructions

3    to the grand jury.  You responded, Miss Gavin responded on

4    the issue of grand jury transcripts.

5              MR. EVANS:  Right.  The legal instructions is a

6    wholly separate issue.

7              Just, I think I can resolve this quite quickly.

8    The government supplied us with excerpted grand jury

9    transcripts because there were Brady information in them.  We

10   have communicated back and forth with regard to what, and

11   what we wanted was we wanted the entire transcript so that we

12   could see the context of this information that the witness is

13   giving.

14             THE COURT:  That the government felt was within

15   the ambit of Brady versus Maryland.

16             MR. EVANS:  Correct.  Now, I don't know how many

17   of these transcripts are going to be disclosed in full on

18   August 22, and to the extent they are going to be disclosed

19   on August 22, I'm happy to live with that.  But to the extent

20   that the full grand jury transcript is not disclosed even

21   though the Brady portion has been, what we have requested is

22   that we get the entire transcript so that we don't, you know,

23   step into some sort of witness trap basically where the

24   witness is saying ten bad things and then there's one good

25   thing and we call the witness --

82

```
 1              THE COURT:  That seems to me that's going to be
 2    resolved when you get to Jencks by August 22.
 3              MR. EVANS:  If it's going to be resolved by the
 4    time we get Jencks --
 5              MS. GAVIN:  I can't say as I sit here, Your
 6    Honor, whether all of those portions that were produced, the
 7    witnesses, whether all of them are going to be on the
 8    government's witness list, whether we're actually planning to
 9    call them, but I mean under the concept of discovery in this,
10    the government has an obligation to provide information that
11    may be relevant on that issue.  We have done that.  And so to
12    the extent that they want to see an entire transcript, a lot
13    of that is not discoverable or may not be discoverable.  And
14    what I suggested to Mr. Evans is please tell us what pages
15    you're saying you can't understand, because that is how it
16    was presented, we can't tell what's going on, and I'll be
17    happy to look at that and see if there's some way to try and
18    address --
19              THE COURT:  Doesn't sound like I need to work on
20    this issue.  Certainly you all can work it out.  Certainly
21    you're going to get the Jencks on August 22.
22              MR. EVANS:  If there's an issue after that, we'll
23    raise it with the court at the time.
24              THE COURT:  It seems to me then that where we are
25    is basically we're going to break for lunch now, at two
```

1   o'clock we'll pick it up again as to legal argument on the

2   motion to dismiss the indictment and the issues raised

3   therein including the motion for severance.  Essentially what

4   is pending before the court now is the motion to dismiss the

5   indictment on the contention that official duties is

6   unconstitutionally vague and fails to provide notice; the

7   motion to dismiss the Hobbs Act, count eight; the motion for

8   severance as to the defendants as well as the motion for

9   severance as to counts 17 and 18, the false statement counts;

10  and then a motion to strike with respect to allegation as to

11  Senator Currie's vote on certain legislation; and then the

12  defendant's request for in camera review of grand jury

13  instructions.  They are what is before the court that has

14  been fully briefed and we'll have legal argument on that

15  after lunch.

16          MS. GAVIN:  Your Honor, just one additional

17  portion thereof in the motion to strike, there are some other

18  background allegations that, paragraph six, some of the

19  subparagraphs.

20          THE COURT:  Paragraphs 6A, B and C is a motion to

21  strike --

22          MS. GAVIN:  C, D and E as well, Your Honor.

23          THE COURT:  Okay.  And we'll address that.  Then

24  I'll try to get some of these orders prepared during the

25  lunch hour or certainly the beginning of the afternoon

1    session.  I'm very serious about this matter and I want both

2    sides to know, I've pushed both sides and that there should

3    not be a lot of surprises in this case.  The issues in this

4    case are pretty well defined, which is why the government

5    needs to get the exhibit list and the Jencks material and the

6    exhibits by August 22.  Mr. Treem, I've given you as much

7    time as I can give you, by September 12 I expect reciprocal

8    good faith discovery on the part of the defense.  And

9    certainly if you know full well you've got exhibits that are

10   going to be introduced, and I expect you in good faith, as

11   Mr. Evans has suggested, to get those to the government as

12   well so everyone has information here.  We're not going to

13   have a trial by surprise here, it's going to be teed up for

14   everybody so we knows what the case is about.

15              So with that we have handled the other motions

16   and we'll break for lunch until two o'clock, and at two

17   o'clock we'll have legal argument on the motion to dismiss

18   the indictment.

19              And Mr. Brennan, if you as quickly as possible,

20   as soon as Mr. Outlaw gets that subpoena to me, and gets it

21   to you, hopefully the team is going to narrow it as best they

22   can.  As quick as possible, I had not given you a deadline on

23   it, but as quick as you can, give me a reasonable cost

24   estimate what this is going to cost, you believe, to your

25   client, and then I will have to address with defendants,

1    particularly those that are not represented by government

2    counsel, I'm going to have to address with Mr. Small and Mr.

3    White a contribution toward the cost.  And, again, I'm not

4    suggesting it's going to be a third, a third, a third, but

5    it's going to be some contribution required and we'll go from

6    there.  So with that, we will stand in recess until two

7    o'clock.

8                    (LUNCH RECESS.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          AFTERNOON SESSION

 2                THE COURT:  We are continuing in the motions

 3      hearing in United States versus Currie, White and Small,

 4      criminal number RDB-10-532.

 5                     Presently pending before the court is the motion

 6      to dismiss the indictment filed by the defendant.  I'll say

 7      parenthetically obviously that counts nine, 10, 11, 12, 13,

 8      14, 15 and 16 have already been dismissed by the court

 9      without prejudice on May 11 of this year based upon a

10      government motion and obviously the defendant's consent, so

11      we'll talk about the renumbering of the indictment in a

12      moment ultimately.

13                     What I would propose to do, counsel, is first as

14      to the motion to dismiss the indictment, paper number 45, let

15      us first hear argument on -- the way I'd like to proceed is

16      to have argument on counts two through seven with respect to

17      the motion to dismiss under what I'd call the Travel Act

18      counts, and then address the motion to dismiss count eight,

19      the Hobbs Act count, and then the motion for severance and

20      hear argument back and forth on each one of these as we go

21      through them.

22                     Is that agreeable to you, Miss Gavin or Mr. Wise?

23                THE MS. GAVIN:  Yes, Your Honor.

24                THE COURT:  Mr. Evans and Mr. Treem and Mr.

25      Zucker and Mr. Outlaw, is that agreeable to you?
```

1          MR. EVANS:  Yes, sir.

2          THE COURT:  Mr. Vitek?

3          MR. VITEK:  Yes, sir.

4          THE COURT:  I assume you had to do all the

5    research, Mr. Vitek.  The younger the lawyer, the more work

6    has generally been done down there.

7          All right.  And so with that, I'll be glad to

8    hear from you, Mr. Evans, if you want to take the lead on

9    this.

10          MR. EVANS:  So Your Honor wants me to address

11   counts one through seven?

12          THE COURT:  Counts one through seven, essentially

13   the conspiracy count -- the conspiracy count is based both on

14   an alleged Hobbs Act violation as well as an alleged Travel

15   Act violation, and counts two through seven are the Travel

16   Act charges, and count eight is the Hobbs Act charge, so you

17   can address counts one through seven first if you'd like.

18   Thank you.

19          MR. EVANS:  What I don't want to do, Your Honor,

20   is repeat what's in our papers.  That serves no purpose

21   whatsoever.

22          THE COURT:  That's right.

23          MR. EVANS:  So what I'd like to do is kind of

24   just jump to the bottom line here.  We think that counts one

25   through seven, by implication actually eight, are void for

1    vagueness because of the ambiguity associated with the term

2    official duties.

3              Now, I know it's tempting for, certainly for all

4    of us, for me, to think to one's self, well, Senator Currie

5    was a senator.  Everyone knows what senators do.  But the

6    problem in this specific case is that Senator Currie, like

7    all Maryland legislators, is a part-time legislator.  The

8    Maryland Constitution calls for a citizen legislature and so

9    each and every legislator works part-time and virtually all

10   of them have additional employment.  For some of them it's

11   subordinate employment, for some others, it's actually their

12   major employment, so you can't really talk about it as being,

13   it's not fair to say that the legislative position is at the

14   core and everything else is surrounding it.

15             Now, with Senator Currie, given his age, his

16   primary employment was with the Maryland State Senate, but he

17   did have this consulting arrangement with Shoppers.  So the

18   question is when you're dealing with a state employee whose

19   duties are not defined by statute, not defined by regulation,

20   not codified anywhere, anyplace, and where there is an

21   expectation and an understanding, this is I think crucial,

22   there is an expectation and understanding that a Maryland

23   legislator as a part-time legislator will have other work

24   that causes him to interact with government entities at the

25   state, local and actually even also at the federal level.

1           So it's understood that in the course of non,

2     I'll call it non-legislative, that might be an overbroad

3     term, but just for our purposes, for the purposes of

4     non-legislative employment, a Maryland legislator will

5     interact with Maryland government.

6           Secondly, the specific rule that delineates what

7     is permitted and what is not permitted by the Maryland

8     legislator who is interacting with Maryland government is

9     that he can do anything a private consultant could do, so

10    long as he doesn't charge a contingent fee.

11          So that means, I mean one of the allegations here

12    is that Senator Currie enabled a meeting between Shoppers

13    representatives and the administrator of the state highway

14    administration about a traffic light in Baltimore County.

15    I'm just using that as one, for instance --

16          THE COURT:  That was Route 140 if I'm not

17    mistaken.

18          MR. EVANS:  Right.  In the Owings Mills,

19    Reistertown Road area.

20          So the question is was that an official act, does

21    that implicate Senator Currie's official duties?  I'm just

22    using this as one example.

23          So if a private consultant, and let's even say a

24    private consultant who's known to the administrator, friend

25    of his, for example, or someone he's worked with in the past,

1    if a private consultant could call up the administrator and

2    say, hey, I would like you to sit down with Shoppers people

3    to talk about a traffic light on Route 140, then if that

4    could occur, then Senator Currie is permitted to do that as

5    well.

6              So that I think highlights the problem.  There

7    are actions and circumstances that Senator Currie is

8    permitted to do that any private consultant is able to do and

9    the question is how can a fact finder, after the fact, be the

10   one to say, okay, when Senator Currie did it that was

11   official, but when the private party did it, that wasn't

12   official.  So it becomes, I mean, when one tries to determine

13   what it is that is an official act by Senator Currie, it

14   becomes really quite difficult.

15             Coupled with the fact, in the Route 140 example,

16   coupled with the fact that at the meeting Senator Currie by

17   all accounts said nothing and did nothing, and by all

18   accounts the ball was taken by the Shoppers folks, and the

19   request for the traffic light was denied.  So there was no

20   traffic light put in there on Route 140.  So what did Senator

21   Currie do in that situation?  He didn't threaten anybody's

22   budget, he didn't exert any influence, he didn't do anything

23   that's linked to his clearly legislative responsibilities.

24   He orchestrated a meeting that resulted in nothing.

25             Now, if that's an official act on his part,

 1    frankly I'm hard-pressed to see it.  But what I, and I don't

 2    intend to go through all of the transactions, but I take that

 3    as simply an excellent example of how it is one can define

 4    the phrase official duties.

 5           Now, this is the word in the Maryland bribery

 6    statute.  It is undefined.  It's defined in the federal

 7    system.  It's undefined in the state system.

 8           THE COURT:  The Travel Act charges are predicated

 9    upon the violations of the Maryland bribery statute.  The

10    Hobbs Act charge is not, it's under color of official, right.

11           MR. EVANS:  But the point I'm trying to make here

12    is there is no definition of what constitutes official acts,

13    and there are no cases anywhere in the state of Maryland that

14    address the question of what you, you know, how one deals

15    with the situation where there is this hybrid employment of

16    both official and non-official.  Each and every bribery case

17    in Maryland has to do with someone who has full-time

18    responsibilities and has a well-defined set of

19    responsibilities and is clearly acting within the ambit of

20    that.

21           There is no Maryland case that deals with this

22    unusual, very, very unusual situation where we're dealing

23    with someone where the expectation is that he's wearing his

24    official -- whether he's wearing his official hat or

25    non-official hat.

1          The problem isn't limited to Senator Currie

2   because it bears directly on the mens rea, the state of mind,

3   the level of knowledge of Mr. White and Mr. Small because

4   they are accused, the indictment against them reads, or

5   fairly read, I guess, I'm not quoting literally, but what it

6   requires is actions on their part to influence corruptly

7   Senator Currie in the operation of Senator Currie's official

8   actions.

9          So it's not just Senator Currie who has some

10  doubt about what's official and what's not.  It's a huge

11  issue with people who have nothing to do with the Maryland

12  legislature, namely Mr. White and Mr. Small.  How are they

13  supposed to know for someone like Senator Currie what's

14  official and what's not?  It's a problem.  It's a big

15  problem.  And it's embedded at the core of this case.

16         So we have the question of what the official

17  duties are of a citizen legislator.  We have the question of

18  what Senator Currie understood his official duties to be.  We

19  have the question of what Mr. White and Mr. Small understood

20  Senator Currie's duties to be.  And we have no, you know, we

21  have nothing to look at, we don't have a book or a rule book

22  or anything which says here is what he can do or not do.

23         Now, that is, and that is a vagueness problem.

24  That is a notice problem.  And it's not simply a notice to

25  Senator Currie; it's a notice to Mr. White and Mr. Small as

1    well.

2              So when we look at what the indictment says in

3    the paragraph labelled obligations and duties, I believe --

4    duties and laws, paragraph six, so we first look at paragraph

5    6A.  So 6A says that Senator Currie owes a duty of honest

6    services.  We know from United States versus Skilling what

7    that means.  That means he can't be bribed.  That's all that

8    that means.  It has no significance beyond the synonymous

9    assertion that bribery is illegal.  Of course, bribery is

10   illegal for Senator Currie, bribery is illegal for every

11   state employee.  So the fact that bribery is illegal doesn't

12   inform on the question of what his actual duties are.

13             And I think the government has acknowledged some

14   modest concession about striking paragraph 6A, but I'm sure

15   that I'm overstating it, frankly.

16             Paragraph 6B simply says that Senator Currie had

17   the obligation not to be bribed.  6A and 6B are tautologic,

18   they just use the same logic to say the same thing.

19             THE COURT:  6A refers to Travel Act violations

20   and 6B is to the Hobbs Act allegation, isn't it?

21             MR. EVANS:  No, no.  I'm talking about in

22   paragraph six of the indictment.

23             THE COURT:  I'm sorry.  Honest services is 6A.

24             MR. EVANS:  And bribery is 6B.  What I was saying

25   is the honest services, that's simply a Skilling way of

1    saying bribery.

2              THE COURT:  I understand.

3              MR. EVANS:  So paragraph 6C says that a public

4    employee can't use his position for private gain.  Once

5    again, this is a prohibition, and it's a reasonable one, and

6    it applies to any member of the Maryland legislature.  It

7    applies to all the attorneys in the attorney general's

8    office.  It applies to all the employees in the state

9    comptroller's office.  It applies to everyone.  But it

10   doesn't inform, again, on the core question which is what are

11   the duties of a Maryland legislator.

12             And it also, 6C also is probably Skilling-barred

13   as well because what it effectively states is that a public

14   employee who profits from his position is engaged in a

15   conflict of interest and so 6C is probably Skilling-barred.

16             6D indicates that Senator Currie was required to

17   file a financial disclosure form.  That's true enough, he

18   was.  Many state employees, assistant attorneys general,

19   people in the comptroller's office, people in the governor's

20   office, a host of people are required to file financial

21   disclosure forms.  But it doesn't say, that doesn't, again,

22   bear on the question of just what it is his official duty is.

23   And when he met with the state highway administrator

24   regarding a traffic light at 140, the fact that he's not

25   permitted -- the fact that he's got to file a financial

1          disclosure form is, what, kind of a non-sequitur actually.

2                    And finally, paragraph 6E indicates that he was

3          supposed to file sworn conflict of interest disclosures.

4          Okay.  That's true again.  That's true for many individuals

5          again in state government.  It doesn't though add to the

6          realm of information or the realm of definition of what an

7          official duty is.

8                    So what is the effect of these allegations here,

9          and why is it that we care about them?  Well, we care about

10         them for this reason, and we readily understand, and I think

11         this was clear in our papers, we readily understand that it

12         may, that there may be some evidentiary value as to the

13         intent of Senator Currie for the government to introduce

14         evidence of an incomplete financial disclosure form.  We're

15         not suggesting that that evidence is not admissible.  We

16         understand it's admissible.  What we object to is the

17         elevation of what are the laws of the state of Maryland, in

18         general, to some kind of stature in this indictment that will

19         go to the jury that indicates that those are his official

20         duties.  They are not.  They are not his official duties.

21                   So, number one, there's no, there is nothing in

22         the indictment that describes his official duties, number

23         one, and that's a problem because those duties, the nature of

24         those duties is, with regard to a part-time employee,

25         ambiguous.

96

1                    Number two, to the extent that these paragraphs

2          in essentially 6A, C, D and E purport to define his official

3          duties, they don't, and to that extent they are misleading.

4                    And point number three is just -- I just lost it.

5          But so the question here is what, so the question is what is

6          his official duty.  And you can look to statutes,

7          regulations, you can look to common practice, but there's

8          nothing here that defines it.

9                    THE COURT:  What is your response to the language

10         that's been noted by the government in the Maryland Court of

11         Appeals opinion last year in Thomas versus State where the

12         defendant was a Prince George's County Office of Central

13         Services deputy director, and in that case he was accused of

14         accepting a bribe in exchange for attempting to secure

15         approval of a developmental project.  And on appeal Mr.

16         Thomas argued that since he couldn't approve of the project

17         himself that his conduct was not part of his official duties,

18         and the court of appeals affirmed the conviction in terms of

19         interpreting, addressing this very question, what's official

20         duties.

21                    And the language of the court of appeals, I

22         forget who authored the opinion, I should remember and I

23         don't, but last year the language is an officer's conduct

24         need not be specifically prescribed by statute in order to

25         constitute an official act, and it is sufficient that the

1    duty exists by reason of natural implication from the powers

2    specifically granted by statute, or by reason of the lawful

3    custom or regulation of a department of government.

4              Does not the requirement of filing a financial

5    disclosure statement under Subtitle 6 of Title 15, or a

6    conflict of interest statement under Subtitle 5 of Title 15,

7    does not that constitute a regulation of a department of

8    government, in this case a regulation of the Maryland General

9    Assembly, Mr. Evans?

10             MR. EVANS:  Absolutely.

11             THE COURT:  And then if it does, then the Court

12   of Appeals of Maryland has essentially said that official

13   duty need not be specifically prescribed, and it is

14   sufficient that a duty exists by reason of natural

15   implication or by reason of regulation.

16             So isn't the crux of this what the implications

17   are within the statute as to the allegation that Senator

18   Currie did not file a conflict of interest form or a

19   financial disclosure form basically not divulging services

20   that he performed for Shoppers Warehouse?

21             MR. EVANS:  Well, I guess what the point I'm

22   trying to make, Your Honor, is that is an overarching duty

23   for many different state employees.  So if you're the

24   attorney general, let's say, Mr. Gansler, he has to file

25   similar disclosure forms.  But the duties, the official

1    duties of the attorney general are different than the

2    official duties of a state senator.  So we concede the

3    legitimacy of evidence associated with the disclosure form,

4    conceded that from day one, though there will be plenty of

5    evidence of his disclosure generally, but as to the

6    disclosure forms we acknowledged their evidentiary value or

7    not, but evidentiary admissibility.

8              THE COURT:  I guess my question precisely is that

9    the Court of Appeals language last year on this precise point

10   it seems to me essentially said it need not be specifically

11   prescribed by statute and it exists by reason of natural

12   implication from certain powers as well as by regulations of

13   the department of government.  So my question to you then is

14   it seems to me that language is fairly broad from Maryland's

15   highest court in terms of interpreting the state statute,

16   that it basically has to do as to the natural implications,

17   in this case being a member of the Maryland state senate and

18   regulations attendant thereto, that, yes, your argument is

19   it's a part-time position, they're free to be dentists,

20   doctors, contractors, whatever, and the manner in which their

21   conduct is regulated is that if there's something that they

22   do in their capacity of whatever it is, be it a contractor or

23   a dentist, a doctor, or whatever.

24             MR. EVANS:  Consultant.

25             THE COURT:  That's right.  Consultant.  That they

1  just need to disclose in order then to trigger the

2  mechanisms.  And how do you get around the fact that the

3  Court of Appeals of Maryland has specifically said that it

4  does not need to be specifically prescribed by statute?

5  That's my question to you.  Because clearly the Court of

6  Appeals in Maryland seem to say that it doesn't need to be

7  because you have these other indicia that you're supposed to

8  analyze essentially.

9          MR. EVANS:  Well, first of all, I don't think

10  Thomas addressed the point we're raising.  Thomas didn't

11  address the question of whether the word official duties or

12  the phrase official duties or official acts was void for

13  vagueness.

14          In Thomas, he was a full-time PG County employee,

15  and the issue in Thomas --

16          THE COURT:  I think you say Prince George's

17  County.  I think people from Prince George's County prefer it

18  to be Prince George's County, not PG County, Mr. Evans.  I

19  think Senator Currie would agree with that, it's Prince

20  George's county, correct, Senator?

21          THE DEFENDANT:  I agree with you, Judge.

22          THE COURT:  It's not PG County, it's Prince

23  George's County.

24          MR. EVANS:  Well, us folks from up north --

25          THE COURT:  That's all right.  We don't have any

1   AA County or PG County, we have Anne Arundel and Prince

2   George's and all of them are pronounced.

3              Go ahead, Mr. Evans.

4              MR. EVANS:  So this individual was in Prince

5   George's County government and he was accepting a payment to

6   do something that actually was not within his direct control.

7   Okay.

8              So the question in Thomas was is it bribery when

9   the person accepts the money but can't perform.  That's

10  really the issue in Thomas.  And the court of appeals there

11  said, as I read Thomas, is if you, you know, if an individual

12  portrays himself as having that power and accepts money to

13  influence him, then that's bribery.  Okay.  But the whole

14  question of what defines official duties is really not on the

15  table in Thomas, and it's really not on the table for a

16  part-time state employee.  So I don't read Thomas perhaps

17  quite so liberally because it seems to me that it doesn't

18  actually address the question of how one defines official

19  duties.

20             It is true there doesn't need to be a statute,

21  although a statute would be nice.  It's true that there

22  doesn't need to be regulations, though regulations would be

23  nice.  But what there has to be is something that is

24  identifiable to the public and to the people involved so that

25  they know what it is.  And the absence of a statute and the

1    absence of regulations make it very difficult to know,

2    particularly if you're Mr. Small or Mr. White.  Those are

3    people who just in the course of their daily operations

4    aren't schooled in the esoterica of Maryland state

5    legislative activities.  And their intent, of course, is key

6    to this entire case because if they didn't have the intent to

7    bribe, there's no bribery.

8              So the question is how does one, all we are

9    saying, and particularly given -- and all of these issues

10   dovetail, but when you talk about a duty for honest and fair

11   services, you talk about a duty to not profit from a public

12   position or a duty to file disclosure forms.  Those are all,

13   all reminiscent of and evocative of Skilling.

14             I mean one of the problems here is that Skilling,

15   the way that Skilling has infiltrated this entire indictment,

16   and it makes it hard, makes it virtually impossible actually,

17   to parse out what's actually bribery and what is the residue

18   and remnants of Skilling.

19             That's why, for example, to segue into the other

20   point down the road, but the question of an in camera review

21   of the legal instructions.  The whole point of that is to

22   see, and we're just really, I mean when push comes to shove

23   it's an in camera review.  I know that we asked for it to be

24   disclosed to us, but we would rely on the court actually to

25   make an appropriate assessment.  But the whole question is

1    what was the grand jury told about what Senator Currie's

2    official duties were, and how close was it to Skilling which

3    was then barred?  I mean at the time this grand jury

4    indicted, Skilling had already been decided.

5            THE COURT:  Skilling didn't totally vitiate

6    bribery charges under the mail fraud statute, Mr. Evans.  It

7    just defined, it gave greater definition to what the meaning

8    of honest services was and it still bars direct bribery.

9            MR. EVANS:  But that's it.  That's it.  It bars

10   direct bribery and that's it.  Nothing more.  And when these

11   assertions are made in paragraph 6 of the indictment about

12   duties and laws, duties and laws, it makes it sound to an

13   ordinary person like if one were to violate paragraph 6D,

14   that is, failing to file a financial disclosure form, then

15   one's guilty of this charge.  And that's really not true at

16   all.  If the jury finds that Senator Currie did not -- well,

17   let me put it this way, let me put it in a more substantive

18   way.

19           If the jury thinks that Senator Currie is only

20   guilty because he didn't file a financial disclosure form,

21   then the jury should return a verdict of not guilty because

22   failing to file a financial disclosure form is a Skilling

23   matter, not a bribery matter.

24           If the jury finds that, if the jury, as the

25   jury's deliberating, determines that he profited from his

1    public office but nothing else, it should acquit because that

2    is Skilling barred.

3              If the jury finds 6A, C, D and E, if it finds

4    each and every one of those duties or laws to have been

5    violated -- well, not A because A is bribery, but if it were

6    to find C, D and E, it should acquit because those are all

7    Skilling related violations.

8              What the jury has to find is did Senator Currie

9    and Mr. White and Mr. Small violate the Maryland bribery

10   statute.  That's it.

11             THE COURT:  As to the Travel Act charges.

12             MR. EVANS:  As to the Travel Act charges.

13             THE COURT:  Count 8, the Hobbs Act, is not the

14   least bit dependent on the Maryland state bribery statute,

15   it's under the color of official right, correct?

16             MR. EVANS:  Right.  But it's defined, when you go

17   into the definitions in the Hobbs Act, you end up at the same

18   place.

19             THE COURT:  We'll get to that later.  I don't

20   think that's correct, but we'll get to that.  I understand

21   your argument in terms of the Travel Act, because the Travel

22   Act specifically references the state statute.

23             The language of the Maryland Court of Special

24   Appeals in the Richardson case back in 1985 specifically

25   noted that there is a large area in which the determination

1    of whether or not the action is an official action must

2    depend upon particular facts.  Isn't much of this fact

3    driven, Mr. Evans?

4              MR. EVANS:  Well, it's fact driven in one regard,

5    but it's notice driven mostly.  I mean if we're talking about

6    reasonable minds could differ about whether meeting with the

7    administrator of the HSA about a traffic light, setting up a

8    meeting with that individual, if reasonable minds can differ

9    about whether that is an official duty or not, then that is

10   the very definition of vagueness.  That is the very

11   definition of vagueness.  Because how is anyone supposed to

12   know in advance what the duty is?

13             Twelve people who are unhappy because he didn't

14   file financial disclosure forms want to convict him of

15   something, okay, because they're unhappy about the compliance

16   with the disclosure forms?  So they say okay, well, I guess

17   it's an official duty.  You know, to meet with the

18   administrator about a traffic light?  I mean that's the

19   problem here.  The problem is no one knows.  No one knows the

20   range and extent of official duties.  That's the problem.

21   It's a problem for the defense, and it's a problem for the

22   jury, and frankly, when it comes time to -- if it comes time

23   to craft a jury instruction, if that should ever be necessary

24   on this issue, I'm not sure how the court can do it.  I'm not

25   sure how the court can do it.  I have tried to think about

1    what such a jury instruction would look like that both

2    reflects the state of the law and common sense and

3    constitutional notice.  And those are hard to blend together

4    in this kind of situation.

5              So we have been raising the issue of official

6    duties since the day of the indictment essentially.  I know

7    that predecessor counsel for Senator Currie was raising it

8    for the preceding at least two years.  So this has been

9    really a hot issue I guess one could say in the course of

10   this matter as it progressed through the investigative stage

11   into where we are today.  This is not something new to any of

12   the people involved in the case, and it's not something that

13   comes as a surprise to anyone involved in the case.  It's a

14   real problem.  It's a real problem.

15             I mean maybe, I know that the court isn't going

16   to look kindly on this suggestion, but it's conceivable, I

17   suppose, that we could refer the matter to the Maryland Court

18   of Appeals for an advisory opinion.  That obviously can't be

19   done in two months and would disrupt the entire schedule.

20   But it would be useful at the very least, you know, to have

21   some direction on a situation that has never been addressed

22   in the history of Maryland.  This is all new.  This is all

23   new.  And it is very reminiscent and it's very similar to the

24   arguments that have been made for now two decades about

25   honest and fair services which finally, you know, wound its

1       way up to the Supreme Court which clarified that that phrase

2       is vague.  It is, it was unconstitutionally vague and what it

3       did was it provided an avenue for juries to convict when

4       something offended their sense of morality.  That's what

5       happened.  The Supreme Court said you can't do that, that's

6       just not fair.

7                   THE COURT:  You're referring to the original

8       McNally opinion as to the mail fraud statute before the

9       McNally amendment passed.

10                  MR. EVANS:  And then the legislative fix and what

11      have you.  And the Skilling case said the legislative fix is

12      fine, so long as it related to bribery.  But after the

13      legislative fix, which essentially overturned McNally, and

14      resurrected pre-McNally law, that's really what Congress did.

15      And then for some 20 years thereafter everyone operated under

16      the same almost pre-McNally kind of jurisprudence with regard

17      to the question of honest and faithful services.  And

18      everyone said we know what honest and faithful services is,

19      everyone knows what honest and faithful services is, and if

20      you act unreasonably it's going to be a violation of honest

21      and faithful services.  And everyone knows what it is.  We

22      don't need a specific definition.  We can apply it to a

23      multitude of different cases.  And whenever someone, either a

24      private employer or a public official, does something which

25      is deemed to be unethical, like the failure to disclose a

1    conflict of interest, then that is a violation of honest and

2    fair services.  And what the Skilling court said is, no, it's

3    not.  That's too vague.  That's too uncertain.  That is too

4    amorphous.  It is too unpredictable.  And it goes where -- we

5    don't know where it is goes.  And so though Skilling was

6    asking the entire 1346 be struck --

7              THE COURT:  Skilling was not a public official,

8    he was a corporate executive.

9              MR. EVANS:  No.  But Skilling applies to both

10   private individuals and public officials.  And Skilling's

11   honest and faithful services conviction was based on a

12   failure to disclose a conflict of interest.

13             So what the Supreme Court said in about as

14   explicit language as it could be is that for honest and

15   faithful services to withstand with regard to a state public

16   official, it is tantamount to and equivalent to bribery, and

17   nothing less than that.

18             Now, I mean the effects that Skilling had on this

19   case, that's not really relevant here, but the point is that

20   in order for this indictment to be sound, in order for a jury

21   instruction to be correct, the jury has to be told that mere

22   conflicts of interest are not the same as bribery.  Bribery

23   is something different.  Bribery has to do with a corrupt,

24   either an attempt or the actuality of corrupt acts by the

25   public official in consideration for something of value.  And

1    a mere conflict of interest is not that.  And so in trying to

2    decide what official duties are, we are back to the

3    beginning.

4              Is meeting about a traffic light in Reistertown,

5    something that was done, is that part of his official duties?

6    Is that an official duty of someone in the Maryland

7    legislature from Prince George's County to meet with them

8    regarding a traffic light in Reistertown?  I don't see it.

9    But you know, I'm not the one that makes these calls.

10             So is the jury supposed to decide whether that's

11   an official duty that he undertook at that point?  And if so,

12   what do they go on?  What do they decide?

13             Well, if the jury hears that sometimes

14   legislators meet with state officials in their legislative

15   capacity about matters outside their district?  Great.  If

16   they hear that sometimes legislators meet with state

17   government officials about matters outside their district in

18   their private capacity?  Great.

19             So what does that mean?  Where are we left then?

20   It could be either.  How is one to know, in advance, what an

21   official duty is under these circumstances.

22             I mean these are, Your Honor, we don't often make

23   constitutional arguments of this sort, but this is by no

24   means, this is by no means just some lawyer's creed here.

25   These are weighty, weighty issues.  They are precisely the

1        same issues that were raised in Skilling, and they are

2        precisely the same issues that confront all of us in this

3        case.

4                      THE COURT:  If a member of the Maryland General

5        Assembly is a committee chairman and he has a one-time

6        relationship hypothetically with a client who pays him

7        $400,000 for two hours of services, and that's not disclosed

8        in a conflict of interest form or a financial disclosure

9        form, would that be bribery, Mr. Evans?

10                     MR. EVANS:  I don't know.  It would depend.

11                     THE COURT:  The reason I pose that hypothetical,

12       isn't that exactly what the Court of Appeals in Maryland and

13       the Maryland Court of Special Appeals have said, it's fact

14       driven?  Could that go to a jury as to whether or not it's

15       bribery or not?

16                     MR. EVANS:  Well, I guess it would depend.  I

17       mean, again, it depends on the circumstances.  But the mere

18       fact of payment coupled with non-disclosure does not go to

19       the jury room.  That does not go to the jury.  The mere fact

20       of non-disclosure does not go to the jury.

21                     THE COURT:  I mean that's obviously not the facts

22       here, but even in that hypothetical, the Maryland bribery

23       statute would be unconstitutionally vague and that would not

24       constitute bribery?

25                     MR. EVANS:  I'm addressing just Your Honor's very

1    highly delineated hypothetical which is the legislator

2    receives $400,000 and doesn't disclose it.  I mean, if that's

3    all that happened --

4              THE COURT:  Well, I mean the legislator could say

5    I'm a lawyer, I'm an expensive lawyer, that's what I charge

6    for meetings, $400,000.  I'm a lawyer and that's what I do

7    and it's $400,000, and the lawyer says I could always just

8    disclose to the public that that's what I charge for my fee

9    was $400,000, or he or she would choose not to disclose it.

10   So the matter of non-disclosure would necessarily be endemic

11   to analyzing whether or not that's bribery or not, wouldn't

12   it?

13             MR. EVANS:  That's correct, Your Honor.

14             THE COURT:  And that would have to go to the

15   jury, would it not?

16             MR. EVANS:  And Your Honor, what I'm saying is

17   that the question of disclosure is a piece of evidence.  But

18   if the indictment said that that individual received $400,000

19   and didn't disclose it, hence he's guilty, that doesn't go to

20   the jury.  What you need is, you need more facts than just

21   those two bare facts, the receipt of the money and the

22   failure to disclose.  If it's just those two facts, it

23   doesn't go to the jury.

24             THE COURT:  But again, it's fact driven though,

25   is it not?

111

1          MR. EVANS:  It is.

2          THE COURT:  And then your point is because it's

3    fact driven, then therefore it's unconstitutionally vague.

4          MR. EVANS:  No.  What's not fact driven are his

5    official duties.  Let's just say hypothetically, okay, and

6    I'm not saying there needs to be a rule, but let's just

7    assume for a moment that it said, that there was a rule that

8    said no member of the legislature shall meet with a state

9    official on anything.  Okay.  And Senator Currie arranged a

10   meeting between Shoppers and the secretary regarding the, the

11   administrator regarding the traffic light.  Then we would

12   know, then we would know that he engaged in an official duty.

13         Now, what's fact driven there?  Did he do it for

14   money?  Did he do it as a constituent?  Was it corrupt, not

15   corrupt?  There's a lot of facts beyond the hypothetical.

16   But if the, you know, if there was a regulation that said,

17   okay, you can't set up these meetings, and the indictment

18   said Senator Currie was under the obligation not to set up

19   such meetings, and he did set up such meetings, then we would

20   know that was an official duty.  We would know it was an

21   official duty.  We would know what he can do and can't do

22   with regard to setting up meetings.

23         THE COURT:  Let me allow you to move on because I

24   want to give other lawyers the chance to argue as well as the

25   government to respond.  Mr. Zucker, Mr. Treem, are you going

1    to be addressing this point as well?

2              Fine.  Let me just ask you, Mr. Evans, if you'll

3    move to the matter of count eight, the Hobbs Act count, which

4    is accepting the money under the color of official right.  As

5    I read cases, and I've looked through this, there's no direct

6    dependency on a particular state statute as there is under

7    the Travel Act.

8              It's bribery, the Hobbs Act clearly is acceptance

9    of money under color of official right and it's not

10   predicated upon the state statute.  Whereas clearly the

11   Travel Act charges in counts two through seven is predicated

12   upon state statute.  In addition to any arguments you've made

13   or any separate arguments you want to make as to the Hobbs

14   Act charge.

15             MR. EVANS:  I disagree with Your Honor that it

16   doesn't -- it still raises the same question, official acts.

17             THE COURT:  I'm not saying it doesn't raise the

18   issue in terms of under color of official right that has to

19   be analyzed, but it clearly, I think the Fourth Circuit has

20   clearly in the Spitler case previously noted, the argument

21   doesn't wash in terms of reference to a specific state

22   statute.

23             MR. EVANS:  That's correct.  That's correct.

24             THE COURT:  The Fourth Circuit has ruled on that.

25             MR. EVANS:  Right.  We're not saying that it's

1    linked to the Maryland statute, but it does have the same

2    language and so the same problem is generated.

3              Our separate argument on count eight, Your

4    Honor --

5              THE COURT:  Because a conspiracy charge also is

6    not only predicated upon the Travel Act charge, it's also

7    predicated upon the Hobbs Act charge.

8              MR. EVANS:  Right.  Count eight.

9              THE COURT:  Right.

10             MR. EVANS:  And this was actually the paragraph

11   that I think Your Honor was referencing earlier.

12             THE COURT:  Yes.

13             MR. EVANS:  So our argument on count eight very

14   simply put is that under the Hobbs Act there has to be a

15   victim.  And in this instance the allegation reads that

16   Senator Currie conspired with Shoppers to obtain money from

17   Shoppers with Shoppers' consent.  So Shoppers -- and if I

18   might add also, Your Honor, that there is I think confusion

19   about who's charged in count eight.  We said in our initial

20   pleading that we didn't think Mr. White or Mr. Small were

21   charged in count eight.

22             THE COURT:  They're charged in count eight with

23   aiding and abetting.

24             MR. EVANS:  Well, I don't think so, because --

25             THE COURT:  Does not the indictment read that the

1   defendant, Ulysses S. Currie, aided and abetted by defendants

2   William J. White and R. Kevin Small and others, did

3   unlawfully, knowingly and willfully obstruct, delay and

4   affect interstate commerce in the charging sections of 18

5   U.S.C. Sections 1951A, the Hobbs Act charge, and 18 United

6   States Code Section 2, the aiding and abetting charge?

7           MR. EVANS:  Right.  You know, I looked at the

8   docket entries in this matter when it was first presented to

9   the clerk.  When the clerk types in the counts that are

10  applicable to each defendant, I actually have a copy.

11          THE COURT:  No disrespect to the clerk's office,

12  but the fact that a clerk in the clerk's office may or may

13  not have correctly typed in the entry is not dispositive,

14  it's how the indictment was returned by the grand jury.

15          MR. EVANS:  That's absolutely correct, Your

16  Honor.  In this instance, both for Mr. Small and Mr. White,

17  there is no count eight.  It is there for Senator Currie and

18  it's not there for the other two.

19          THE COURT:  Well, I can't explain what the

20  clerk's office did.  I'm looking at count eight and count

21  eight -- Senator Currie didn't aid and abet himself.  It's

22  alleged that Senator Currie committed the wrong alleged in

23  count eight, and it's alleged that he was aided and abetted

24  by defendants William J. White and R. Kevin Small and the

25  aiding and abetting section is cited there.

1          MR. EVANS:  First of all, the aiding and abetting

2     section can mean section 2A or section 2B, which is simply

3     using another person as an instrumentality.  The fact that

4     section two is cited --

5          THE COURT:  We'll hear from the government in a

6     minute on that.  It doesn't seem that confusing to me.  Mr.

7     Wise, are not Mr. White and Mr. Small charged in count eight

8     with aiding and abetting?

9          MR. WISE:  Yes, Your Honor.

10          THE COURT:  It seems perfectly clear to me.  No

11     disrespect to the clerk's office, but whoever in the clerk's

12     office typed it up didn't get it correctly typed up, that's

13     all.

14          MR. EVANS:  Well, it's usually typed up based on

15     the speedy trial form, but --

16          THE COURT:  Wasn't correctly entered on the

17     docket sheet.  It's not controlling.  It's the indictment

18     returned by the grand jury that's controlling and this is

19     what it is.

20          But with respect to the matter of the, as to the

21     Hobbs Act charge in count eight, who paid the money?  Mr.

22     Small and Mr. White didn't pay the money.  Shoppers

23     Warehouse.

24          MR. EVANS:  Shoppers paid the money.

25          THE COURT:  Shoppers is the victim, not Mr. Small

1      or Mr. White?

2              MR. EVANS:  Correct.  And Shoppers is listed in

3      the indictment as a co-conspirator.  It says Shoppers.  If it

4      didn't say Shoppers as a co-conspirator, I wouldn't obviously

5      make this argument because the money was taken from Shoppers.

6      But here Shoppers is a co-defendant.  Or not a co-defendant,

7      but a co-conspirator is the better term.  Specifically and

8      expressly identified.  So the question is, it has to be, you

9      know, something of value from another Shoppers, I guess,

10     taken with that individual or entity's consent.  So Shoppers

11     and Senator Currie and Mr. Small and Mr. White conspired to

12     get together, Shoppers and Senator Currie conspired to get

13     Shoppers' consent.  I mean we're relying here on the plain

14     language of the statute, particularly as reflected in the

15     Brock case which we cited.

16             THE COURT:  It was Brock as well as U.S. versus

17     Spitler.

18             MR. EVANS:  And we cited Spitler as well, and we

19     think Spitler is actually quite supportive of our position on

20     this issue.

21             THE COURT:  Well, Brock involved two defendants

22     that were two owners in a bail bond company.  They owned the

23     company.  It isn't like a large company in which executives

24     are employed.  In Brock the two defendants were also the

25     owners of the company.

1              MR. EVANS:  Correct.

2              THE COURT:  And they're alleged to have been

3    guilty of having bribed a court clerk to prevent the

4    collection of bonds.  And the Sixth Circuit in that case in

5    2007 vacated the convictions for the very reason that you're

6    raising, that it wasn't the property of another.

7              MR. EVANS:  Correct.

8              THE COURT:  But in this context you have the

9    allegation as to Mr. White and Mr. Small being an employee of

10   Shoppers, a large corporation, and that it's Shoppers that's

11   paying the money and allegedly getting shaken down, not Mr.

12   White or Mr. Small individually.  But your point is because

13   of the fact that Shoppers was originally listed as a

14   co-conspirator that they fall within the ambit of Brock.

15   That's essentially your argument.

16             MR. EVANS:  Well, Your Honor, it's not just

17   originally listed.  Shoppers is in fact listed.  And if you

18   look at paragraph seven --

19             THE COURT:  I'm just trying to summarize your

20   argument.  You're saying because Shoppers is listed as a

21   co-conspirator, it comes within the ambit of Brock is your

22   argument.

23             MR. EVANS:  Exactly.

24             THE COURT:  I understand.

25             MR. EVANS:  And in Spitler -- the deferred

1    prosecution agreement that we were discussing earlier says

2    Shoppers was a co-conspirator.

3           So in Spitler what happened were these two

4    people, you know, they might be like Mr. White and Mr. Small,

5    they were saying they were the alter ego of the company.  The

6    company wasn't charged in Spitler.  And the Fourth Circuit

7    went back through the history of the Hobbs Act to try and

8    determine whether the Hobbs Act was intended to criminalize

9    victims, and the Fourth Circuit determined that the two

10    private people charged in Spitler were not sufficiently

11    corporate to get the benefit of being deemed to be a victim.

12    Okay.

13           Here the corporation is the victim.  We're not

14    saying that Mr. White and Mr. Small are the alter ego of the

15    corporation, we're saying the corporation is the victim.  I

16    have been able to find no cases where a victim corporation

17    under these circumstances was held to be criminally

18    responsible.

19           The government had its reasons for wanting to

20    name Shoppers, whether it's strategy or tactics or whatever.

21    That's their business.  But they made that choice, they got

22    an indictment from a grand jury that said Shoppers is a

23    guilty party, and they can't now say Shoppers is the victim.

24    Okay.

25           And if you look at, which I'm sure the court has,

1    the plain language of the Hobbs Act, it says the property of

2    another with its consent.  And, again, we're left with the

3    conundrum of how can Shoppers consent under these

4    circumstances?  How can it conspire with the other defendants

5    to get its own consent?  I mean it doesn't --

6         THE COURT:  If I'm not mistaken, the section that

7    you have noted with Mr. Outlaw is aptly noted as paragraph

8    seven of the indictment.  Is there any other reference to

9    Shoppers Food Warehouse being a co-conspirator other than

10   paragraph seven?

11        MR. EVANS:  Well, I don't know off the top of my

12   head standing here, but that's a pretty big one.

13        THE COURT:  Paragraph eight says it was the

14   purpose of the conspiracy for White, Small and Shoppers Food

15   Warehouse to enrich Currie and defendants White, Small and

16   Shoppers Food Warehouse by issuing regular payments to

17   Currie.  So it's there in paragraph eight.

18        MR. EVANS:  Right.  And I think it's in paragraph

19   nine.  Well, not exactly.

20        THE COURT:  Thank you, Mr. Evans.  I think I

21   understand your argument there and certainly be glad to here

22   from you in rebuttal.  And no other defense lawyers are

23   addressing these issues?

24        Thank you.  Mr. Vitek, do you have anything you

25   want to add on this?

1          MR. VITEK:  No, Your Honor.

2          THE COURT:  It's quite all right.

3          MR. EVANS:  Mr. Vitek will be addressing the

4    question of the severance of count 17.

5          THE COURT:  Thank you very much.  Miss Gavin or

6    Mr. Wise.

7          MS. GAVIN:  Mr. Wise.

8          THE COURT:  Go ahead, Mr. Wise.  I'll be glad to

9    hear from you.

10          MR. WISE:  Thank you, Your Honor.  I'll start

11   with the Hobbs Act since it's fresh in our minds.

12          The first thing I would note is that count eight

13   -- Your Honor is absolutely correct for purposes of count

14   eight Shoppers is the victim.  Count eight names William J.

15   White and R. Kevin Small as aiding and abetting defendant

16   Currie.  It does not name Shoppers as aiding and abetting

17   defendant Currie.  So the substantive Hobbs Act count is not

18   affected by this.

19          THE COURT:  How about the conspiracy count?

20          MR. WISE:  The conspiracy count, and this is a

21   point we made in our papers regarding the Medford case which

22   the defense cites.  Brock was about a Hobbs Act conspiracy.

23   Medford concedes that if a substantive Hobbs Act count was

24   charged, the Brock analysis wouldn't apply in Medford.

25          This is not a Hobbs Act conspiracy.  This is a

1    371 conspiracy.  It was not charged as a Hobbs Act

2    conspiracy.  371 makes it unlawful to conspire to commit a

3    violation against the United States.  It does not have the

4    statutory language that the court of appeals, the Sixth

5    Circuit Court of Appeals stumbled over in Brock.  That's one

6    reason why the argument fails.

7            The second reason is looking at Fourth Circuit

8    law is Spitler makes clear that the Hobbs Act provides

9    protection, if you will, for victims.  That if they are

10   extorted, they can't then be charged.  But the Spitler court

11   makes it very clear that when an individual protected by such

12   legislation exhibits conduct more active than mere

13   acquiescence, he or she may depart the realm of victim and

14   may unquestionably be subject to conviction for aiding and

15   abetting conspiracy.  And that's the fact pattern here, that

16   Shoppers' agents unquestionably crossed that line from victim

17   into perpetrator via an aiding and abetting strategy.  And

18   just by the nature of the way corporate criminal liability is

19   assigned in our system, anytime corporate officers acting

20   within the scope of their employment engage in criminal

21   conduct, the company is, by operation of the law, criminally

22   liable; in the case of a conspiracy, part of the conspiracy.

23           So both because what was charged in Brock isn't

24   charged here, and because of the decision in Spitler, count

25   eight and the conspiracy prong that addresses the Hobbs Act

1    stands.

2                    THE COURT:  So your argument is because it's

3    charged as a 371, a traditional conspiracy and not a Hobbs

4    Act conspiracy, that Shoppers Food Warehouse could be listed

5    initially as being a conspirator with the two corporate

6    executives, and yet at the same time could be a victim of the

7    Hobbs Act substantive count as well as a participant in the

8    conspiracy indirectly through the two corporate officials.

9    That's essentially the government's position?

10                   MR. WISE:  Yes, Your Honor.

11                   THE COURT:  Do you want to address counts two

12   through seven, the Travel Act counts, and the matter of

13   official duties?

14                   MR. WISE:  Yes, Your Honor.  And at the outset, I

15   think Your Honor has already signaled that this isn't a point

16   of confusion for the court, but at the outside I think it's

17   important to make sure that the defense I think mistakenly

18   asserted in their motion to dismiss, and this is the

19   language, that both the Hobbs Act and the Travel Act counts,

20   quote, hinge on the government proving a violation of

21   Maryland's bribery statute.  And that is not correct I think

22   as Your Honor has signaled.

23                   THE COURT:  For the reasons I'll indicate

24   subsequently, the Hobbs Act charged is not predicated on a

25   Maryland state statute.  The Travel Act charge clearly is

1    predicated on a Maryland state statute, it certainly seems to

2    me.  The government agrees with that.  The Travel Act counts,

3    counts 2, 3, 4, 5, 6, and 7 are in fact predicated by the

4    Maryland bribery statute.

5              MR. WISE:  Yes, Your Honor.

6              THE COURT:  Was at one time article 27, section

7    22, and is now section 9-201 of the criminal law.

8              MR. WISE:  Yes, Your Honor.

9              So for the court to find vagueness, the court

10   would both have to find the Maryland bribery statute vague

11   and the federal Hobbs Act vague with separate bodies of case

12   law --

13             THE COURT:  I'm asking you now to just focus on,

14   put the Hobbs Act on the shelf.  We're talking about the

15   Travel Act counts in terms of the contention of vagueness and

16   the issue Mr. Evans has raised as to the matter of what are

17   the official duties and how that plays out in the case of a

18   part-time legislator.

19             MR. WISE:  Yes, Your Honor.  And I think Your

20   Honor has, as we also identified in our papers, rightly

21   pointed out the two decisions of the Court of Appeals of

22   Maryland that provide the framework for how official duties

23   are defined under this statute, that it is a mixed basket.

24             THE COURT:  Richardson I thought was a Maryland

25   Court of Special Appeals opinion, if I'm not mistaken.

1          MR. WISE:  I believe you're right, Your Honor.

2    In any event, it is a mixed basket of constitutional,

3    statutory, regulatory, and then, just as important, custom

4    and usage that defines what official duties are for any given

5    public office.  And in this case, and I think Your Honor has

6    also correctly identified, the custom and usage questions are

7    fact based questions, and the evidence will come out at

8    trial, and this is why it's not appropriate at the motion to

9    dismiss stage, the evidence will come out at trial that the

10   official duties that Senator Currie engaged in were well

11   within the heartland of what a legislator does.  Not out of

12   the periphery, but well within the heartland.  Things like

13   contacting the heads of cabinet departments and agencies as

14   the chairman of the committee that sets their budget.

15   Summoning them to meetings in the offices of the committee

16   that sets their budget.  Asking for legislation to be

17   introduced.  Asking for legislation implementation to be

18   delayed.  Sending out correspondence and other documents on

19   senate letterhead.

20          All of this make it clear, and the testimony from

21   the witnesses will be that there was never any doubt in their

22   minds that they were dealing with defendant Currie in his

23   role, in his official role as the chairman of the budget and

24   taxation committee.  I mean the email traffic that follows

25   some of these contacts says things like, remember, he sets

1    our budget, that the director wants this done in an expedited

2    manner.  It all supports that he was acting pursuant to his

3    official duties.

4              And stepping back from the legal argument, I mean

5    the defense's argument would require us to believe that

6    someone who served in the state senate as of now, and he

7    continues to serve in the state senate for 17 years, rose to

8    the second highest position arguably after the senate

9    president as chairman of this committee, doesn't know what

10   his official duties are because he doesn't have some kind of

11   job description in law or in regulation.  And the defense's

12   position would mean that every prosecution in Maryland under

13   the state bribery statute for any public official where there

14   is not such a job description is invalid, and that no

15   prosecution of offices where there isn't a job description

16   could go forward.

17             And I've looked to see, defense don't cite any of

18   these job descriptions, but there's none for the governor,

19   there's certainly none for the senate, none for the house of

20   delegates, and none for the heads of cabinets or agencies.

21   And it really in that sense they sort of prove too much.

22             Mr. Evans stood up and said, and I wrote it down,

23   even for Senator Currie bribery is illegal.  But if you look

24   at their argument, they argue on the one hand that the state

25   bribery statute is so vague that the only conduct it covers

1    is voting, and therefore the only thing that can be

2    prohibited to bribe someone for is voting, and then they take

3    a legislative immunity argument and put it over the top and

4    say, but, under the legislative immunity provisions, you

5    can't be prosecuted for that either.

6           So the conclusion is that for legislators, at

7    least in Maryland, bribery is legal because there's not a way

8    at the state level or, based on the way they argued the

9    Hobbs, at the federal level to reach that conduct.

10          This issue of conflict of interest keeps coming

11   up and it's sort of a puzzle to me.  Mr. Evans said the jury

12   will have to be explained that conflict of interest doesn't

13   mean bribery.  I don't foresee any jury instructions on

14   conflicts of interest.

15          The federal conflict of interest statutes are at

16   18 U.S.C. 201 through 209 and 216.  They are not charged in

17   this case.  And bribery cannot be reduced to conflict of

18   interest.  And bribery at its core reduces to abuse of

19   official position.  And that's why the extortion under

20   official, color of official right language is used.

21          So conflict of interest is, in terms of the

22   disclosures that he did not make, those can be used as

23   evidence of his criminal intent.  But he is not charged with

24   violating the criminal conflict of interest statute.  And so

25   for the defense to argue that his conduct would have been

```
 1     permissible but for filing a piece of paper -- that's
 2     something they say in their reply -- no, it wouldn't.  There
 3     is no piece of paper one can file that allows one to take
 4     money for official acts, that allows one to trade on their
 5     public office.  And this conflict of interest issue, and the
 6     related Skilling issue, really is a straw man in this case
 7     that this, that charged simply and solely as bribery and
 8     Travel Act violation and false statements doesn't have a
 9     place either as a basis to dismiss the indictment or
10     ultimately will have a place in the jury instructions.
11             A point I wanted to make as well, Your Honor, is
12     the defense concedes that adopting the usage and practice
13     language from Thomas and Richardson, if there was conduct
14     that a private individual couldn't engage in, then that would
15     certainly be actionable under the state bribery statute.  And
16     that's exactly what we have here.
17             No private consultant can pick up the phone to a
18     cabinet member and say this is the chairman of the budget and
19     finance committee, the committee that controls the budget of
20     your agency, and I want you to come to a meeting in my
21     office, my senate office, and meet with some people that are
22     important to me.  Or I want you to bestow a benefit on these
23     people, whether it's two million dollars in a transportation
24     grant, or three million dollars at another point.  Even the
25     Route 140 example that he had given, Mr. Evans leaves out
```

1  that they didn't get a traffic light, but they got the

2  traffic pattern rerouted which was of benefit to Shoppers in

3  this instance.

4  And that gets back to the factual nature of this.

5  All of the people he interacted with believed without any

6  hesitation that they were interacting with the chairman of

7  the senate budget and taxation committee.  And he didn't

8  disclose it because if he did, it would reduce his

9  effectiveness in that capacity.  And if he disclosed it, it

10  wouldn't stand scrutiny.  And if he had disclosed this and

11  someone said let's see this contract, and they saw a contract

12  for minority and community outreach, and then you look at

13  them reaching out to the head of the Maryland Energy

14  Administration to delay implementation of energy standards

15  for refrigerators, you would say, well, what does that have

16  to do, which was enormously valuable to Shoppers, but what

17  does that have to do with minority and community outreach.

18  It had nothing to do with it.

19  And our position has been and will be at trial

20  that the consulting arrangement was a cover because Shoppers

21  can't have in its corporate books a line item that says money

22  for public officials.  There had to be some way to account

23  for it.  And so this consulting arrangement was arrived at.

24  But at its core, it was paying him for official

25  acts and access to his office.  And that's why, even Your

1    Honor gave a couple of examples of the kinds of things that

2    parties can do that actually are like what private parties

3    can do.  They can be doctors, they can be dentists, they can

4    be farmers, they can write real estate contracts as lawyers.

5    None of those involve trading on the offices they occupy.

6           If you pull someone's tooth out as a dentist,

7    it's not more valuable because you happen to be the chairman

8    of the committee on budget and finance.  But if you're going

9    to contact state officials, it's very valuable to the party

10   that's paying you that you have that office because it gets

11   you access.  And that's what was seen time and time again and

12   will be seen time and time again in the facts presented to

13   the jury.

14          Your Honor, lastly on this point, I don't know

15   that whether we've articulated, but I've made reference to

16   it, on the issue of legislative immunity, the Gillock case,

17   the Supreme Court case, 445 U.S. 360, and the opinion

18   authored by Chief Justice Burger makes it abundantly clear

19   that the legislative immunity that exists at the state level

20   does not by operation of Federal Rule of Evidence 501 apply

21   to the federal level.  And I think that that argument is

22   foreclosed by Chief Justice Burger's opinion, but I'm happy

23   to address it further.

24          THE COURT:  No, no.  I think the Gillock opinion

25   clearly indicates that with respect to privileges as to the

1    state legislators it yields to federal criminal prosecutions,

2    and I note that Mr. Treem's recent victory in the Holton case

3    before the Court of Appeals in Maryland, they stayed away

4    from the Gillock case, as well they should have.  It was a

5    state case involving state privileges, but it doesn't affect

6    the federal privilege.

7                 Thank you very much, Mr. Wise.

8                 Mr. Evans, be glad to hear from you in rebuttal

9    on this.

10                MR. EVANS:  Okay.  I really want to make only

11   three or four points.

12                First of all, count one and the allegations in

13   paragraphs 1 through 6 and eight through the balance are

14   incorporated into count eight.  So when the government says

15   Shoppers can be a victim for one count and, you know, a

16   co-conspirator for another count, I think that's actually not

17   correct.

18                I mean it is true that paragraph seven isn't

19   incorporated, but the other counts that relate to and

20   demonstrate Shoppers' status are incorporated.  So that's

21   point number one.

22                As a factual matter, and this is really a minor

23   point number two, Route 40 wasn't changed.

24                THE COURT:  Route 140.

25                MR. EVANS:  Route 140 wasn't changed.  Nothing

1    was done.  And had it been changed, it would have been done

2    at the expense of Shoppers.  There wouldn't have been a

3    dollar of public money spent.  The same is true actually with

4    the installation of any traffic lights.  The developer or the

5    party requesting the traffic light, a commercial entity

6    requesting a traffic light has to pay for it.

7             But, and in fact all of the parade of horrors

8    that Mr. Wise recited, I think every one will be surprised, I

9    think everyone will come to know that virtually nothing,

10   virtually nothing that Senator Currie ostensibly did for

11   Shoppers happened.  I mean there are a couple small

12   exceptions, but none of these things, these grants and

13   millions of dollars and all this kind of stuff, none of that

14   ever went anywhere.  None of it ever went anywhere.

15            But the final point I wanted to make, and

16   probably the single most important point for rebuttal, is

17   that if the phrase conflict of interest is not permitted to

18   be addressed at trial, at least in the government's view,

19   then we better have a hearing on that because we plan, we are

20   in the position of trying to make it clear to these 14 or 15

21   folks over there what bribery is.

22            THE COURT:  Twelve and some alternates.

23            MR. EVANS:  Right.  Exactly.

24            THE COURT:  Trying to make sure for the record

25   we're not going to have a 15 person jury.  That would

1    definitely make the newspapers, I think, and that would be of

2    some interest with American jurisprudence.  There will be a

3    12 person jury in the case.

4              MR. EVANS:  But I mean this is a huge, huge,

5    huge, huge, huge issue.  And if we can't stand up and we

6    can't elicit testimony about what's a conflict of interest as

7    opposed to a bribe, because the difference is very subtle

8    sometimes, and if we can't use the phrase conflict of

9    interest, if we can't, you know, I mean frankly our defense

10    is that there was an undisclosed conflict of interest, and

11    before July of 2010, Senator Currie would have a hard time

12    defending such an allegation.  Okay.  Although Mr. White and

13    Mr. Small wouldn't.  They're only here because of Skilling

14    frankly.  But when the law changed, you know, 12 months ago,

15    it became very, very clear that a conflict of interest is not

16    bribery.  But unfortunately in real life as a factual matter

17    those things can merge and overlap and become blended and

18    it's hard to know sometimes what the difference is.  But I

19    mean we have already been working on jury instructions that

20    distinguish between what a conflict of interest is and what a

21    bribe is.  We think that is absolutely crucial, crucial in

22    this case.

23              THE COURT:  We may address that another day.

24              Mr. Evans, let me ask you something.  What could

25    be prosecuted under the Maryland state bribery statute?

1          MR. EVANS:  What could be?

2          THE COURT:  Tell me a scenario whereby a member

3     of the Maryland General Assembly as a part-time legislator

4     could be charged with bribery under the state statute, or is

5     your view that it is so unconstitutionally vague that none of

6     the members of the General Assembly could be charged with

7     bribery?

8          MR. EVANS:  No, I'm not taking that position.

9          THE COURT:  I'm asking you, give me an example

10    where a member of the Maryland General Assembly as a

11    part-time legislator could be charged with bribery.

12         MR. EVANS:  Let's say --

13         THE COURT:  Not in the context of saying I'm

14    going to vote for this legislation, pay me for my vote.

15    Apart from that blatant example, how could a member of the

16    Maryland General Assembly as a part-time legislator be

17    charged with bribery?

18         MR. EVANS:  Let's say that he's committee

19    chairman and there is a bill that's going to be coming up and

20    the committee chairman has the power to squelch the bill from

21    even being heard.  And someone who is opposed to that bill

22    pays him money, and in exchange for that money, as a quid pro

23    quo for that money he prevents that bill from coming up.

24         Or here's one:  Let's say that the person has

25    a -- let's say someone wants a traffic light and he's paid

1    money to lobby for it, and when it starts looking like it's

2    not going to happen, he starts calling up the administrator

3    and saying things like you better be concerned about your

4    budget, you know, I've got control over the purse strings

5    here for you.  I want this, I want this, I want this.

6                Now, that didn't happen here.  That didn't happen

7    here.  There's none of that.

8                THE COURT:  So your position is is that

9    essentially there should be a direct quid pro quo in most

10   circumstances for there to be a prosecution under the state

11   bribery statute.

12               MR. EVANS:  I'm not -- I mean the point I'm

13   trying to make is that it is possible for there to be

14   prosecutions under the state bribery provision of a Maryland

15   legislator and that it is not fair to say that under this

16   reading of it, okay, no one can ever be prosecuted.  That's

17   just a logical fallacy and it's -- well, and of course if

18   that's the case, I guess, so what?  I mean, you know, I mean

19   if it's unconstitutional for everyone, it's unconstitutional

20   for everyone.  We're just saying it's unconstitutional as

21   applied in this case.  We're not asking for some grand

22   pronouncement that the entire, you know, bribery provision is

23   unconstitutional.

24               THE COURT:  You're not saying it's prima facie

25   unconstitutional, but it's unconstitutional as applied.

135

1          MR. EVANS:  As applied, exactly.  I mean there

2     are examples and I guess we could all sit around and conjure

3     up examples.  I mean I've prosecuted state bribery.  It's not

4     that hard to do.  But I've never been in a situation where, I

5     mean I've prosecuted state bribery as a state prosecutor and

6     there's never been any trouble telling and discerning what

7     the state employee's responsibilities were.  You knew.  You

8     knew because it was clear whether there was a, you know,

9     specifically identified job description or not.  You knew

10    that the person that was just inherently embedded in that

11    person's job.  These actions are not.

12          THE COURT:  Alternatively, and this issue relates

13    both to counts two through seven as well as count eight with

14    respect to the ambit of the Gillock opinion by the Supreme

15    Court in 1980 in which the Supreme Court of the United States

16    essentially held that a state senator in Tennessee could be

17    prosecuted and that there was no speech and debate privilege

18    applicability as a state legislator in a federal criminal

19    prosecution.  Do you want to be heard on that as well?

20    Essentially the Supreme Court said there that the federal

21    speech and debate clause is limited to members of Congress

22    and essentially found it did not apply to a state legislator.

23          Apart from your access to the unconstitutional

24    vagueness in counts two through seven and then the issue as

25    to the Hobbs Act on count eight, do you want to be heard on

1      that at all?

2                    MR. EVANS:  Can I say one sentence?

3                    THE COURT:  Sure.  I'm not trying to rush you.

4                    MR. EVANS:  There's no reason to belabor it.  Our

5      position is that the state speech and debate clause,

6      particularly as reflected in Holton that Your Honor has

7      referred to, is a substantive part of state bribery.  We are

8      not suggesting that it's a, that it's an evidentiary

9      privilege that comes through and, you know, the operation of

10     Rule 501.  We're suggesting that it's a state substantive --

11                   THE COURT:  Doesn't seem like the language in the

12     Gillock case, I mean I understand what your argument is, but

13     it seems like that's precluded by the Gillock opinion, but

14     I'm giving you the opportunity to try to distinguish it.

15                    Put it on the record, that's fine.  Essentially

16     you feel that there's, you know, Gillock is obviously a tough

17     sledding from your point of view on this one particular

18     issue.

19                   MR. EVANS:  Right.

20                   THE COURT:  That's why you have Miss Hensler

21     sitting behind you.

22                   MR. EVANS:  As I say, all we're saying is it's

23     substantive, not evidentiary.

24                   THE COURT:  But I guess my point is it certainly

25     seems to me, and I've looked at the Holton opinion as well,

1        the Gillock case seems to me to clearly indicate that there

2        isn't a privilege issue here under the speech and debate

3        clause for a state legislator under federal law.

4                        MR. EVANS:  We defer to the court on that.

5                        THE COURT:  I understand.  Thank you very much.

6                        With respect to the motion to dismiss the

7        indictment, I'm going to take that sub curia and will be

8        issuing a written opinion on that as to counts one through

9        eight as to the motion to dismiss.  I will be addressing

10       those issues as quickly as possible.  But they're important

11       issues and I will be issuing a written opinion.

12                       As to the motion for severance, as to the matter

13       of severance of the defendants, essentially the defendants

14       have raised an issue under Bruton versus United States, 391

15       U.S. 123, a 1968 opinion, as to some contention that there

16       may or may not be Bruton statements that would implicate a

17       co-defendant and thereby trigger the right for severance.

18       Mr. Vitek, are you arguing this one?

19                       MR. VITEK:  Yes, Your Honor.

20                       THE COURT:  All right.  Hold on one second.

21                       First of all, if the government can just clarify

22       for me, what are the statements we're talking about?  Exactly

23       what statements --

24                       MS. GAVIN:  They're expressly set forth in the

25       indictment, Your Honor, and those are the only statements.

1                    THE COURT:  That's what I thought.  I'm trying to

2       make sure.  Exactly verbatim, what are the statements they're

3       talking about?

4                    MS. GAVIN:  Count 17 against Mr. White, that Mr.

5       White stated that Currie did not try to assist Shoppers in

6       any way with legislation that would help the company or any

7       of its related entities.  That's one false statement.

8                    THE COURT:  What paragraph is that?

9                    MS. GAVIN:  That is paragraph 3A of count

10      seventeen.

11                   THE COURT:  All right.  Hold on one second,

12      please.

13                   Go ahead.  Thank you.

14                   MS. GAVIN:  And the other false statement alleged

15      against Mr. White is in subparagraph B, that Mr. White stated

16      that Currie did not contact local or state officials on

17      Shoppers' behalf with respect to any issues involving

18      regulatory matters, zoning, real estate transactions,

19      construction projects, including road and traffic issues, tax

20      incentives for development and construction projects or grant

21      monies.  So those are the two statements alleged.

22                   THE COURT:  By Mr. White in count 17.

23                   MS. GAVIN:  Yes.

24                   And then count 18, the false statements alleged

25      against Mr. Currie, again, paragraph 3A of count 18 is that

1    Currie stated that his only involvement in the legislation

2    that allowed the transfer of the liquor license from one

3    Prince George's County alcoholic beverage district to another

4    was that he voted on the legislation.

5           The second false statement alleged is in

6    subparagraph B that Currie stated that he never had any

7    contact with any of the commissioners of the liquor board

8    regarding the aforementioned transfer of the liquor license.

9           And the third false statement alleged in

10   subparagraph C is that Currie stated that he only dealt with

11   White regarding matters that pertained to minority

12   recruitment.  Those are the false statements that the

13   government --

14          THE COURT:  I'll be glad to hear from you, Mr.

15   Vitek, and Miss Gavin I'll give you an opportunity to

16   respond.  Essentially one initial issue is that the

17   government is contending they would not be offering this for

18   the truth of the matters asserted therein, merely as a

19   factual context in terms of an alleged misrepresentation.

20          MS. GAVIN:  Yes, Your Honor.

21          THE COURT:  Mr. Vitek, I'll be glad to hear from

22   you.

23          MR. VITEK:  Yes, Your Honor.

24          Coming after Mr. Evans and Mr. Wise's very

25   weighty arguments, this seems a little bit lighter, but this

1    actually implicates a very important Sixth Amendment right

2    obviously for the defendant here.  And the first thing is the

3    government operates under this misapprehension that you can

4    edit an oral statement made to a government agent to just the

5    statements that they want to introduce for the false

6    statements.

7              The Richardson V Marsh case is a written

8    confession case.  The Gray case is a written confession case.

9    And Bruton, in the case itself, directly states the problems

10   when you have a case like this.  And maybe it's helpful to

11   back up for a moment and really look at what these statements

12   are.

13             On May 29, 2008, FBI agents knocked on Bill

14   White's door at 6:30 in the morning.  At the exact same time,

15   a couple miles away, they knock on Senator Currie's door.

16   And they enter and start asking specific questions regarding

17   a relationship with Senator Currie, a relationship with

18   Shoppers, and a relationship that Mr. White had with Currie

19   and Shoppers.  These all interrelate.  These conversations

20   last for about three hours for each one, and they are the

21   result of about a two year investigation at that point.

22             When Mr. Small was -- I'm sorry.  When Mr. White

23   was being interviewed, the agents had a single-spaced list of

24   questions that they wanted to ask him regarding what Mr.

25   Currie did for Shoppers, what Mr. White knew about what Mr.

1      Currie had done for Shoppers, and what others might have

2      known about that.  And all told, there's about 60 questions

3      that relate to what Currie did, what Shoppers knew, what

4      White knew, what Small knew, and what others knew.

5                And so you cannot, as a, just as a matter of

6      practice, limit these statements to just a false statement

7      that comes in the context of a three hour interview that is

8      interrelated with 60 questions on 60 different topics.

9                THE COURT:  Aren't you free to cross examine and

10     raise any other answers that you want, Mr. Vitek?

11               MR. VITEK:  Well, that raises another problem.  I

12     just --

13               THE COURT:  Because the government is contending

14     that they're not being offered for the truth of the matter

15     asserted therein, so aren't you able to cross examine with

16     respect to the context of any statements made by Mr. White,

17     your client, or by Senator Currie?

18               MR. VITEK:  There's two problems with that.

19     First, these are hearsay statements.  The fact that the

20     government alleges that these are false doesn't get this out

21     of a hearsay problem.  What these statements are go to the

22     core of this case.  They are exactly what this case is about.

23     And you know that for two reasons:  One, the government

24     states in its original reply to our papers that these are

25     factual assertions about what Mr. Currie did, what Mr. White

1    did, what Mr. White knew, what Mr. Currie knew, what Mr.

2    Small did, and what Mr. Small knew.  Those are factual

3    assertions that are the core of this case.

4            What they're saying essentially is that what

5    these false statements go to are exactly what is at dispute

6    in this case.  What did Currie do and what did Mr. Small do?

7    What did Mr. White do?  What did Mr. Small know about?  What

8    did Mr. White know about?  And for Mr. Currie and for Mr.

9    Small they're saying that there's certain statements within

10   that three hour interview that they claim are false.

11           By merely claiming that they're false though does

12   not get that out of the issue that this is in dispute.  The

13   factual assertions that were made on May 29 are in dispute.

14   The government alleges them to be false.  The defense says

15   that they are true.  And that is really what is at issue

16   here.

17           In fact, if you look at the notes in the rules

18   committee under 801, and when it talks about the definition

19   of what hearsay is, and you look at the definition under

20   subsection C which is really what the issue here is, whether

21   or not it's being offered for the truth, you know, A defines

22   what a statement is and C talks about whether or not it's

23   offered for the truth.

24           What the rules committee cites to is a Seventh

25   Circuit case and says that in the situation where it would

1      not be hearsay are situations such as, and I'll just quote

2      from this, that the significance of an offered statement lies

3      solely in the fact that it was made and no issue is raised as

4      to the truth of anything asserted, the statement is not

5      hearsay.  Well, that's clearly not this case here.  These

6      statements are going directly to what is at issue in this

7      case.

8              And so the second reason that you know that

9      that's true is that you can actually look at counts 17 and 18

10     which are the false statement counts.  They reallege one

11     through six, and eight through 66 in the indictment, the

12     factual allegations that are in the indictment.  And so this

13     is really a factual dispute which the government says is that

14     because our theory of what happened here is true, they must

15     have been lying.  And so this is not a situation where the

16     false statements are offered solely that they're false.  And

17     there are lots of times where that is the case.

18             One of the cases that is cited by the government

19     is a person who gets pulled over and they ask for that

20     person's name and the name that the person gives is some

21     clearly false name.  My name is Minnie Mouse, right?  No one

22     in that case is asserting that that person actually was

23     Minnie Mouse.  The only relevance for that statement is that

24     it was uttered and it was clearly uttered to be false.

25             That's not what's going on here.  What's going on

1    here is that they interview Mr. Currie and Mr. White for

2    three hours on a wide-ranging topic of events, some of them

3    relating back five years into the past about what is a core

4    issue in this case, about what happened, what did people

5    know, what did people do.  And out of that they're saying,

6    for Mr. White, two or three statements are false, and out of

7    Mr. Currie, three or four of them are false.  But you

8    cannot -- I haven't found any case that says you can't except

9    for a written confession edit those oral confessions, those

10   oral statements made to FBI agents to just those things.

11   Because the reality is you cannot question someone about

12   those statements without getting into what the other things

13   were about that will directly implicate the co-defendants.

14           So, for example, Mr. Currie's lawyer is going to

15   ask the FBI agents about questions that were made on that

16   day, and to defend that charge he has to ask them, okay,

17   well, when he said that he told Mr. White X, that was true,

18   wasn't it?  When he met with so and so, that's true, isn't

19   it?  When Mr. Small said, asked you to do X, Y and Z, that

20   was true, right?  Those are all statements that Mr. Currie's

21   lawyers are going to offer into evidence to show that Mr.

22   Currie was not lying or misleading investigators at that

23   point.  That's going to be offered against Mr. White that we

24   don't have any right to cross examine him by.  And the

25   opposite is true there.  Same thing would happen with Mr. --

1    with regard to the statements of Mr. White to Senator Currie

2    and to Mr. Small.

3              And so I think the real issue here is that these

4    are statements that are so intertwined about the facts at

5    issue in this case, these are not *I was in New York* or some

6    other thing that is ancillary to the facts of this case.

7              If Mr. White had been stopped or when he was

8    interviewed by the agents and had simply said, one, I'm not

9    Mr. White, you know, you got the wrong guy, that could come

10   in because that is clearly false and it's not at issue.  The

11   only sole importance of that statement is that he intended to

12   lie.  Or if he had said that I had retired in 2002, way

13   before Mr. Currie had been hired by Shoppers Food Warehouse,

14   that, again, follows the same sort of logic.  But what is at

15   issue here with these false statements go directly to the

16   issue of the case here.

17             And, again, as the rules committee said in

18   describing 801(c) and what was the foundation for that rule,

19   it is for when statements are offered solely for the fact

20   that they are made, and there's no issue as to the truth of

21   those statements, then they're not hearsay.  But that's not

22   what's at issue here.

23             THE COURT:  The government has cited, obviously,

24   the government has cited cases that are post-Crawford and

25   post-Davis that reject your position, Mr. Vitek, and I really

1     haven't noted any cases that you've argued that support it.

2          MR. VITEK:  Well, the cases that they cite

3     actually are not similar to the facts in this case.

4          THE COURT:  I'm asking you that I haven't noted

5     any cases that would support your position.  I understand the

6     ingenuity of your argument, but I'm asking for cases that

7     support your position.  Because the cases are legion that

8     talk about these kinds of statements that are not being

9     offered for the truth of the matter asserted therein.  And

10    case after case have said they're not hearsay and they

11    rejected your argument.  I'm asking you to cite a case that

12    supports your argument.

13         I understand your argument.  What cases do you

14    have that support it?

15         MR. VITEK:  I don't have a case for you today.

16         THE COURT:  That's exactly right.  You don't have

17    any case law to support your argument.

18         MR. VITEK:  But there's a reason for that and I'd

19    just like to sort of point out what happened here.  We raise

20    an issue about the false statements.  The government

21    responded and said that these are not -- that these can come

22    in because they are factual assertions, not admissions.  I

23    didn't understand what that meant, and so we responded by

24    providing additional cases relating to that issue which is

25    about whether or not it's inculpatory which really isn't the

```
 1    issue, it's whether it implicates a co-defendant, which these

 2    statements clearly do --

 3                THE COURT:  I understand your argument.  I'll

 4    hear from the government in a minute.  I think it's a very,

 5    very good intellectual argument, Mr. Vitek, and I commend you

 6    for your ingenuity.  The simple fact is you don't have one

 7    case to support it.  You've essentially taken the Bruton case

 8    and seek to expand it very broadly.  And you don't have any

 9    case law to support it.  If you have a case, tell me; but if

10    you don't, you don't have a Fourth Circuit case or any case

11    that supports your argument, isn't that correct?

12                MR. VITEK:  As I sit here today I don't have a

13    case.

14                THE COURT:  Thank you very much.  I'll be glad to

15    hear from the government, Ms. Gavin or Mr. Wise.

16                MS. GAVIN:  Your Honor, I think we agree with the

17    court.

18                THE COURT:  I'm not trying to rule too quickly.

19    We have got a lot of issues to deal with here and we're not

20    trying to write law review articles.  It's a very good

21    argument and not one case has ever supported it.  I've tried

22    to find some.  There aren't any that support Mr. Vitek's

23    argument.

24                MS. GAVIN:  There are actually a lot of cases on

25    point.
```

1                    THE COURT:  Thank you for that.  Thank you very

2      much, Miss Gavin.  There is just simply no basis for

3      severance of these defendants.  I commend Mr. Vitek for his

4      intellectual ability, but there's actually not one case that

5      has taken Bruton versus United States to the extent that

6      you've argued, Mr. Vitek.  Just like I didn't mean to be too

7      quick with Mr. Outlaw, we have got a lot of work to do here.

8      We're not trying to impress anybody with how bright we are.

9                    MR. VITEK:  There is one point that I'd like to

10     make with regards to Mr. Small.

11                    In our papers we raise the fact that there are

12     statements from Mr. White, from Mr. Currie, from Mr. Small.

13     They only responded with respect to Mr. Currie and Mr. White.

14     I just want to put on the record that it's our position that

15     they're not introducing any statements that Mr. Small had

16     made to the government agents because they never raised that

17     issue.

18                    THE COURT:  Well, I gather that they're not.  Mr.

19     Small is not charged with a false statement count, correct?

20                    MS. GAVIN:  Correct, Your Honor.

21                    THE COURT:  Mr. White is charged in count 17 and

22     Senator Currie is charged in count 18 with respect to false

23     statements.

24                    MR. ZUCKER:  Just for clarification, and I

25     appreciate Mr. Vitek bringing that up.

1          THE COURT:  Go ahead, Mr. Zucker.

2          I notice you guys all let the younger lawyer

3    charge off on a case that doesn't have any support.  The

4    older lawyers always take the more intellectual cases with

5    the cases they can cite.  Mr. Vitek, they set you up there,

6    but that's okay, that comes with your young age.  Thank you

7    very much.

8          Go ahead, Mr. Zucker.

9          MR. ZUCKER:  I really just wanted to alert the

10   court and make sure that we're not going to sandbag the court

11   by complicating this at the trial.  In footnote two of the

12   reply it's put in there that they are not, that the

13   government has not offered any redacted statements nor any

14   statements at all that they intend to introduce of Mr. Small.

15   Not just in the context of false things, any statements at

16   all.  I just wanted to make sure that's correct.

17         THE COURT:  I understand that to be the case.  Is

18   that correct, Miss Gavin?

19         MS. GAVIN:  We're not aware of any written or

20   recorded statements of Mr. Small.

21         THE COURT:  So you've made your record on that,

22   Mr. Zucker.

23         MS. GAVIN:  I mean he gave interviews.

24         MR. ZUCKER:  But they're not seeking to introduce

25   those.

1          MS. GAVIN:  We couldn't.  They're 302s.

2          THE COURT:  You can certainly charge up here with

3   a flag during the trial and that's protected on the record,

4   Mr. Zucker.

5          MR. ZUCKER:  Thank you.

6          THE COURT:  As to this, there is just simply no

7   basis for there to be a severance of the defendants under the

8   theory of Bruton versus the United States.  Essentially Rule

9   14 of the Federal Rules of Criminal Procedure clearly

10  provides that if the joinder of offenses or the defendants in

11  an indictment or information appears to prejudice a defendant

12  or the government, the court may order separate trials of

13  counts or sever the defendant's trials or provide other

14  relief.  And as is well established, there is a preference in

15  the federal system for joint trials on these issues if it

16  arises.

17          First of all, there's just no need to sever the

18  defendants.  There's simply no Bruton problem because none of

19  these statements are being introduced for the truth of the

20  matter asserted therein.

21          And with respect to the matter of trying to

22  separate these charges out, they're part and parcel of the

23  nature of the charges here.  There's simply no basis under

24  Bruton versus the United States to in any way sever.  So I'm

25  going to hold obviously and take sub curia the motion to

1    dismiss the indictment as to counts one through eight, and

2    with respect to counts 17 and 18 the motion for severance is

3    denied.

4              Incidentally, just so we clarify this, is the

5    motion to -- the motion to dismiss essentially that should be

6    deemed to also apply to counts 17 and 18, is that correct,

7    Mr. Evans, on constitutional vagueness grounds in terms of

8    alleged false statements by Mr. White and Senator Currie?

9              I don't know that there's actually a motion to

10   dismiss counts 17 and 18.  Counts 17 and 18 are false

11   statement charges and I don't think that there's any ground

12   to --

13             MR. EVANS:  I don't think we --

14             THE COURT:  I'm just verifying it, that's all.

15   You have not moved to dismiss counts 17 and 18.

16             MR. EVANS:  On vagueness ground.

17             THE COURT:  On any grounds.

18             MR. EVANS:  That's correct.  We moved to sever

19   the two counts.  And really the severance was not so much

20   defendants, it was counts.

21             THE COURT:  I understand.  I'm denying the motion

22   to sever counts for reasons indicated on the record, and I'm

23   just making sure you're not going to make Mr. Vitek get up

24   here and make another tough argument.  I'm just teasing you.

25             I'm just verifying.  My notes don't reflect that

1    there's any motion to dismiss counts 17 and 18, on the motion

2    to sever counts 17 and 18.

3              MR. EVANS:  Correct.

4              THE COURT:  All right.  Thank you very much.

5              The next part of the motion here I think is still

6    pending is the motion to strike with respect to the

7    allegation as to Senator Currie's vote on certain

8    legislation, and I --

9              MR. EVANS:  I think that was the speech and

10   debate issue, Your Honor.

11             THE COURT:  I think that was the speech and

12   debate clause issue, I'm just verifying I've addressed that.

13   And it certainly seems that's precluded by Gillock, so that

14   motion to strike with respect to the allegation as to Senator

15   Currie's vote on certain legislation will be denied.

16             And my law clerk will prepare a separate letter

17   order on the matter of the severance and the motion to strike

18   the allegation as to certain legislation while I take sub

19   curia the motion to dismiss the indictment.

20             And then I think the last thing I have on my

21   list, and if I've missed something, please let me know, we

22   have the defendant's request for an in camera review of grand

23   jury instructions, which I've not directly ruled on yet, and

24   I know you alluded to it earlier, Mr. Evans.  I'll be glad to

25   hear from you or Mr. Outlaw on that further.

1        MR. EVANS:  Your Honor, we think it's part and

2    parcel of the vagueness question.  We just wonder, you know,

3    what legal instructions were given to the grand jury and

4    under these circumstances where the indictment is so infused

5    with Skilling issues, we're concerned that the grand jury

6    was, frankly, misadvised.

7        THE COURT:  What is the standard on this that

8    would require my review?

9        MR. EVANS:  Particularized need, I guess.

10        THE COURT:  I mean there's a standard that the

11    defendant has to meet in these kinds of cases, whatever kind

12    of case, in order for a defendant to ask that the trial judge

13    actually review the grand jury indictment, and I'm just

14    wondering essentially, you know, the cases have noted that

15    there's some, there's some basis, there's factually based

16    grounds of some sort, some allegation of impropriety or

17    correct summary or something that would trigger the court's

18    inquiry.  What is it that you think would trigger my inquiry?

19        I mean what you continue to refer to as the

20    Skilling charges, the mail fraud and wire fraud charges,

21    counts 9 through 16, in fact now have been dismissed by the

22    government.  I entered an order on May 11.  So if there was

23    some question about how the mail fraud or wire fraud charges

24    were summarized for the grand jury, that might pique the

25    court's interest in light of the Skilling case, but they're

1      no longer in the case.

2                 MR. EVANS:  Well, but of course they were in the

3      case at the time the grand jury was instructed.  And what we

4      have tried to suggest to the court is that, for example, in

5      paragraphs 6A, C, D and E, those are conflict of interest

6      allegations apropos of Skilling, and those are, appear to be

7      central allegations in this matter.

8                 THE COURT:  And those allegations you think are

9      totally precluded by Skilling?

10                MR. EVANS:  I think that proof of those matters

11     is not.  I think, again, elevating those matters to where

12     they are the, where they constitute the definition of

13     official duties, I think that is precluded by Skilling, yes.

14                THE COURT:  What would be the language in

15     Skilling as to that?  You obviously have great familiarity

16     with that case and I've looked at the case.  It had to do

17     with a private individual.  The Enron case, correct?  And it

18     had to do with the honest services clause as to a private

19     individual, and essentially the Supreme Court limited the

20     applicability to bribery of a public official and they roped

21     in essentially the honest services clause will be known as

22     the McNally amendment essentially in terms of how broadly

23     they're interpreted.  But I don't understand where the

24     argument -- I mean I understand your issue as to

25     constitutional vagueness and the issue of conflict of

1    interest, etcetera, but I'm not really sure how that is

2    precluded by the Skilling case.

3           MR. EVANS:  Well, I mean Skilling, I mean there's

4    the holding of Skilling which is honest and fair services is

5    limited to mean certain very, very discrete matters.

6           THE COURT:  And did not apply to Mr. Skilling, a

7    private individual who was alleged to have engaged in fraud

8    as to shareholders and investors in a company, correct?

9           MR. EVANS:  By its facts, yes.  But there is no

10   doubt, when one reads Skilling, that it is intended to apply

11   to public officials as well.  I mean I understand the facts

12   are a private party, but it is about as definitive as it

13   could be with regard to the sweep of honest and fair services

14   with regard to public officials.  It dispenses with the

15   distinction between private parties and public officials.

16          The process of getting from the beginning, the

17   court -- the process that the court goes through from the

18   beginning to the end when it announces its holding is what is

19   so ultimately interesting with regard to Skilling, and I'm

20   honestly, you know, without having it in front of me and

21   starting to parse through the words, it's a little hard to

22   sort of recite all of that.

23          THE COURT:  I guess I'm trying to stay focused on

24   this, I think this might be the last issue of the day, your

25   request that I conduct an in camera review of the legal

1    instructions given to the grand jury before return of the

2    indictment.  As I say, I can understand that there may or may

3    not be some basis for that in terms of particularized need in

4    light of a Supreme Court opinion as it relates to certain

5    counts of the indictment.  But those counts of the indictment

6    are no longer in the case.  So then the only basis would be

7    your view that these duties that are alleged in paragraph

8    six, paragraphs A through E, are within the ambit of Skilling

9    so that I should review the instructions having to do with

10   the conspiracy and the Travel Act and the Hobbs Act.  And I'm

11   just wondering there.

12              I notice you're reading your Kindle now, Mr.

13   Evans?

14              MR. EVANS:  I'm too old for this.  Frankly I

15   can't do this.

16              THE COURT:  Well, Mr. Outlaw has the case there

17   on his Kindle.

18              MR. EVANS:  He's got Skilling and it says --

19              THE COURT:  I want the record to be stricken.

20   Mr. Evans is not too old to read a Kindle and I think the

21   record should reflect that.

22              MR. EVANS:  It's technology.  But, Your Honor,

23   I'm willing to submit on the question.

24              THE COURT:  Okay.  I just think essentially there

25   is no basis for me, there's no allegation of any impropriety

1    on the part of the government and the defendant has not made

2    any.  There are issues that result from a Supreme Court

3    opinion that certainly affected the crimes of mail fraud and

4    wire fraud under 18 United States Code Section 1341 and 1343,

5    but the government filed a motion with no objection by the

6    defense and I signed an order on May 11 striking and

7    dismissing counts 9 through 15 of the indictment.

8              And grand jury minutes, in terms of a court

9    reviewing that kind of information and challenges going to

10   instructions given to the grand jury are not grounds for

11   dismissal of an indictment on the face of an indictment, and

12   there has to be some particularized or factually based

13   grounds for the judge to undertake to review grand jury

14   instructions.  I mean this is a request that can be made by

15   many defendants in cases and it's not routinely done, and

16   there's been no basis to show it should be done here.  So for

17   the reasons indicated on the record, the defendant's request

18   for an in camera review of grand jury instructions will be

19   denied.

20             I think where that leaves us is is that we have

21   counts one, conspiracy charging both the Travel Act and a

22   Hobbs Act conspiracy; we have counts two, four, five, six,

23   and seven charging a Travel Act violation, they are based

24   upon the Maryland bribery statute; we have count eight, the

25   Hobbs Act charge, which is not based upon the Maryland state

1    bribery statute but alleges taking the property under color

2    of official right; and then we have what had been numbered

3    counts 17 and 18 which are the false statement counts.

4              There is a pending motion to dismiss counts one

5    through eight.  There is no pending motion to dismiss the

6    false statement counts against Mr. White in count 17 and

7    Senator Currie in count 18.  And what remains pending is my

8    opinion that will be forthcoming within the next week and a

9    half with respect to the motion to dismiss counts one through

10   eight.

11             I would think that we probably, for purposes of

12   at least right now we can wait on this, but obviously the

13   counts of the indictment will need to be renumbered I think

14   in light of the reality of going to trial in this case, and

15   I've issued an order already based upon the rulings today

16   that I think you would have got a copy of or you'll get a

17   copy of in terms of the rulings I've made on the other

18   pending motions.

19             And is there anything further from the point of

20   view of the government at the present time?

21             MS. GAVIN:  No, Your Honor.

22             THE COURT:  Anything further from the point of

23   view of the defendants?

24             MR. ZUCKER:  One small housekeeping matter,

25   Judge.  The court allowed Mr. Small to get his passport to

1    take vacation, I think wanted it returned back to pretrial

2    services.  He took it back to pretrial services and they

3    won't accept it.  He's got it here today.

4            THE COURT:  Why don't you surrender it right here

5    to the clerk of the court?  Thank you very much.

6            MR. ZUCKER:  Yes, sir.

7            THE COURT:  All right.  Thank you very much, Mr.

8    Zucker.

9            Is there anything further, Mr. Evans or Mr.

10    Outlaw, from the point of view of the defense?

11            MR. EVANS:  I don't think so.

12            THE COURT:  All right.  And I have moved to

13    strike your reference about not reading the Kindle and I

14    don't want that to be held against you, so I'm sure you do

15    read a Kindle.  You're technologically up to date, I'm

16    confident.

17            Is there anything further, Mr. Treem or Mr.

18    Vitek, on behalf of Mr. White?

19            MR. TREEM:  No, Your Honor.

20            THE COURT:  And again, Mr. Vitek, I know they

21    saved one of the toughest arguments for you and you didn't

22    have any cases to support you, but I appreciate your argument

23    and thank you very much.

24            And, Mr. Zucker, anything further on behalf of

25    Mr. Small?

1          MR. ZUCKER:  Nothing further, Your Honor.

2          THE COURT:  So we will continue to proceed on.

3   If there are any other issues, you all should certainly let

4   me know.

5          I think the first thing we need to do as quickly

6   as possible, Mr. Outlaw, if you will redraft that, I've

7   essentially granted in part and denied in part the Shoppers

8   Warehouse motion to quash and the order that I signed this

9   morning at the conclusion of this morning's hearing noted

10  that you can prepare it once again and submit it to Mr.

11  Brennan.  And Mr. Brennan, you will let me know some cost

12  estimates as quickly as possible.

13         MR. BRENNAN:  Yes, Your Honor.  I'll just say the

14  narrower in scope, the less cost it will be.

15         THE COURT:  I understand.  And I think Mr.

16  Zucker, Mr. Treem and Mr. Vitek understand that on behalf of

17  their clients.  And I'll schedule another conference call on

18  this matter sometimes in the next few weeks and we'll go into

19  some cost allocation on it in terms of how difficult a

20  process it is and what the costs will be.

21         So with that I want to thank everyone for their

22  thorough preparation of the issues here before me and all

23  these issues have been very thoroughly briefed and there are

24  many very important issues that I need to address.  So with

25  that this court stands adjourned.

1                Thank you very much.

2                (HEARING CONCLUDED.)

3

4                I certify that the foregoing is a correct

5       transcript from the record of proceedings in the

6       above-entitled matter.

7

8                                *s/ Anthony Rolland*

9                                ANTHONY ROLLAND

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25